## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

UNITEDHEALTH GROUP
INCORPORATED,

Court File No. _O9-2l0 gme/srn_

   Plaintiff,

**COMPLAINT**

  v.

**Jury Trial Demanded**

COLUMBIA CASUALTY COMPANY,
FIREMAN'S FUND INSURANCE
COMPANY, AMERICAN ALTERNATIVE
INSURANCE CORPORATION,
EXECUTIVE RISK SPECIALTY
INSURANCE COMPANY, FIRST
SPECIALTY INSURANCE
CORPORATION, STARR EXCESS
LIABILITY INSURANCE
INTERNATIONAL LIMITED, LIBERTY
MUTUAL INSURANCE COMPANY,
STEADFAST INSURANCE COMPANY,
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,
CERTAIN UNDERWRITERS AT
LLOYD'S, DARWIN NATIONAL
ASSURANCE COMPANY, HOMELAND
INSURANCE COMPANY OF NEW
YORK, and ACE AMERICAN
INSURANCE COMPANY,

   Defendants.

Plaintiff, for its Complaint against the above-named Defendants states and alleges

as follows:



## INTRODUCTION

1.      This action arises out of an insurance coverage dispute between UnitedHealth Group Incorporated ("UHG") and its managed care liability insurers that issued policies for the policy periods December 1, 1998, through December 1, 2000, (the "1998-2000 Program") and May 1, 2007, through May 1, 2008, (the "2007-2008 Program") regarding the following underlying claims:

(a)      Two lawsuits captioned (1) *The American Medical Ass'n, The Medical Society of the State of New York, The Missouri State Medical Ass'n, John Marcum, MD, Michael J. Attkiss, MD, Sandra Taylor, Edward F. Mitchell, Jr. and Clifford E. and Michelle S. Wilson v. United Healthcare Corporation, et al.,* ("AMA") which was filed on March 15, 2000, in the Supreme Court of New York County, New York, and subsequently removed to the United States District Court for the Southern District of New York, Master File No. 00-2800; and (2) *Oborski, et al. v. United Healthcare Corporation, et al.,* Master File No. 00-7246 (S.D.N.Y.), that was filed on or about September 25, 2000, and which was consolidated with AMA on July 31, 2001, (collectively, the "AMA Claim");

(b)      A lawsuit captioned *Rodney Malchow, et al. v. Oxford Health Plans, Inc., et al.,* Civ. No. 08-935(FSH), which was filed on February 19, 2008, in the United States District Court for the District of New Jersey (the "Malchow Claim"); and

(c)      A "Notice of Proposed Litigation Pursuant to Section 63(12) of the Executive Law, Sections 349 and 350 of Article 22-A of the the [sic] General

Business Law, and Section 2601(a) of the Insurance Law" ("Notice Letter"), dated February 13, 2008 and served on UHG and certain of its subsidiaries (the "NYAG Claim").

2.     On January 13, 2009, UHG and the Office of the New York Attorney General ("NYAG") entered into an Assurance of Discontinuance (the "AOD") under which UHG is legally obligated to pay $50 million to a third party.

3.     On January 14, 2009, UHG executed a global settlement agreement with the plaintiffs in the AMA Claim and the Malchow Claim pursuant to which, if finally approved by the court and the other preconditions to completion of the settlement are satisfied, UHG will become legally obligated to pay third persons $350 million (the "AMA/Malchow Settlement").

4.     Prior to the execution of the AOD and AMA/Malchow Settlement, UHG fully cooperated with the Defendants, regularly informed all of the Defendants of the status of the settlement negotiations, and responded to the Defendants' reasonable requests for information and documents regarding the AMA Claim, the Malchow Claim, and the NYAG Claim.

5.     Despite repeated written requests by UHG, Defendants have wrongfully refused to consent to the AOD and AMA/Malchow Settlement, in breach of their obligations under their respective insurance policies and applicable law.

6.     Defendants have not acknowledged coverage for the payments UHG is (or will become) legally required to make pursuant to the AOD and the AMA/Malchow Settlement, and several of the Defendants have affirmatively taken the position that they

3

will not provide coverage for such payments in breach of their obligations under their respective insurance policies and applicable law.

7.      As a consequence of Defendants' failure to abide by the terms of their respective insurance policies issued to UHG, UHG has been forced to commence this action to obtain the benefits due under such policies, which benefits include both claims expenses (e.g., the costs to defend the suits) and damages and other expenses (e.g., the amounts to be paid under the AOD and the AMA/Malchow Settlements), as defined by the insurance policies.

8.      Because the AMA Claim, the Malchow Claim, and the NYAG Claim (collectively, the "Underlying Actions") have been resolved (in some cases, subject to court approval), and UHG has now made a demand for coverage, issues regarding the determination of insurance coverage for both defense and settlement of the Underlying Actions are ripe for judicial consideration.

## PARTIES

9.      UHG is a corporation organized and existing under the laws of the state of Minnesota with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota. UHG is a diversified health and well-being company. UHG is pursuing this action for coverage on its behalf as the "Named Insured" under the insurance policies and on behalf of all of its applicable subsidiaries.

10.     Upon information and belief, Columbia Casualty Company ("Columbia") is a corporation organized and existing under the laws of the state of Illinois with its principal place of business in Chicago, Illinois. Columbia is an insurer in the business of

providing managed care liability insurance to, *inter alia*, companies in the health care industry.

11.    Upon information and belief, Fireman's Fund Insurance Company ("Fireman's Fund") is a corporation organized and existing under the laws of the state of California with its principal place of business in California. Fireman's Fund is an insurer in the business of providing managed care liability insurance to, *inter alia*, companies in the health care industry.

12.    Upon information and belief, American Alternative Insurance Corporation ("AAIC") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business located in New Jersey. AAIC is an insurer in the business of providing managed care liability insurance to, *inter alia*, companies in the health care industry.

13.    Upon information and belief, Executive Risk Specialty Insurance Company ("ERSIC") is a corporation organized and existing under the laws of the state of Connecticut with its principal place of business in New Jersey. ERSIC is an insurer in the business of providing managed care liability insurance to, *inter alia*, companies in the health care industry.

14.    Upon information and belief, First Specialty Insurance Corporation ("First Specialty") is a corporation organized and existing under the laws of the state of Missouri with its principal place of business in Kansas. First Specialty is an insurer in the business of providing managed care liability insurance to, *inter alia*, companies in the health care industry.

15. Upon information and belief, Starr Excess Liability Insurance International Limited ("Starr Excess") is a corporation organized and existing under the laws of Ireland with its principal place of business in Bermuda. Starr Excess is an insurer in the business of providing managed care liability insurance to, *inter alia*, companies in the health care industry.

16. Upon information and belief, Liberty Mutual Insurance Company ("Liberty Mutual") is a corporation organized and existing under the laws of the state of Massachusetts with its principal place of business in Massachusetts. Liberty Mutual is an insurer in the business of providing managed care liability insurance to, *inter alia*, companies in the health care industry.

17. Upon information and belief, Steadfast Insurance Company ("Steadfast") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Illinois. Steadfast is an insurer in the business of providing managed care liability insurance to, *inter alia*, companies in the health care industry.

18. Upon information and belief, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") is a corporation organized and existing under the laws of the state of Pennsylvania with its principal place of business in New York. National Union is an insurer in the business of providing managed care liability insurance to, *inter alia*, companies in the health care industry.

19. Upon information and belief, Certain Underwriters of Lloyd's ("Lloyd's") is a legal association or other entity, comprised of the following syndicates that subscribed to Policy No. 509/QG007207: (a) Syndicate 33 with underwriter's reference

6

number 68058G1AA0YA; (b) Syndicate 2488 with underwriter's reference number AEEQ67YD5049; and (c) Syndicate 4472 with underwriter's reference number 1121070107FM. Lloyd's is headquartered in London, England, and is commonly known as either Certain Underwriters at Lloyd's or Lloyd's of London. Upon information and belief, none of the subscribing Syndicates is a citizen of or has its principal place of business in the State of Minnesota. Lloyd's is in the business of providing managed care liability insurance to, *inter alia*, companies in the health care industry.

20. Upon information and belief, Darwin National Assurance Company ("Darwin") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Connecticut. Darwin is an insurer in the business of providing managed care liability insurance to, *inter alia*, companies in the health care industry.

21. Upon information and belief, Homeland Insurance Company of New York ("One Beacon") is a corporation organized and existing under the laws of the state of Massachusetts with its principal place of business in Massachusetts. One Beacon is an insurer in the business of providing managed care liability insurance to, *inter alia*, companies in the health care industry.

22. Upon information and belief, ACE American Insurance Company ("ACE") is a corporation organized and existing under the laws of the state of Pennsylvania with its principal place of business in Pennsylvania. ACE is an insurer in the business of providing managed care liability insurance to, *inter alia*, companies in the health care industry.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. § 1332(a)(2), in that the action is between a citizen of Minnesota and citizens

of foreign states, and the amount in controversy exceeds the sum of $75,000, exclusive of

interest and costs.

24.     Upon information and belief, this Court has jurisdiction over the person of

Defendants, in that at all times relevant, Defendants were licensed to do business in

and/or engaging in business activities within the State of Minnesota, and have otherwise

purposefully availed themselves of this jurisdiction.

25.     Venue is proper in the United States District Court for the District of

Minnesota pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the

Defendants' transactions, acts, or omissions giving rise to the causes of action asserted

herein occurred within the state of Minnesota.  The insurance policies at issue here were

sold and issued to a Minnesota resident.  The insurance policies were delivered to UHG

in Minnesota, and premiums were paid by UHG from Minnesota.

## UHG 1998-2000 MANAGED CARE LIABILITY INSURANCE PROGRAM

26.     The primary managed care liability policy in the 1998-2000 Program was

issued to UHG by Lexington Insurance Company ("Lexington") under Policy No. 563-

3385 (the "Lexington Policy").  A true and correct copy of the Lexington Policy is

attached as Exhibit A.  The Lexington Policy has a $30 million per-claim limit of liability

that is subject to a $3 million per-claim self-insured retention, and a $60 million

aggregate limit of liability that in turn is subject to a $30 million aggregate self-insured

retention. Lexington has fully paid and exhausted its applicable per claim and aggregate limits of liability under the Lexington Policy; therefore, Lexington has not been made a party to this lawsuit. With respect to the managed care liability coverage provided by each of the insurance policies in the 1998-2000 Program, such coverage was generally intended to follow form to the terms and conditions of the Lexington Policy.

27. Reliance Insurance Company of Illinois ("Reliance") issued an excess managed care liability policy bearing policy number NPD 0132342 to UHG for the policy period December 1, 1998, to December 1, 2000 ("Reliance Policy"). The Reliance Policy has a $25 million per claim limit of liability and a $50 million aggregate limit of liability, both of which provide coverage above the respective limits of liability provided by the Lexington Policy.

28. Reliance was placed into liquidation in October 2001 by Order of the Commonwealth Court of Pennsylvania, and, by statute, cannot be joined as defendant in this lawsuit. On September 12, 2003, UHG submitted an Aggregate Proof of Claim in the Reliance liquidation proceedings. The Reliance Liquidator has not issued a Notice of Determination with respect to UHG's Aggregate Proof of Claim. A Notice of Determination is the first of several steps that must be completed when processing a Proof of Claim in the Reliance liquidation.

29. Columbia issued an excess managed care liability policy bearing policy number EMC 1040038924-0 to UHG for the policy period December 1, 1998, through December 1, 2000 ("Columbia Policy"). The Columbia Policy has a $30 million per claim limit of liability and a $60 million aggregate limit of liability, both of which attach

9

above the respective Reliance Policy limits of liability.  The underlying insurance or UHG has paid all sums required for the Columbia Policy's coverage to attach.

30.    Fireman's Fund issued an excess managed care liability policy bearing policy number HXC02935867 to UHG for the policy period December 1, 1998, through December 1, 2000 ("Fireman's Fund Policy").  The Fireman's Fund Policy has a $30 million per claim limit of liability and a $60 million aggregate limit of liability, both of which attach above the respective Columbia Policy limits of liability.

31.    AAIC issued an excess managed care liability policy bearing policy number 1A2F00000008 to UHG for the policy period December 1, 1998, through December 1, 2000 ("AAIC Policy").  The AAIC Policy has a $10 million per claim limit of liability and a $20 million aggregate limit of liability, both of which attach above the respective Fireman's Fund Policy limits of liability.

32.    ERSIC issued an excess managed care professional liability policy bearing policy number 962-148751-98 to UHG for the policy period December 1, 1998, through December 1, 2000 ("ERSIC Policy").  The ERSIC Policy has a $15 million per claim limit of liability and a $30 million aggregate limit of liability, both of which attach above the respective AAIC Policy limits of liability.

33.    FSIC issued an excess managed care liability policy bearing policy number MPL070228-0 to UHG for the policy period December 1, 1998, through December 1, 2000 ("FSIC Policy").  The FSIC Policy has a $20 million per claim limit of liability and a $40 million aggregate limit of liability, both of which attach above the respective ERSIC Policy limits of liability.

34.     Starr Excess issued a combined directors' and officers' and excess managed care liability policy bearing policy number 740006 to UHG for the policy period December 1, 1998, through December 1, 2000 ("Starr Excess Policy"). The Starr Excess Policy has a $50 million per claim limit of liability in excess of $160 million which attaches above the FSIC Policy limits of liability.

35.     Liberty Mutual issued a combined directors' and officers' and excess managed care liability policy bearing policy number 071470-018 to UHG for the policy period December 1, 1998, through December 1, 2000 ("Liberty Mutual Policy"). The Liberty Mutual Policy has a $10 million per claim limit in excess of $210 million which attaches above the Starr Excess Policy limits of liability.

36.     Steadfast issued a combined directors' and officers' and excess managed care liability policy bearing policy number IPR 2185672 00 to UHG for the policy period December 1, 1998, through December 1, 2000 ("Steadfast Policy"). The Steadfast Policy has a $20 million per claim limit of liability in excess of $220 million which attaches above the Liberty Mutual Policy limits of liability.

37.     National Union issued a combined directors' and officers' and excess managed care liability policy bearing policy number 857-99-51 to UHG for the policy period December 1, 1998, through December 1, 2000 ("National Union Policy"). The National Union Policy has a $20 million per claim limit of liability excess of $240 million which attaches above the Steadfast Policy limits of liability.

## THE 1998-2000 PROGRAM POLICY PROVISIONS

38.    As described above, the Lexington Policy is the lead policy in the 1998-2000 Program.  The Lexington Policy provides broad coverage for managed care liability claims brought against UHG relating to its operations.

39.    The Lexington Policy's insuring agreement states:

> We will pay amounts any **Protected Person** is required to pay as damages and claim expenses, including **Damages** assumed under contract and related claim expenses assumed under contract, for claims that directly or indirectly result from or are related to the **Operations**, including but not limited to any **Wrongful Act** committed or allegedly committed by you or another party for whom you are alleged to be liable, in rendering or failure to render **Services**.

40.    The Lexington Policy broadly defines **Operations, Services, Wrongful Acts** and **Damages** as follows:

> **Operations** includes all operations of any **Protected Person** formed, now existing, which may have existed or hereafter be constituted after the effective date of this policy.  Without in any way limiting the generality of the foregoing, **Operations** include, but are not limited to:
>
> -Health Care Related Services;
>
> -clinical trial administration and consulting services;
>
> -activities of employed lawyers within the scope of their duties;
>
> -the design, marketing and administration of benefit plans;
>
> -claim handling, reviewing and adjusting;
>
> -insurance consulting; insurance company of insurance operations;
>
> -sale and/or placement of products, including but not limited to insurance, managed care, annuities or mutual funds and publications;
>
> -computer services and products for others, including data processing systems analysis, Internet applications, programming and consulting, and

development and sale of computer programs including Internet applications;

-development, maintenance and credentialing of provider networks;

-design of financial incentive plans for health care providers;

-the review of health care services including; cost of health care; necessity of health care; peer review and quality of health care;

-consulting services, including actuarial, health care, education and wellness programs;

-management services you contractually agree to provide to others through management contracts;

-a process or plan to utilize health care resources which is formulated or implemented.

**Services** means services rendered by the **Insured** or by a person for whom the **Insured** is alleged to be legally liable, in connection with the **Operations.**

**Wrongful Acts** means any actual or alleged act, error or omission, including but not limited to:

-negligent acts;

-misstatements or misleading statements;

-breach of duty; or

-breach of privacy or confidentiality.

**Damages** mean compensation to others. **Damages** include compensatory, exemplary, enhanced, equitable and punitive damages, settlements, and **Claim Expenses** awarded against or agreed to as part of a covered **claim** settlement by a **Protected Person**. If you are legally required, by statute, regulation or contract, to pay a claimant's legal costs and any interest that applies to such costs, these costs will also be considered **Damages** . . . .

41.     The Lexington Policy also provides coverage for antitrust claims through

Endorsement No. 10.3, which provides:

### Endorsement # 10.3 Anti Trust

This endorsement issued on 12/01/98 12:01 am forms a part of policy #563-3385 issued to United HealthCare Corporation et al by Lexington Insurance Company.

In consideration of the premium charged and notwithstanding any other provisions of this policy, including any exclusionary provision, we will pay amounts any **Protected Person** is legally required to pay as **Damages** and **Claim Expenses** for claims that directly or indirectly result from or are related to, a **Wrongful Act** consisting in whole or in part of anti-trust, price fixing or restraint of trade activities occurring on or after the Retroactive Date stated in the Declaration and before the cancellation date or expiration date of this policy. **Damages** arising out of the same or inter related acts, errors or omissions shall be deemed to arise form the first such same or interrelated acts, errors or omissions.

42.     The Lexington Policy requires notification to the insurers as follows:

You agree to notify us as soon as practicable of all incidents, claims or suit in which any claim you reserve at or in excess of 50% of your Self-Insured Retention for that claim . . . .

43.     The Lexington Policy includes the following provisions regarding consent:

The Insured shall arrange for and assume the investigation, defense and settlement of each claim or suit provided that the Insured shall take no action or settlement which alone or together with Claim Expenses will exceed the Self-Insured Retention without consent of the Company, which consent will not be unreasonably withheld.

44.     The Lexington Policy obligates the insurer to advance defense costs as incurred:   "The Company shall advance defense costs as incurred, subject to the applicable Self-Insured Retention . . . ."

45.     UHG exhausted the $30 million aggregate Self-Insured Retention underlying the Lexington Policy through the payment of covered claim expenses and damages.

46.     As noted, the 1998-2000 Program primary insurer, Lexington, has exhausted its $60 million aggregate limit of liability through the payment of covered claim expenses and damages.

47.     As also noted, UHG itself has paid sufficient sums with respect to Claims that the 1998-2000 Program Policies cover to exhaust the applicable limit of liability of the Reliance Policy and to reach the attachment point of the Columbia Policy.

48.     UHG has incurred approximately $40 million in claim expenses in defending the AMA Claim, as of December 31, 2008.

## UHG'S 2007-2008 MANAGED CARE
## LIABILITY INSURANCE PROGRAM

49.     The primary policy in the 2007-2008 Program was issued to UHG by Certain Underwriters of Lloyd's under Policy No. 509/QG007207 (the "Lloyd's Policy"). A true and correct copy of the Lloyd's Policy is attached as Exhibit B.  The Lloyd's Policy has a $15 million per-claim and annual aggregate limit of liability that is subject to a $25 million per-claim self-insured retention for non-class action lawsuits and a $50 million per-claim self-insured retention for class action lawsuits.  With respect to the managed care liability coverage provided by each of the insurance policies in the 2007-2008 Program, such coverage was generally intended to follow form to the terms and conditions of the Lloyd's Policy.

50.     Darwin issued a first layer excess managed care liability policy bearing policy number 0303-0703 to UHG for the policy period May 1, 2007, through May 1,

15

2008 ("Darwin Policy"). The Darwin Policy has a $10 million per claim and aggregate limit of liability that attaches above the Lloyd's Policy limits of liability.

51.    National Union issued an excess managed care liability policy bearing policy number 741-70-54 to UHG for the policy period May 1, 2007, through May 1, 2008 ("National Union Policy II"). The National Union Policy II has a $15 million per claim and aggregate limit of liability which attaches above the Darwin Policy limits of liability. The National Union Policy II has a mandatory mediation provision. UHG agrees to comply with the mediation provision unless it is waived by National Union.

52.    One Beacon issued an excess managed care liability policy bearing policy number MCX-1615-07 to UHG for the policy period May 1, 2007, through May 1, 2008 ("One Beacon Policy"). The One Beacon Policy has a $10 million per claim and aggregate limit of liability which attaches above the National Union Policy II limits of liability.

53.    ACE American issued an excess managed care liability policy bearing policy number XFL G2181619A 001 to UHG for the policy period May 1, 2007, through May 1, 2008 ("ACE American Policy"). The ACE American Policy has a $10 million per claim limit of liability which attaches above the One Beacon Policy limits of liability.

54.    National Union issued an excess managed care liability policy bearing policy number 741-70-57 to UHG for the policy period May 1, 2007, through May 1, 2008 ("National Union Policy III"). The National Union Policy III has a $10 million per claim and aggregate limit of liability which attaches above the Ace American Policy limits of liability. The National Union Policy III has a mandatory mediation provision.

UHG agrees to comply with the mediation provision unless it is waived by National Union.

### THE 2007-2008 PROGRAM PRIMARY POLICY PROVISIONS

55.     As described above, the Lloyd's Policy is the lead policy in the 2007-2008 Program.  The Lloyd's Policy provides broad coverage for managed care liability claims brought against UHG relating to its operations.

56.     The Lloyd's Policy's insuring agreement states:

**3.1     Professional Liability**

> **Underwriters**, subject to their Limit of Liability, will indemnify amounts any **Insured** is legally obligated to pay as **Damages** or **Claim Expenses**, as a result of any **Claim** for a **Wrongful Act** that is first made against the **Insured** during the **Policy Period** and is reported to the **Underwriters** as soon as practicable, but in no event later than sixty (60) days after expiration of the **Policy Period**, provided such **Wrongful Act** is committed or allegedly committed by you or any other party for whom you are liable for in rendering or failure to render **Professional Services.**

57.     The Lloyd's Policy broadly defines **Damages, Professional Services** and **Wrongful Act** and as follows:

> **4.4     Damages** mean any monetary amount in excess of the applicable Retention and not exceeding **Underwriters'** Limit of Liability which an **Insured** is legally obligated to pay as a result of a **Claim.** **Damages** include compensatory, exemplary, statutorily mandated, and punitive damages; settlements; and **Claim Expenses** awarded against, or agreed to as part of a settlement.  Damages do not include fines, penalties, or taxes; amounts, benefits, or coverages owed to any enrollee, member, subscriber, or client under any contract, healthcare plan, insurance policy, or plan or program of self-insurance; amounts owed to any provider of **Medical Professional Services** under any contract; non-monetary relief or redress in any form, including without limitation the cost of complying with any

injunctive, declaratory, or administrative relief; and matters which are uninsurable under applicable law.

\* \* \* \*

**4.9**     **Professional Services** includes all operations of any **Protected Person** which are now existing, which may have existed or hereafter be constituted after the **Effective Date** of this **Policy**. **Professional Services** include:

\* \* \* \*

b.     the design, marketing and administration of benefit plans;

c.     claim handling, reviewing and adjusting;

\* \* \* \*

f.     computer services and products for others for a fee, including data processing systems analysis, Internet applications, programming and consulting, and development and sale of computer programs including Internet applications;

\* \* \* \*

i.     the review of health care services including; cost of health care; necessity of health care; peer review and quality of health care;

\* \* \* \*

**4.17**     **Wrongful Act** means any actual or alleged negligent act, error, omission, misstatement, breach of duty, breach of privacy or breach of confidentiality in the performing or failure to perform **Professional Services** or **Medical professional [sic] Services**, as applicable, by any **Insured** or any person for whom the **Insured** is legally responsible. All **Wrongful Acts** arising out of the same or related actual or alleged negligent act, error, omission, misstatement, breach of duty, breach of privacy or breach of confidentiality shall be deemed to be the same **Wrongful Act**.

58.     The Lloyd's Policy also provides coverage as set forth in Endorsement No.

10.2, which provides:

**Anti Trust**

In consideration of the premium charged and notwithstanding any other provisions of this Policy, including any exclusionary provision, we will pay amounts any **Protected Person** is legally required to pay as **Damages** and **Claim Expenses** for **Claims** that directly or indirectly result from or are related to, a **Wrongful Act** consisting or allegedly consisting in whole or in part of anti-trust, restraint of trade activities occurring on or after the Retroactive Date stated in Item 6 of the Declaration and before the cancellation date or Expiration Date of this Policy. **Damages** arising out of the same or inter related [sic] **Wrongful Acts** shall be deemed to arise from the first such same or interrelated acts **Wrongful Acts.**

59.     The Lloyd's Policy has the following provision regarding consent:

The Insured shall arrange for and assume the investigation, defense and settlement of each claim or suit provided that the Insured shall take no action or settlement which alone or together with Claim Expenses will exceed the Self-Insured Retention without consent of the Company, which consent will not be unreasonably withheld.

60.     The Lloyd's Policy obligates the 2007-2008 Defendant Insurers to pay defense costs and damages as follows: "We will have the duty to pay **Damages** and **Claims Expense** that result from any **Claims** for the amounts which are greater than a **Self-Insured Retention**."

61.     UHG will exhaust its $25 million Self-Insured Retention for non-class action claims through the payment of covered claim expenses and damages in connection with the NYAG Claim and the AOD.

62.     UHG will exhaust its $50 million Self-Insured Retention for class-action claims through the payment of covered claim expenses and damages in the defense and settlement of the Malchow Claim.

## THE UNDERLYING CLAIMS

**The AMA Claim.**

63.    A class action lawsuit entitled *The American Medical Ass'n, The Medical Society of the State of New York, The Missouri State Medical Ass'n, John Marcum, MD, Michael J. Attkiss, MD, Sandra Taylor, Edward F. Mitchell, Jr. and Clifford E. and Michelle S. Wilson v. United Healthcare Corporation, et al.*, was filed on March 15, 2000, in the Supreme Court of New York County, New York, and subsequently removed to the United States District Court for the Southern District of New York, Master File No. 00-2800 (the "AMA Complaint").

64.    The AMA plaintiffs generally alleged that UHG used "inappropriate data" to understate the "usual, customary and reasonable" ("UCR") charges for out-of-network medical treatment, which resulted in subscribers paying more for out-of-network medical services or forgoing treatment from out-of-network providers.

65.    The original AMA Complaint asserted causes of action for breach of contract, violation of New York and Minnesota deceptive trade practices acts, and trade libel.

66.    On July 31, 2001, *Oborski, et al. v. United Healthcare Corporation, et al.*, Master File No. 00-7246 (S.D.N.Y.) (the "Oborski Complaint") was consolidated with the AMA Complaint.  The Oborski Complaint was originally filed on September 25, 2000, as a putative class action on behalf of individual subscribers against United HealthCare Corporation, UnitedHealth Group, Inc., United Healthcare Insurance Company and United Healthcare Insurance Company of New York, along with all

predecessors and successors and other related affiliates or parties to whom the allegations of the Complaint pertain ("Oborski Defendants"). The Oborski Complaint alleges that the Oborski Defendants systematically understated UCR reimbursement for treatment by out-of-network providers and improperly refused to disclose the data used to calculate UCR charges for out-of-network medical services.

67.     The original AMA Complaint was amended on August 25, 2000, and a Second Amended Complaint was filed shortly thereafter, on September 22, 2000. On January 11, 2002, an AMA Third Amended Complaint was filed. On July 10, 2007, a Fourth Amended Complaint was filed.

68.     The AMA Fourth Amended Complaint continued to assert the same core of facts that were asserted in the initial Complaint, and continued to allege that UHG used "flawed and inadequate data" to determine UCR amounts, which resulted in reimbursements below actual UCR for out-of-network medical services. The AMA Fourth Amended Complaint which included three antitrust claims, centered on allegations that UHG conspired to use the Ingenix (a subsidiary of UHG) databases to determine UCR reimbursement amounts to restrain trade and reduce competition by reducing UCR determinations below market levels to induce health insurance plans to use the Ingenix databases or suffer a competitive disadvantage. The plaintiffs further alleged that the design and effect of the conspiracy was to: 1) artificially restrain the price of medical services; 2) shift the cost of such services to subscribers and out-of-network

21

providers; 3) force subscribers to forgo out-of-network service to avoid such costs; and 4) pressure out-of-network providers to become in-network providers.

69.     The AMA Fourth Amended Complaint sought compensatory and consequential damages, plus plaintiffs' attorneys' fees and costs pursuant to Section 4 of the Clayton Act, for UHG's alleged violations of Section 1 of the Sherman Act.

70.     On January 14, 2009, the AMA Claim was resolved in a global settlement with the AMA plaintiffs, which also included the settlement of the Malchow Claim (which claim is described below in paragraphs 81 through 83).

71.     Under the terms of the proposed AMA/Malchow Settlement, UHG and its affiliated entities will be released from claims relating to its out-of-network reimbursement policies from March 15, 1994, through the date of final court approval of the settlement.  UHG will pay a total of $350 million as part of the consideration given for the AMA/Malchow settlement.

72.     UHG provided timely notice of the AMA Claim to the 1998-2000 Insurer Defendants under their policies.  Certain insurers reserved the right to deny coverage for the AMA Claim, and none of them at any point defended UHG against it.

73.     UHG cooperated with and apprised the 1998-2000 Program Defendant Insurers of significant events transpiring in the AMA Claim.  Additionally, UHG provided the 1998-2000 Program Defendant Insurers with reports on a regular basis reflecting the payment of defense fees and costs and the reserves for future defense fees and costs and indemnity for the AMA Claim.

74. In the summer of 2008, UHG notified the 1998-2000 Program Defendant Insurers of preliminary settlement discussions with the AMA plaintiffs and provided information regarding such settlement discussions in a June telephone conference with lead counsel who was defending the AMA Claim.

75. Between June 2008 and January 2009, UHG continued to provide information to the 1998-2000 Program Defendant Insurers regarding the status of settlement discussions with the AMA plaintiffs, including, *inter alia*, providing the 1998-2000 Program Defendant Insurers with numerous draft proposed settlement agreements, as they were exchanged between UHG and the plaintiffs and to the extent that they contained material changes; arranging for two additional telephone conferences between the insurers and UHG's defense counsel in the AMA litigation to answer questions regarding the proposed AMA settlement; and responding to the 1998-2000 Program Defendant Insurers' reasonable requests for information and documents regarding not only the AMA Claim, but also the Malchow Claim and the NYAG Claim, which included producing thousands of pages of documents to the insurers. UHG also offered to make available voluminous additional documents for the insurers' review, but to the best of UHG's knowledge, none of the insurers reviewed such documents.

76. Prior to executing the AMA/Malchow Settlement Agreement, UHG repeatedly requested consent from the 1998-2000 Program Defendant Insurers to enter into the settlement.

77.     The 1998-2000 Program Defendant Insurers unreasonably refused to provide their consent to the AMA/Malchow settlement, despite their contractual obligation not to unreasonably withhold such consent.

78.     The AMA Claim is a covered claim under the Lexington Policy and the excess policies issued by the 1998-2000 Program Insurers.

79.     The 1998-2000 Insurer Defendants are contractually obligated to indemnify UHG for the portion of the $350 million settlement attributable to resolving the AMA Claim, as well as defense fees and costs incurred in defending the AMA Claim, subject to their respective limits of liability.

80.     The 1998-2000 Program Defendant Insurers have breached the express and implied terms of their respective insurance policies by refusing to consent to UHG's settlement of the AMA Claim, and by refusing to agree to reimburse UHG for both the defense fees and costs it incurred in defending the AMA Claim and the settlement amount UHG will become obligated to pay in order to resolve the AMA Claim, assuming that the settlement is fully consummated.

**The Malchow Claim.**

81.     On February 19, 2008, a class action lawsuit styled *Rodney Malchow, et al. v. Oxford Health Plans, Inc., et al.*, Civ. No. 08-935(FSH) was filed in the United States District Court for the District of New Jersey (the "Malchow Claim" or "Malchow Complaint"). The only named defendants in this lawsuit are Oxford Health Plans, Inc., Oxford Health Plans, LLC, Oxford Health Plans (NJ), Inc., Oxford Health Plans (NY), Inc. and Oxford Health Insurance (the "Malchow Defendants.)

82.     UHG acquired each of the defendants named in the Malchow Complaint in 2004.

83.     The Malchow Complaint alleges that the Malchow Defendants improperly relied upon the Ingenix databases to calculate the UCR charges for out-of-network medical service; which allegedly resulted in understating UCR amounts.

84.     As stated above, the Malchow Complaint was resolved in a global settlement effective January 14, 2009 along with the AMA Claim (the "AMA/Malchow Settlement"), and UHG is responsible to pay the settlement amount.

85.     UHG provided timely notice of the Malchow Claim to the 2007-2008 Insurer Defendants under their policies.   Certain insurers reserved the right to deny coverage and did not defend their insureds against the action.

86.     In the summer of 2008, UHG notified the 2007-08 Program Defendant Insurers of preliminary settlement discussions with the Malchow plaintiffs and provided information regarding such settlement discussions in a June telephone conference with lead counsel who was defending the Malchow Claim.

87.     Between June 2008 and January 2009, UHG continued to provide information to the 2007-2008 Program Defendant Insurers regarding the status of settlement discussions with the Malchow plaintiffs, including, *inter alia*; providing the 2007-2008 Program Defendant Insurers with numerous draft settlement agreements, as they were exchanged between UHG and the plaintiffs and to the extent that they contained material changes; arranging for two additional telephone conferences between the insurers and UHG's defense counsel in the Malchow litigation to answer questions

25

regarding the proposed settlement; and responding to the 2007-2008 Program Defendant Insurers' reasonable requests for information and documents regarding not only the Malchow Claim, but also the AMA Claim and the NYAG Claim, which included producing thousands of pages of documents to the insurers. UHG also offered to make available voluminous additional documents for the insurers' review, but to the best of UHG's knowledge, none of the insurers reviewed such documents.

88.   Prior to executing the Malchow settlement agreement, UHG repeatedly requested consent from the 2007-2008 Program Defendant Insurers to enter into the settlement.

89.   The 2007-2008 Program Defendant Insurers unreasonably refused to provide their consent to the Malchow settlement, despite their contractual obligation not to unreasonably withhold the same.

90.   The Malchow Claim is a covered claim under the 2007-2008 Program insurance policies.

91.   The 2007-2008 Program Insurer Defendants are contractually obligated to pay the portion of the $350 million settlement attributable to resolving the Malchow Claim as well as defense fees and costs incurred in the defense of the Malchow Claim, subject to UHG's self-insured retention and their respective limits of liability.

92.   The 2007-2008 Program Defendant Insurers have breached the express and implied terms of their respective insurance policies by refusing to consent to UHG's settlement of the Malchow Claim, and by refusing to agree to reimburse UHG for both

the defense fees and costs it incurred in defending the Malchow Claim and the settlement amount it is required to pay in order to resolve the Malchow Claim.

**The NYAG Claim.**

93.     On February 13, 2008, the New York Office of the Attorney General sent UHG a Notice of Proposed Litigation to UHG (the "Notice Letter").

94.     The Notice Letter enclosed a summary of allegations against UHG, which included an allegation of a purported conflict of interest raised by UHG's acquisition and ownership of the Ingenix databases and its use by UHG to determine UCR.

95.     In response to NYAG's requests, UHG produced hundreds of thousands of documents to the NYAG and provided information requested by the NYAG in an effort to resolve the allegations raised in the Notice Letter.

96.     On or about January 13, 2009, UHG entered into a settlement agreement with the NYAG which is entitled "Assurance of Discontinuance Under Executive Law § 63(12)" ("AOD").

97.     In the AOD, the NYAG found that UHG "has a conflict of interest in owning and operating the Ingenix Databases in connection with determining reimbursement rates."

98.     In exchange for the NYAG's discontinuance of its conflict of interest claim against it, UHG agreed to pay $50 million to a Not-For-Profit Company to be designated by the NYAG, so as to fund the establishment and operation of a new, independent database for academic research and as a tool for determining UCR.

99.    UHG provided timely notice of the NYAG Claim to the 2007-2008 Insurer Defendants under the policies.  Certain 2007-2008 Insurers have taken the position that the NYAG Claim is interrelated with the AMA Claim.  UHG provided timely notice of the NYAG Claim to the 1998-2000 Insurers in the event it is determined that the NYAG Claim is interrelated with the AMA Claim.

100.    In the summer of 2008, UHG notified the 2007-08 Program Defendant Insurers of preliminary settlement discussions with the NYAG and provided information regarding such settlement discussions in a June telephone conference with lead counsel who was defending the NYAG Claim

101.    Between June 2008 and January 2009, UHG continued to provided information to the 2007-2008 Program Defendant Insurers regarding the status of settlement discussions with the NYAG, including, *inter alia*; providing the 2007-2008 Program Defendant Insurers with numerous draft settlement agreements, as they were exchanged by UHG and the NYAG and to the extent that they contained material changes; arranging for two additional telephone conferences with UHG's defense counsel in the NYAG matter to answer questions regarding the proposed settlement; and responding to the 2007-2008 Program Defendant Insurers' reasonable requests for information and documents regarding not only the NYAG Claim, but also the AMA Claim and the Malchow Claim, which included producing thousands of pages of documents to the insurers.  UHG also offered to make available voluminous additional documents for the insurers' review, but to the best of UHG's knowledge, none of the insurers reviewed such documents.

102.   Prior to the final execution of the AOD, UHG repeatedly requested consent from the 2007-2008 Program Defendant Insurers to enter into the settlement.

103.   The 2007-2008 Program Defendant Insurers unreasonably refused to provide their consent to the NYAG settlement, despite their contractual obligation not to unreasonably withhold such consent.

104.   The NYAG Claim is a covered claim under the 2007-2008 Program insurance policies.

105.   The 2007-2008 Insurer Defendants are contractually obligated to pay the $50 million settlement payment that UHG is legally required to make pursuant to the AOD as well as the defense fees and costs incurred in defending the NYAG Claim, all of which would be subject to a $25 million non-class action self-insured retention.

106.   The 2007-2008 Program Defendant Insurers have breached the express and implied terms of their respective insurance policies by refusing to consent to UHG's settlement of the NYAG Claim, and by refusing to agree to reimburse UHG for both the defense fees and costs it incurred in defending the NYAG Claim and the $50 million settlement amount it is required to pay.

## COUNT I

## DECLARATORY JUDGMENT: 1998-2000 INSURER DEFENDANTS

107.   Plaintiff restates and realleges the facts and allegations contained in paragraphs 1 through 106 as if fully set forth herein.

108.   United has fully complied with all of the terms and conditions of the policies issued to UHG by the 1998-2000 Program Defendant Insurers with regard to the AMA Claim.

109.   The 1998-2000 Program Defendant Insurers have unreasonably refused to consent to the settlement of the AMA Claim and have improperly refused to agree to reimburse UHG for the defense fees and costs and that portion of the $350 million settlement payment attributable to the settlement of the AMA Claim, all of which are covered under the 1998-2000 Program insurance policies.

110.   UHG requests that the Court issue a judicial declaration that the 1998-2000 Defendant Insurers' refusal to consent to the settlement of the AMA Claim was unreasonable and further declare that the AMA Claim is covered under the 1998-2000 Program insurance policies, and that the 1998-2000 Program Defendants Insurers are contractually obligated to reimburse UHG for all fees and costs relating to the defense of the AMA Claim and that portion of the $350 million settlement attributable to the resolution of the AMA Claim, subject to the insurers' applicable limits of liability.

## COUNT II

### BREACH OF CONTRACT: 1998-2000 INSURER DEFENDANTS

111.   Plaintiff restates and realleges the facts and allegations contained in paragraphs 1 through 110 as if fully set forth herein.

112.   United has fully complied with all of the terms and conditions of the policies issued to UHG by the 1998-2000 Program Defendant Insurers with respect to the AMA Claim.

113.   The 1998-2000 Program Defendants have and continue to refuse to agree to reimburse UHG for the fees and costs it has incurred in defending the AMA Claim and that portion of the $350 million settlement payment attributable to the settlement of the AMA Claim, subject to the insurers' applicable limits of liability.

114.   The 1998-2000 Program Defendants' refusal to agree to reimburse UHG for the defense fees and costs and the settlement of the AMA Claim constitutes a breach of the 1998-2000 Program Defendants' insurance policies.

115.   The 1998-2000 Program Defendants' breach of their insurance policies has proximately caused UHG harm for which UHG is entitled to damages according to proof, but in any event exceeding $75,000.

## COUNT III

### DECLARATORY JUDGMENT: 2007-2008 INSURER DEFENDANTS

116.   Plaintiff restates and realleges the facts and allegations contained in paragraphs 1 through 115 as if fully set forth herein.

117.   United has fully complied with all of the terms and conditions of the policies issued to UHG by the 2007-2008 Program Defendant Insurers relating to the Malchow Claim and the NYAG Claim.

118.     The 2007-2008 Program Defendants have unreasonably refused to consent to the settlements of the Malchow Claim and the NYAG Claim, and have improperly refused to agree to reimburse UHG for the fees and costs it has incurred defending such claims, and the settlement amounts UHG has agreed to pay to settle such claims.

119.     UHG requests that the Court issue a judicial declaration that the 2007-2008 Defendant Insurers unreasonably refused to consent to the settlement of the Malchow Claim, and further declare that the Malchow Claim is covered under the 2007-2008 Program insurance policies, and that the 2007-2008 Program Defendants are contractually obligated to reimburse UHG for all fees and costs UHG incurred in defending the Malchow Claim and for the settlement amount attributable to the settlement of the Malchow Claim, subject only to UHG's class action self-insured retention and to the insurers' applicable limits of liability.

120.     UHG requests that the Court issue a judicial declaration that the 2007-2008 Defendant Insurers unreasonably refused to consent to the settlement of the NYAG Claim, and further declare that the NYAG Claim is covered under the 2007-2008 Program insurance policies, and that the 2007-2008 Program Defendants are contractually obligated to reimburse UHG for all fees and costs UHG incurred in defending the NYAG Claim and for the $50 million settlement payment, subject only to UHG's non-class action self-insured retention and to the insurers' applicable limits of liability.

## COUNT IV

## BREACH OF CONTRACT: 2007-2008 INSURER DEFENDANTS

121.    Plaintiff restates and realleges the facts and allegations contained in paragraphs 1 through 120 as if fully set forth herein.

122.    United has fully complied with all of the terms and conditions of the policies issued to UHG by the 2007-2008 Program Defendant Insurers with respect to the Malchow Claim and the NYAG Claim.

123.    The 2007-2008 Program Defendants have and continue to refuse to agree to reimburse UHG for the fees and costs it has incurred in defending the Malchow Claim and NYAG Claim and further refuse to agree to reimburse UHG for the amounts UHG is legally obligated to pay pursuant to the settlement of the Malchow Claim and settlement of the NYAG Claim, all of which are covered under the 2007-2008 Program insurance policies.

124.    The 2007-2008 Program Defendants' refusal to reimburse or agree to reimburse UHG for defense fees and costs and the settlement amounts regarding the NYAG Claim and/or the Malchow Claim constitutes a breach of the 2007-2008 Program Defendants' insurance policies.

125.    The 2007-2008 Program Defendants' breach of their policies has proximately caused UHG harm for which UHG is entitled to damages according to proof, but in any event exceeding $75,000.

## COUNT V

### ALTERNATIVE DECLARATORY JUDGMENT
### REGARDING THE 1998-2000 INSURER DEFENDANTS

126.   Plaintiff restates and realleges the facts and allegations contained in paragraphs 1 through 125 as if fully set forth herein.

127.   United has fully complied with all of the terms and conditions of the policies issued to UHG by the 1998-2000 Program Defendant Insurers with respect to the NYAG Claim.

128.   In the alternative and in the event it is determined that the NYAG Claim and the AMA Claim involve interrelated wrongful acts, UHG requests that the Court issue a judicial declaration that the NYAG Claim and AOD are covered under the 1998-2000 Program insurance policies, and that the 1998-2000 Program Defendants are contractually obligated to reimburse UHG for all fees and costs UHG incurred in defending the NYAG Claim, and for the $50 million settlement payment UHG will make pursuant to the AOD.

## COUNT VI

### ALTERNATIVE BREACH OF CONTRACT:
### 1998-2000 INSURER DEFENDANTS

129.   Plaintiff restates and realleges the facts and allegations contained in paragraphs 1 through 128 as if fully set forth herein.

130.   United has fully complied with all of the terms and conditions of the policies issued to UHG by the 1998-2000 Program Defendant Insurers with respect to the NYAG Claim.

131.   In the alternative and in the event it is determined that the NYAG Claim and the AMA Claim involve interrelated wrongful acts, the 1998-2000 Program Defendants' refusal to reimburse or to agree to reimburse UHG for defense fees and costs, and the settlement amount relating to the NYAG Claim and AOD constitute a breach of the 1998-2000 Defendants' insurance policies.

132.   The 1998-2000 Program Defendants' breach of their policies has proximately caused UHG harm for which UHG is entitled to damages according to proof, but in any event exceeding $75,000.

**WHEREFORE**, UHG respectfully prays for an Order of the Court:

1.   Declaring that: a.) the 1998-2000 Defendant Insurers unreasonably refused to consent to the settlement of the AMA Claim; b.) the AMA Claim is covered under the 1998-2000 Program insurance policies; c.) the 1998-2000 Program Defendant Insurers are contractually obligated to reimburse UHG for defense fees and costs it incurred in defending the AMA Claim; and, d.) the 1998-2000 Program Defendant Insurers are contractually obligated to reimburse UHG for the portion of the settlement amount attributable to the settlement of the AMA Claim, subject to the insurers' applicable limits of liability.

2.   Declaring that: a.) the 2007-2008 Defendant Insurers unreasonably refused to consent to the settlement of the Malchow Claim; b.) the Malchow Claim is covered under the 2007-2008 Program insurance policies; c.) the 2007-2008 Program Defendant Insurers are contractually obligated to reimburse UHG for defense fees and costs it incurred in defending the Malchow Claim; and d.) the 2007-2008 Program Defendant

Insurers are contractually obligated to reimburse UHG for the settlement amount attributable to the settlement of the Malchow Claim, subject to payment of the applicable retained limit and to the insurers' applicable limits of liability.

3.    Declaring that: a.) the 2007-2008 Defendant Insurers unreasonably refused to consent to the settlement of the NYAG Claim; b.) the NYAG Claim is covered under the 2007-2008 Program insurance policies; c.) the 2007-2008 Program Defendant Insurers are contractually obligated to reimburse UHG for defense fees and costs it incurred in defending the NYAG Claim; and, d.) the 2007-2008 Program Defendant Insurers are contractually obligated to reimburse UHG for the settlement amount it is legally obligated to pay pursuant to the AOD, subject to payment of the applicable retained limit and to the insurers' applicable limits of liability.

4.    Declaring in the alternative, in the event it is determined that the NYAG Claim and the AMA Claim involve interrelated wrongful acts, that a.) the NYAG Claim is covered under the 1998-2000 Program insurance policies; b.) the 1998-2000 Program Defendant Insurers are contractually obligated to reimburse UHG for defense fees and costs it incurred in defending the NYAG Claim; and c.) the 1998-2000 Program Defendant Insurers are contractually obligated to reimburse UHG for the settlement amount it is legally obligated to pay pursuant to the AOD, subject to the insurers' applicable limits of liability.

5.    Entering a judgment against each of the 1998-2000 Program Defendant Insurers for damages representing each defendant's applicable share of the defense fees and costs and settlement payments relating to the AMA Claim.

6.     Entering a judgment against each of the 2007-2008 Program Defendant Insurers for damages representing each defendant's applicable share of the defense costs and settlement payments relating to the Malchow Claim.

7.     Entering a judgment against each of the 2007-2008 Program Defendant Insurers for damages representing each defendant's applicable share of the defense costs and settlement payments relating to the NYAG Claim.

8.     In the alternative, entering a judgment against each of the 1998-2000 Program Defendant Insurers for damages representing each defendant's applicable share of the defense costs and settlement payment relating to the NYAG Claim.

9.     Awarding Plaintiff prejudgment interest, and reasonable costs, disbursements, and attorneys' fees incurred in the prosecution of this action.

10.     Granting such other relief as the Court may deem to be just, fair, and equitable under the circumstances of this case.

## JURY DEMAND

Plaintiff UHG hereby requests a jury trial on all claims so triable.

Dated:  January 29, 2009          **OPPENHEIMER WOLFF & DONNELLY LLP**

By:
          Jeffrey J. Bouslog  (No. 174671)
          Christine L. Nessa (No. 277666)
          Katherine M. Wilhoit  (No. 313853)
45 South Seventh Street, Suite 3300
Minneapolis, Minnesota  55402-1609
Telephone:    (612) 607-7000
Facsimile:    (612) 607-7100
Email:        JBouslog@Oppenheimer.com
              CNessa@Oppenheimer.com
              KWilhoit@Oppenheimer.com

Of Counsel:

David B. Goodwin (CA Bar No. 104469)
Covington & Burling, LLP
One Front Street
San Francisco, California 94111-5356
Telephone:    (415) 591-6000
Facsimile:    (415) 591-6091
Email:        dgoodwin@cov.com

**Attorneys for Plaintiff**
**UnitedHealth Group Incorporated**

38