# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UnitedHealth Group
Incorporated,

        Plaintiff,

      v.

Hiscox Dedicated Corporate
Member Ltd., individually,
Lexington Insurance Company,
National Union Fire Insurance
Company of Pittsburgh, PA,
Darwin National Assurance
Company, Homeland Insurance
Company of New York, and Ace
American Insurance Company,

        Defendants,

Civil No. 09-210 (PJS/SRN)

**REPORT & RECOMMENDATION**

---

David B. Goodwin, Covington & Burling, LLP, One Front St., San Francisco, California 94111, and Jeffrey J. Bouslog, Oppenheimer, Wolff & Donnelly, LLP, 45 S. 7th St., Suite 3300, Minneapolis, Minnesota 55402, for Plaintiff UnitedHealth Group Incorporated

Stephen M. Lazare, Lazare, Potter & Giacovas, LLP, 950 3rd Ave., 15th Floor, New York, New York 10022, and Eric C. Tostrud, Lockridge, Grindal, Nauen, 100 Washington Ave. S., Suite 2200, Minneapolis, Minnesota 55401, for Defendants Hiscox Dedicated Corporate Member Ltd. and Lexington Insurance Company

Erin A. Oglesbay, Winthrop & Weinstine, PA, 225 S. 6th St., Suite 3500, Minneapolis, Minnesota 55402, for Defendant National Union Fire Insurance Company of Pittsburgh, PA

Lewis K. Loss, Thompson, Loss & Judge, LLP, 1133 21st St. NW, Suite 450, Washington, D.C. 20036, for Defendant Darwin National Assurance Company

Matthew J. Gollinger, Zelle, Hofmann, Voelbel & Mason, LLP, 500 Washington Ave. S., Suite 4000, Minneapolis, Minnesota 55415, and Darius N. Kandawalla, Bailey Cavalieri, LLC, One Columbus, 10 West Broad St., Suite 2100, Columbus, Ohio 43215, for Defendant Homeland Insurance Company of New York

Steven J. Sheridan, Foley & Mansfield, 250 Marquette Ave., Suite 1200, Minneapolis, Minnesota 55401, and Thomas M. Jones, Cozen O'Connor, 1201 3rd Ave., Suite 5200, Seattle, Washington 98101, for Defendant Ace American Insurance Company

---

SUSAN RICHARD NELSON, United States Magistrate Judge

This case is before the Court on Defendant Ace American Insurance Company's Motion to Dismiss (Doc. No. 69); Defendant Hiscox Dedicated Corporate Member and Lexington Insurance Company's Motion to Dismiss (Doc. No. 72); Defendant Homeland Insurance Company's Motion to Dismiss (Doc. No. 75); Defendant National Union Fire Insurance Company's Motion to Dismiss (Doc. No. 78); and Defendant Darwin National Assurance Company's Motion to Dismiss (Doc. No. 81).

In addition to having submitted separate memoranda in support of their respective Motions to Dismiss, all of the Defendants join in the arguments presented in the memorandum jointly filed by Defendants Hiscox Dedicated Corporate Member and Lexington Insurance Company. (Doc. No. 102.)[1]  The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a). (See Order of 5/6/09, Doc. No. 85.)  For the reasons set forth herein, the Court recommends that Defendants' Motions to Dismiss be denied.

I.    **FACTUAL AND PROCEDURAL HISTORY**

Plaintiff UnitedHealth Group Incorporated ("UHG") is a managed health care company, located in Minnesota.  Plaintiff UHG purchases insurance coverage for managed care liability claims from several insurers.  For the 2007-2008 period, UHG's primary policy was issued by Defendant Hiscox Dedicated Corporate Member Ltd. ("Hiscox"), a British corporation, other Underwriters of Lloyd's, and Lexington Insurance Company ("Lexington"), under Lloyd's

---

[1]The Court refers to this memorandum (Doc. No. 102) and the Reply Memorandum (Doc. No. 111), filed by Defendants Hiscox and Lexington, as "Defendants' Memorandum" and "Defendants' Reply Memorandum."

Policy No. 509/QG007207 ("the Policy"). (Am. Complaint ¶ 19.) Both Hiscox and Lexington

subscribed to the Policy, with Hiscox acting as the "lead" underwriter. (Am. Complaint ¶¶ 10-

11.) Excess managed care liability policies were issued by the following other

insurer-Defendants: Darwin National Assurance Company ("Darwin"); National Union Fire

Insurance Company of Pittsburgh, PA ("National Union"); Homeland Insurance Company of

New York ("One Beacon"); and ACE American Insurance Company ("ACE").

The Policy has a $15 million per claim and aggregate limit of liability (with a $25 million

per claim self-insured retention for non-class action lawsuits and a $50 million per claim

self-insured retention for class action lawsuits). The managed care liability policies issued by

the other insurers generally were intended to "follow form" to the terms and conditions of the

Policy. (Id.)

A.      **Underlying Cases**

This lawsuit results from an insurance coverage dispute between UHG and Defendants.

Plaintiff alleges that Defendants improperly denied coverage for two claims that were covered

under the Policy: (1) the "Malchow Claim," arising from Rodney Malchow , et al. v. Oxford

Health Plans, Inc., et al., Civ. No. 08-935 (FSH) (D. N.J.); and (2) the "NYAG Claim," litigation

advanced by the New York Office of the Attorney General.[2] Both cases involved allegations that

UHG knowingly used a flawed database known as the "Ingenix Database" to calculate the rate at

---

[2] A third case involving related allegations is not directly at issue here: the "AMA Claim," concerns two lawsuits that were consolidated in 2001 and collectively known as The American Medical Ass'n, The Medical Society of the State of New York, The Missouri State Medical Ass'n, John Marcum, MD, Michael J. Attkiss, MD, Sandra Taylor, Edward F. Mitchell, Jr. and Clifford E. and Michelle S. Wilson v. United Healthcare Corporation, et al, Master File No. 00-2800 S.D.N.Y.), and Oborski, et al. v. United Healthcare Corporation, et al., Master File No. 00-724 (S.D.N.Y.). Plaintiff UHG tendered AMA to other insurers under policies covering the period in effect when AMA was brought. (See Defs.' Mem. at 5.) The Malchow Claim will be resolved in conjunction with the AMA Claim, for which settlement approval is currently pending. To that extent, references to the AMA Claim appear in this action.

which it would cover the "usual, customary and reasonable rate" ("UCR") for out-of-network providers' services.  (See Am. Complaint ¶¶ 35; 46.)  By improperly relying on the Ingenix Database to calculate the UCR charges for out-of-network medical services, the plaintiffs in Malchow and NYAG alleged that Plaintiff UHG understated the out-of-network UCR amounts. (Am. Complaint ¶¶ 35, 46.)

Specifically, the plaintiffs in the Malchow Claim, filed in February 2008, alleged that UHG's wholly-owned Oxford subsidiaries wrongfully used the UHG/Ingenix Database to understate UCRs and claim benefits and the Malchow plaintiffs sought relief under the Employee Retirement Income Security Act ("ERISA"), demanding recovery of "unpaid benefits" and various injunctive and declaratory remedies.  (Am. Complaint ¶¶ 33-35.)

The Malchow Complaint was resolved pursuant to settlement, for which court approval is currently pending.  Prior to executing the settlement agreement (and during settlement discussions), UHG requested consent from Defendants to enter into the settlement.  Defendants refused to provide consent to the Malchow settlement.  (Am. Complaint ¶¶ 36-41.)   UHG contends that the claim is covered under the Policy and that Defendants are contractually obligated to pay the portion of the $350 million AMA/Malchow Settlement attributable to resolving the Malchow Claim as well as defense fees and costs incurred in the defense of the Malchow Claim, subject to UHG's self-insured retention and their respective limits of liability. (See Am. Complaint ¶¶ 42-43.)

With respect to the NYAG Claim, in February 2009, the Office of the New York Attorney General sent UHG a Noticed of Proposed Litigation, alleging a purported conflict of interest raised by UHG's acquisition and ownership of the Ingenix database and the way in which Plaintiff used the database to determine UCR.  (Am. Complaint ¶ 46.)  In January 2009, UHG entered into a settlement agreement with the New York Attorney General entitled

"Assurance of Discontinuance Under Executive Law § 63(12)" ("AOD"). (Am. Complaint ¶ 48.) In consideration for the New York Attorney General's discontinuance of its conflict of interest claim against it, UHG agreed to pay $50 million to a not-for-profit company to be designated by the Attorney General, to fund the establishment and operation of a new, independent database for academic research and as a tool for determining UCR. (Am. Complaint ¶ 50.) UHG provided notice of the <u>NYAG</u> Claim to Defendants and certain Defendants took the position that the <u>NYAG</u> Claim was interrelated with the <u>AMA</u> Claim. (Am. Complaint ¶ 51.) Defendants refused to consent to the <u>NYAG</u> settlement, which UHG contends is a covered claim under the Defendants' insurance policies. (Am. Complaint ¶¶ 54-56.)

In this action, UHG seeks a declaratory judgment that Defendants unreasonably refused to consent to the settlement of these two claims, that the claims are covered under Defendants' policies, and that the Defendants are contractually obligated to reimburse UHG for all fees and costs it incurred in defending and settling the claims. (Am. Complaint ¶¶ 59-63; Prayer for Relief.) Plaintiff also asserts a claim for breach of contract. (Am. Complaint ¶¶ 64-68.)

In lieu of answering the Amended Complaint, Defendants filed the instant Motions to Dismiss. Defendants ask the Court to dismiss the Complaint, arguing that, as a matter of law, coverage does not exist under the Policy because the underlying cases did not involve "Damages," as defined in the Policy, and the underlying matters fall within certain Policy coverage exclusions.

In response to Defendants' Motions to Dismiss, Plaintiff requests that they be treated as premature motions for summary judgment and be denied, or alternatively, that the Court grant UHG leave to amend. If granted leave to amend, UHG avers that it would plead facts further showing that Defendants have misconstrued both the <u>NYAG</u> and <u>Malchow</u> Claims and that the claims are covered, as intended by the parties.

**B.     The Policy**

The relevant insuring provision of Professional Liability and Medical Professional

Liability Policy number 509/QG007207 ("the Policy") provides:

> Underwriters. . . will indemnify amounts any Insured is legally obligated
> to pay as Damages or Claim Expenses, as a result of any Claim for a Wrongful
> Act that is first made against the Insured during the policy Period and is reported
> to the Underwriters as soon as practicable. . . .provided such Wrongful Act is
> committed or allegedly committed by you or any other party for whom you are
> liable in the rendering or failure to render Professional Services.

(Am. Complaint at ¶ 26, Policy § 3.1, Ex. A to Am. Complaint.[3])  Coverage is triggered if there

are "Damages," defined as:

> . . .any monetary amount. . . which an Insured is legally obligated to pay
> as a result of a Claim.  Damages include compensatory, exemplary, statutorily
> mandated, and punitive damages; settlements; and Claim Expenses awarded
> against, or agreed to as part of a settlement.  Damages do not include fines,
> penalties. . . ; amounts, benefits, or coverages owed to any enrollee, member,
> subscriber, or client under any contract, healthcare plan, insurance policy,
> reinsurance policy, or plan or program of self insurance; amounts owed to any
> provider of Medical Professional Services under any contract; non-monetary
> relief or redress in any form, including without limitation the cost of complying
> with any injunctive, declaratory, or administrative relief; and matters which are
> uninsurable under applicable law.

(Am. Complaint at ¶ 27, Policy § 4.4)

The Policy also contains various exclusions and limitations.  Most pertinent to the instant

motions, it excludes coverage for any claim "arising out of or attributable to the . . . failure to pay

claim benefit . . . money . . . ." ("the Failure to Pay Exclusion") (Policy § 9.6) and it also

excludes coverage for "Claims based upon [or] arising out of . . . disputes involving . . .

co-payment percentages paid, or any Claims alleging discounting or failure to disclose how

discounts are calculated."  ("the Blanket Billing Exclusion") (Policy § 10.3.)

---

[3] All subsequent references to the "Policy" refer to the document attached as Exhibit A to
Plaintiff's First Amended Complaint (Doc. No. 44-2).

## C.    New York Law Governs

The Policy states that "New York law will apply to issues concerning interpretation of coverage." (Policy § 2.11.) Under New York law, courts determine the rights of insureds and insurers "based on the policy's specific language" and in accordance with the "plain and ordinary meaning" of such language. State Farm Mut. Auto Ins. Co. v. Glinbizzi, 780 N.Y.S.2d 434, 436 (N.Y. App. Div. 2004). Where the terms of an insurance policy are clear and unambiguous, interpretation of the terms is a matter of law for the court." Senate Ins. Co. v. Tamarack Am., 788 N.Y.S.2d 481, 482 (3d Dep't 2005).

## II.    DISCUSSION

### A.    Motion to Dismiss Standard and Applicable Law

Pursuant to Rule 12(b)(6), Defendants move to dismiss UHG's claims, arguing that the Amended Complaint fails to state a claim upon which relief can be granted. (Defs.' Mem. at 2.) Defendants claim that the Amended Complaint is legally insufficient because the insurers never agreed to guarantee or reinsure UHG's contractual obligations to pay claim benefits. Thus, they argue: (1) that the Policy's definition of covered Damages does not include "benefits, or coverages owed to any . . . member" under any healthcare plan; nor does it include non-monetary or injunctive relief; and (2) the Malchow and NYAG claims fall within at least two Policy exclusions for claims "arising out of" a failure to pay claim benefits, co-payment disputes or the discounting of benefits.[4] (Id.)

_____

[4]Defendants Hiscox and Lexington also briefly address the issue of diversity jurisdiction in their memorandum, noting that "Lloyd's of London," is not an insurance company, but a market through which coverage risks are underwritten by individual and corporate "names" subscribing to separate, several shares of insured risk. (Defs.' Mem. at 8-9.) Defendants posit that when all the names are sued, it is widely accepted that diversity jurisdiction and amount in controversy standards must be satisfied with respect to each name individually. (Id. at 8) (citing E.R. Squibb & Sons, Inc. v. Lloyd's & Cos., 241 F.3d 154, 161 (2d Cir. 2001)). In addition, Defendants contend that Circuit Courts of Appeal addressing this issue have upheld diversity

In considering a Rule 12(b)(6) motion to dismiss, "we must assume that all the facts alleged in the complaint are true" and generally construe the complaint in the light most favorable to the plaintiff.  E.g., Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994).  "The complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claim to avoid dismissal," DuBois v. Ford Motor Credit Co., 276 F.3d 1019, 1022 (8th Cir. 2002), and must contain enough facts to state a claim for relief "that is plausible on its face." Ashcroft v. Iqbal, __ U.S. __ (2009); 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly,  550 U.S. 544, 570 (2007)).

Defendants have included both the Policy, which is attached as an exhibit to the Amended Complaint, and the pleadings in the underlying cases, as materials to be considered by the Court on their Rule 12(b)(6) motions without converting them into Rule 56 motions for summary judgment.  When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court generally must ignore materials outside the pleadings, but it may consider "some materials that are part of the public record or do not contradict the complaint," as well as materials that are "necessarily embraced by the pleadings." Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir.1999) (citations omitted); see also 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1357, at 299 (1990) (court may consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint").

Here, the Court will consider the Policy, as it was attached as an exhibit to the original Complaint and the First Amended Complaint, as well as the pleadings in Malchow and NYAG,

jurisdiction in situations similar to that here.  (Id.) (citing Corfield v. Dallas Glen Hills LP, 355 F.3d 853, 863-66 (5th Cir. 2003); Squibb, 241 F.3d at 162)).  The London Insurers do not dispute that diversity and the amount in controversy are satisfied and, to the extent the issue is relevant to the Court's analysis, Plaintiff agrees with the Insurers that diversity jurisdiction exists.  (Pl.'s Mem. Opp'n at 10, n. 2.) The Court does not find diversity relevant to the motion before it, but acknowledges that the parties have addressed this issue.

because they are matters of public record and are necessarily embraced by the pleadings. These documents fall within the exceptions to the rule and, by considering them, the Court does not convert Defendants' Rule 12 motions into Rule 56 motions for summary judgment. The Court, however, is not required to accept the allegations within the underlying complaints as true, rather it takes judicial notice of them, for purposes of Defendants' motions. See, e.g., Uniroyal, Inc. v. Home Ins. Co., 707 F.Supp. 1368, 1379 (E.D.N.Y. 1988) (insured not required to prove the truth of the underlying claim in order for indemnity to attach – only that the claim settled by the insured be a "covered loss" under the policy).

Defendants contend that New York law absolutely permits dismissal of indemnity claims based on the underlying complaint, thus, they argue that where the declaratory judgment action is premised on a duty to indemnify, a 12(b)(6) motion is appropriate. (Defs.' Reply Mem. at 2) (citing Burkhart, Wexler & Hirschberg, LLP v. Liberty Ins., 875 N.Y.S.2d 590, 591-92 (App. Div. 2009). Specifically, Defendants assert that if the face of the underlying allegations do not support coverage, there is no duty to indemnify. (Defs.' Reply Mem. at 2) (citing Burkhart, 875 N.Y.S.2d at 591-92 (N.Y.App. Div. 2009) ("[I]f the allegations, on their face, do not bring the case within the coverage of the policy, there is no duty to defend or indemnify."))

Plaintiff, however, argues that under New York law, it is very difficult for an insurer to avoid coverage for indemnity even on a motion for summary judgment, let alone on a motion to dismiss, because the existence of coverage can be a fact-intensive inquiry that is often inappropriate for early resolution. (Pl.'s Mem. Opp'n at 19.) Plaintiff contends that a defendant's duty to indemnify turns not on the pleadings, but on the actual facts. (Pl.'s Mem. Opp'n at 10.). Because the factual record is undeveloped, UHG argues that dismissal is inappropriate at this time, as discovery will assist the Court and the parties in interpreting the Policy. The cases cited by Defendants that focus solely on the sufficiency of the underlying

pleadings, UHG argues, arise in the context of the duty to defend, which is not at issue here.

The duty to indemnify cannot be based on the mere possibility of coverage, but rather must be based on an independent factual finding that the insured's liability is within the coverage provided by the policy. Servidone Const. Corp. v. Security Ins. Co., 64 N.Y.2d 419, 421 (N.Y. 1985); see also Ingber v. Home Ins. Co., 527 N.Y.S.2d 630 (App. Div. 1988) (stating, "Defendant's duty to indemnify turns not on the pleadings but on the actual facts."). While it is certainly true, as Defendants argue, that indemnity claims may be dismissed based on the underlying complaint, see Burkhart, 875 N.Y.S.2d at 591-92, it is "the rare case" where the allegations of an underlying complaint are solely determinative of coverage. See Technicon Elecs. Corp. v. American Home Assur. Co., 533 N.Y.S.2d 91, 104 (App. Div. 1988).

For example, if a complaint alleged that a defendant had plotted for several months to commit murder and the applicable insurance policy excluded coverage for intentional acts, that would be an example of the type of rare case in which coverage could be determined based on the underlying allegations. A less sensational example (and an actual case) in which the underlying allegations were found dispositive of the duty to indemnify and defend is the New York Appellate Division's decision in Technicon, noted above. In that case, the court held that a manufacturer's discharge of toxic wastes over several years was not a "sudden and accidental" event covered under its liability policy. Consequently, the insurer defendants were not obligated to defend or indemnify the manufacturer in the underlying personal injury lawsuit and EPA investigation. Technicon, 533 N.Y.S.2d at 104. The underlying complaint contained no allegations of a sudden or accidental discharge – to the contrary, it alleged a long-standing, continuous and intentional discharge of toxins. Id. Thus, Technicon is an example of the rare case in which the allegations in the underlying complaint are dispositive of coverage.

Applying the standard of a 12(b)(6) motion here, where the Court is obliged to view the

facts in the light most favorable to the non-moving party, the Court cannot say that coverage is excluded based the face of the Amended Complaint and the underlying allegations. The procedural posture of this case is in its relative infancy and most courts would consider the fundamental question of coverage only after the development of a full and complete factual record. It is indeed the rare case in which a court determines no coverage based on the face of the underlying claims. This case is not a rare case. It may be that after engaging in discovery, the facts will demonstrate that no coverage exists. However, those facts are not before the Court at this time and, as a matter of law, the Court does not find that coverage is excluded based on the face of the pleadings.

In reaching this determination, the Court acknowledges that "[t]he purpose of a motion under Federal Rule 12(b)(6) is to test the <u>formal</u> sufficiency of the statement of the claim for relief; the motion is <u>not</u> a procedure for resolving a contest between the parties about the <u>facts</u> or the <u>substantive merits</u> of the plaintiff's case." 5B Wright & Miller, <u>Federal Practice and Procedure</u> § 1356, at 354 (3d ed. 2004) (emphases added). Thus a Rule 12(b)(6) motion "must be distinguished from a motion for summary judgment under Rule 56, which goes to the merits of the claim." <u>Id.</u> at 372.

Not only is dismissal inappropriate at this time as a matter of law, the parties themselves acknowledge the need for the development of matters of fact. For example, Defendants note that under New York law, courts determine the rights of insureds and insurers "based on the policy's specific language" and in accordance with the "plain and ordinary meaning" of such language. (Defs.' Mem. at 10) (citing <u>Glinbizzi</u>, 780 N.Y.S.2d at 436). An insurance policy is a contract "'which, like any other contract, must be construed to effectuate the parties' intent as expressed by their words and purposes.'" <u>Uniroyal</u>, 707 F.Supp. at 1374 (citing <u>American Home Products Corp. v. Liberty Mutual Ins. Co.</u>, 748 F.2d 760, 765 (2d Cir. 1984)). However, when the terms

of the policy are ambiguous, "the courts should afford the parties an opportunity to adduce extrinsic evidence as to their intent."  Uniroyal, 707 F.Supp. at 1374.  Although Defendants believe that the terms of this Policy are unambiguous, they acknowledge the use of extrinsic evidence as a means of determining the respective intent of the parties in drafting a policy.

Similarly, with respect to certain Policy Exclusions, discussed in greater detail *infra*, both parties discuss extrinsic evidence.  Regarding the Blanket Billing Exclusion, UHG asserts that, assuming the case proceeds, it will establish evidence of the purpose and intent of that exclusion extrinsically.   (Pl.'s Mem. Opp'n at 28, n. 8.)  With respect to the Anti-Trust Exclusion, Defendants also refer to the potential need for extrinsic evidence, stating, "Certain parts of the [antitrust] endorsement's language may be ambiguous and would require extrinsic evidence to aid in their interpretation, but that language is not pertinent to this motion."  (Defs.' Mem. at 33, n. 27.)  By referring to the potential use of extrinsic evidence, Defendants themselves underscore the fact that there are, in fact, conflicting interpretations of certain Policy provisions.  Extrinsic evidence would be a useful vehicle with which to reconcile such ambiguities.  The need for such information further highlights the fact that dismissal is legally inappropriate.   The Court now addresses the specific Policy provisions raised by Defendants' arguments, in more detail.

### A.     Damages

Defendants assert that the Policy applies to a claim for a wrongful act resulting in "Damages," but that UHG's settlements in NYAG and Malchow do not involve Damages. (Defs.' Mem. at 12-13.)  Rather, Defendants argue, the underlying cases involve: (1) only reimbursement of claim benefits otherwise due under UHG's healthcare plans; (2) UHG's agreement to comply with injunctive or administrative measures; and (3) the costs incurred by UHG in complying with those measures.  (Id.)

1.    **NYAG**

Defendants argue that in <u>NYAG</u>, the Office of the Attorney General ("OAG") sought and settled exclusively for injunctive and administrative relief (e.g., that UHG change its business practices by abandoning the UHG/Ingenix Database), as reflected in the Assurance of Discontinuance ("AOD").

Plaintiff responds that it alleged in the Amended Complaint that it paid $50 million to settle the <u>NYAG</u> Claim, which falls directly within the definition of "Damages" in the Policy, as it is both a "monetary amount . . . which an insured is legally obligated to pay as a result of a Claim" and is money paid for a "settlement[]." (Pl.'s Mem. Opp'n at 12) (citing Am. Complaint ¶ 50.)  Thus, UHG argues that it has pled facts stating a claim for coverage, and notes that the Policy imposes no limitation requiring that the payment be made directly to the plaintiff (here, the New York Attorney General), rather than to a third party such as a nonprofit.   (Pl.'s Mem. Opp'n at 12) (citing <u>Vigilant Ins. Co. v. Bear Stearns Cos., Inc.</u>, 824 N.Y.S.2d 91 (App. Div. 2006), <u>rev'd on other grounds</u>, 10 N.Y.3d 170 (2008)).

Defendants assert that the AOD includes only non-monetary relief and the fact that UHG agreed to a $50 million contribution as part of the AOD does not change the nature of the settlement.  Rather, Defendants contend that the sums paid pursuant to the <u>NYAG</u> settlement are part of UHG's cost of complying with the AOD's injunctive and administrative remedies, and are not Damages under the Policy.  Defendants cite <u>Lennon v. Premise Media Corp.</u>, 556 F.Supp.2d 310, 319 (S.D.N.Y. 2008); <u>Patterson v. Newspaper & Mail Deliverers' Union</u>, 138 B.R. 149, 153-54 (S.D.N.Y. 1992); and <u>Bullock v. Maryland Ca. Co.</u>, 102 Cal. Rptr.2d 804, 806, 811 (Cal. Ct. App. 2001), for the general proposition that injunctive relief is a prospective method of preventing future harm.  (Defs.' Mem. at 12-13.)

However, UHG characterizes the $50 million payment as compensation and points to

language in the AOD providing that UHG must switch to a new database in addition to paying $50 million, and the AOD further provides that the database be available to the managed health care industry, not just to UHG.  (Pl.'s Mem. Opp'n at 14) (citing to AOD ¶¶ 23, 26, 28.)  At oral argument, Plaintiff's counsel likened the AOD in NYAG to an environmental settlement where a defendant might settle based on current harm (e.g., to shore up the walls of a landfill), as well as future harm (a possible leak in the landfill), and both would be considered damages.  Here, UHG argues, the New York Attorney General found current harm to the citizens of New York and potential future harm, which it chose to remedy by creating a new series of databases.   Further, UHG argues that the New York Attorney General had the authority to seek monetary relief from UHG.  Plaintiff contends that none of the documents before this Court can lead to a finding, as a matter of law, that every single penny of the $50 paid by UHG was for the purpose of obeying an injunction to change its databases.  (Pl.'s Mem. Opp'n at 14.)  Absent such proof, UHG contends, it cannot be said, as a matter of law, that the Policy provides no coverage for the NYAG settlement. (Id.)

Viewing the allegations in the light most favorable to UHG, as the Court must, this Court cannot find that UHG's claim with respect to the settlement of NYAG, is not covered as a matter of law. The resolution of this dispute presents an interesting question as to whether UHG's $50 million payment is merely a cost of implementing the database, and therefore an essentially injunctive measure excluded under the Policy, or whether it is, in fact, quasi-compensatory.  The Policy's definition of Damages is broad, including compensatory, exemplary, statutorily mandated, punitive damages, settlements and claim expenses awarded against, or agreed to, as part of a settlement. (Policy § 4.4.)  Plaintiff characterizes the $50 million payment as both a cost to implement the new system and a remedy for an injury to the public.  Whether or not Plaintiff will ultimately prevail is another matter, for another day.  But at this very early stage, looking

solely at the pleadings and the documents they embrace, UHG's pleadings with respect to the

<u>NYAG</u> settlement sufficiently state a claim that plausibly might fall within the Policy's broad

definition of Damages and cannot be found to be excluded from coverage as a matter of law.[5]

### 2. **Malchow**

Defendants also argue that the settlement in <u>Malchow</u> did not involve the payment of

damages, but rather that the <u>Malchow</u> plaintiffs sought only injunctive relief and reimbursement

of unpaid benefits. Defendants cite to the <u>Malchow</u> Complaint in support of their argument:

Count I alleges a claim for unpaid benefits under group plans governed by ERISA; Count II

alleges a claim for "failure to provide a full and fair review," the remedy for which is a remand

of plaintiffs' claim for benefits to the plan's administrator; Count III alleges that Oxford failed to

provide accurate Summary Plan Descriptions and Evidence of Coverages, and requested

"appropriate relief under ERISA;" Count IV alleges a breach of fiduciary duty and seeks

equitable relief; and Count V alleges a "violation of claims procedure provisions," and seeks

remand to the plan administrator with instructions to undertake a proper review. (Defs.' Mem. at

14-18) (citing <u>Malchow</u> Complaint, Lazare Decl., Ex. 3.) Defendants argue that Counts II

through V only seek, and under ERISA can only seek, non-monetary, equitable relief that cannot

fall within the meaning of Damages. Pointing to the "wherefore" clause at the end of the

<u>Malchow</u> Complaint, Defendants argue that that Complaint did not include a monetary demand

in addition to the demand for "unpaid benefits." (<u>Id.</u> at 14.)

As with the <u>NYAG</u> Claim, UHG responds that the actual facts, not the underlying

---

[5]To the extent that Defendants argue that a settlement payment must be directly made to a plaintiff, rather than to a third-party, the Court is not persuaded by this argument. <u>See</u> <u>Vigilant Ins. Co.</u>, 824 N.Y.S.2d at 94 (finding $25 million payment for independent research and $5 million for investor education represented a covered "loss" under a liability insurance policy), <u>rev'd on other grounds</u>, 10 N.Y.3d 170 (2008).

pleadings, determine whether a settlement is within the scope of an insurer's indemnity obligation under New York law.  Plaintiff contends that <u>Malchow</u> includes allegations and counts that could result in a recovery constituting "Damages" under the Policy.  (Pl.'s Mem. Opp'n at 19.)   Of the five counts in the <u>Malchow</u> Complaint, UHG argues that only Count I even purports to be a claim for unpaid benefits.  As to Defendants' charge that Counts II through V seek solely non-monetary, equitable relief, Plaintiff cites to two potential monetary forms of "relief:" (1) the possible award of attorneys' fees to the <u>Malchow</u> plaintiffs pursuant to 29 U.S.C. § 1132(g);  and (2) an ERISA statutory provision in which an administrator who fails to comply with a request for information may be fined up to $100 a day.

As to attorneys' fees, Plaintiff asserts that the "wherefore" clause in Paragraph L of the <u>Malchow</u> Complaint expressly seeks the "costs and disbursements of this action, including reasonable counsel fees, costs and reimbursement of expenses, including expert fees . . . ." (<u>Malchow</u> Complaint at ¶ L, p. 49, Lazare Decl., Ex. 3.)  Since a portion of the proposed settlement is for a release of the attorneys' fees claim, UHG characterizes this as "monetary relief, plain and simple," falling within the Policy's definition of "Damages" as "any monetary amount which an insured is legally obligated to pay as a result of a Claim." (Pl.'s Mem. Opp'n at 21) (citing Policy § 4.4.)

Regarding the $100 a day liability prescribed in 29 U.S.C. § 1132,[6] because the <u>Malchow</u> Complaint alleged a violation of  § 1132(c), UHG argues that <u>Malchow</u> includes  a claim for statutory damages, falling within the Policy's definition of "Damages " (i.e. "compensatory,

---

[6] Under 29 U.S.C. § 1132(a)(1)(A), "a civil action may be brought by a participant or beneficiary for the relief provided for in subsection (c) of this section."  Section 1132(c) provides that:   "[A]ny administrator who fails or refuses to comply with a request for any information which such administrator is required . . . to furnish to a participant or beneficiary. . . may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day. . . . ."  <u>See</u> 29 U.S.C.  § 1132(c)(1).

exemplary, statutorily mandated and punitive damages.")  (Pl.'s Mem. Opp'n at 25) (citing Policy § 4.4.)   Defendants, however, argue that the <u>Malchow</u> plaintiffs did not specifically allege that they requested, and failed to receive, plan information.  In response, UHG notes that Defendants are taking the untenable position that, on this motion to dismiss to test the sufficiency of the pleadings in this action, the Court should test the sufficiency of the pleadings in a different case.

 Even assuming that the Defendants are correct that portions of the consideration that UHG will pay for the <u>Malchow</u> settlement fall within exclusions under the Policy, the damages allegations before the Court at this time are sufficient to withstand Defendants' motions to dismiss.  The Court is not persuaded by Defendants' argument that, because the <u>Malchow</u> Complaint fails to specifically plead that the <u>Malchow</u> plaintiffs requested and failed to receive information under 29 U.S.C. § 1132, their claim in Count III fails.  As discussed, *supra*, UHG is not required here to prove the truth of the underlying claim anew.  <u>See</u> <u>Uniroyal</u>, 707 F.Supp. at 1379 (Insured not required to prove the truth of the underlying claim in order for indemnity to attach – only that the claim settled by the insured be a "covered loss" under the policy.)

And while Plaintiff's arguments that the potential award of attorneys' fees and the claim for $100-a-day statutory relief constitute "Damages" may not ultimately prevail, at this stage of the case, this Court has an insufficient record upon which to make such a ruling.  Based on what is before the Court at this time, it cannot be said that the allegations do not involve "Damages,"as a matter of law, and that UHG has insufficiently stated a plausible claim upon which relief may be granted.

### B.      Failure to Pay and Blanket Billing Exclusions

In addition to arguing that the Damages provision precludes coverage, Defendants claim that two Policy Exclusions apply, excluding coverage.  First, contending that the Policy was

never intended to cover unpaid benefits, Defendants refer to Policy Exclusion 9.6 ("Failure to Pay"), which precludes coverage for "claims arising out of or resulting from . . . the . . . failure to pay . . . claim benefit . . . money . . . ."  (Policy § 9.6.)  Second, Defendants contend that Endorsement 10.3 ("Blanket Billing Disputes Exclusion") precludes coverage for "claims based upon, arising out of or attributable to disputes involving . . . co-payment percentages paid, or any Claims alleging discounting or failure to disclose how discounts are calculated."  (Policy § 10.3.)

Defendants contend that the terms "arising out of" and "based upon" are broadly interpreted and that such exclusions apply to any claims that would not exist "but for" the excluded activity, regardless of proximate cause, bases for liability or other case specifics. (Defs.' Mem. at 18) (citing Mount Vernon Fire Ins. Co. v. Creative Housing Ltd., 668 N.E.2d 404, 406 (N.Y. 1996)).  In addition, Defendants assert that "arising out of" and "based upon" are defined as "originating from, incident to, or having connection with" and require only some causal relationship between the alleged damage and the provision's subject matter.  (Id.) (citing Worth Const. Co. v. Admiral Ins. Co., 888 N.E.2d 1043, 1045 (N.Y. 2008); Mount Vernon, 668 N.E.2d at 406)).

### 1. Failure to Pay Exclusion

With those definitions in mind, Defendants argue that the Failure to Pay Exclusion precludes coverage of any claim that would not exist but for (i.e., that "arises out of") "the failure to pay claim benefit . . . money."  (Defs.' Mem. at 19.)  As to the Malchow settlement, Defendants contend that the plaintiffs there alleged a failure to pay benefits, demanded reimbursement of such benefits, and the case was resolved by the creation of a fund requiring the reimbursement of those benefits.  Accordingly, Defendants argue that  Malchow "arises out of" and "would not exist but for" a "failure to pay claim benefit money." Similarly, Defendants assert that the NYAG claim alleges the same failure to pay benefits:  its resolution involved

injunctive and administrative measures designed to insure that UHG would, in the future, fully pay said benefits and it did this in response to an alleged failure to pay benefits.  (Id.)

Plaintiff asserts that the NYAG claim, that was settled through the AOD, was a conflict of interest claim, not a claim of failure to pay benefits.  (Pl.'s Mem. Opp'n at 15.)  Defendants, who acknowledge that the "AOD did not require UHG to reimburse benefits" (Defs.' Mem. at 19),do not characterize NYAG as a conflict of interest claim, arguing instead that NYAG 'arose out of' and 'would not exist but for' the failure to pay claim benefits.  (Defs.' Mem. at 11-12.)

In response to Defendants' argument that the $50 million settlement payment falls within the exclusion from the definition of "Damages" for "benefits," UHG contends that the Failure to Pay Exclusion does not say that claims having a "but for" relationship with a dispute involving a benefits component are excluded from the definition.  (Pl.'s Mem. Opp'n at 15.)  Rather, the Policy says only that the term "Damages" does not include "benefits."  According to UHG, Defendants cannot contend that the $50 million payment to a nonprofit in NYAG was actually the payment of "benefits . .. Owed to any enrollee, member, subscriber or client under any contract, healthcare plan [or] insurance policy."  (Id. at 16) (citing Policy § 4.4.)  Furthermore, UHG maintains that the NYAG's findings, as stated in the AOD, incidentally mention benefits, but only in the context of describing UHG's "financial incentive" to own, operate and use the Ingenix database in a way that gave rise to a conflict of interest.  (Id. at 19-20.)

As to Malchow, UHG argues that only one of the five counts in the Malchow complaint is even arguably for benefits owed under the plans – Count I.   Arguing that the failure to pay claim benefit money does not have the requisite causal connection with the Malchow claims, UHG asserts that coverage cannot be excluded, as a matter of law, based on this record.  (Pl.'s Mem. Opp'n at 28.)

Here, the meaning of the Failure to Pay Exclusion is not clear from the face of the

pleadings, e.g., whether claims having a "but for" relationship with a dispute containing a benefits component are excluded from the definition of Damages.  The Policy only says that the term "Damages" does not include "benefits."  A fuller record will be necessary to give the Court a more complete understanding of the intent of the parties.  Consequently, having determined that Plaintiff has stated a claim with respect to the Policy's definition of Damages, the Court cannot find, as a matter of law, that the "Failure to Pay" Exclusion precludes coverage.

### 2.  Blanket Billing Exclusion

Defendants contend that the Blanket Billing Exclusion also precludes coverage, as it applies to claims "based upon" or "arising out of" "disputes involving negotiated discounts [or] co-payment percentages paid" or any claims "alleging discounting or failure to disclose how discounts are calculated."  (Defs.' Mem. at 20) (citing Policy § 10.3.)  Malchow and NYAG allege that understated UCRs created by the UHG/Ingenix Databases resulted in plan members absorbing a co-payment percentage that was higher than what was bargained for by UHG's plan participants, thus, Defendants contend, both matters "arise out of . . . disputes involving . . . co-payment percentages paid." Also, Defendants note that both matters allege that UHG used the UHG/Ingenix Database to improperly discount benefit payments and failed to disclose the basis for the discounts.  (Defs.' Mem. at 20.)  In addition, Defendants reference the related litigation, UnitedHealth Group v. Columbia, 05-CV-1289 (PJS/SRN), in which the Special Master, viewing a similar Blanket Billing Exclusion, held that certain of the underlying claims fell within that exclusion.

In response, UHG argues that neither Malchow nor NYAG alleges or involves "blanket billing."  As applied to its business, UHG contends that the exclusion is limited to instances in which UHG is sued for wrongful conduct related to negotiated discounts or co-payment percentages in the context of in-network health care provider fees.  UHG argues that it has no

application to <u>Malchow</u> or <u>NYAG</u>, which involved only out-of-network services. (Pl.'s Mem. Opp'n at 29.)

Plaintiff also takes issue with Defendants' argument that the exclusion bars coverage by virtue of its reference to "disputes involving . . . co-payment percentages paid," claiming that Defendants overlook the difference between a co-payment and co-insurance. (Pl.'s Mem. Opp'n at 30.) In addition, UHG argues that <u>Malchow</u> does not involve a dispute over the percentages that were paid – rather, the issue was whether the Ingenix Database that Oxford used to calculate the UCR was accurate. Moreover, UHG counters that <u>Malchow</u> does not involve "claims alleging discounting or failure to disclose how discounts are calculated." (Pl.'s Mem. Opp'n at 31.) As to the Special Master's determination that the blanket billing exclusion in UHG's 1998 Lexington policy applied to exclude coverage in the 05-1289 litigation, noting its disagreement with that ruling, Plaintiff argues that, at this stage, it makes no difference for purposes of this motion. (Pl.'s Mem. Opp'n at 25, n. 7.)

Here, Defendants appear to presume that § 10.3 applies to billing disputes in general, whereas Plaintiff maintains that it applies, if at all, to a subset of billing disputes known as "blanket billing." "Blanket Billing" is not defined and UHG offers, if this motion to dismiss is denied, to submit extrinsic evidence related to its meaning.[7] As with the Failure to Pay Exclusion, the Court cannot say, as a matter of law, that it applies to preclude coverage. More evidence is needed to determine the meaning of the Blanket Billing Exclusion and therefore, as to this exclusion, the Court recommends that Defendants' Motions to Dismiss be denied.

---

[7]Specifically, UHG asserts that the evidence will show that this exclusion was drafted by a lawyer hired by Lexington and was designed to bar coverage for a specific type of dispute involving whether a subscriber's percentage co-payment for in-network services should be calculated based on a provider's billed charges or the provider's discounted charges negotiated with UHG through a provider agreement. (Pl.'s Mem. Opp'n at 26.)

## C. Plaintiff's Affirmative Arguments

Assuming that one of the exclusions discussed *supra* applies, UHG argues that two express grants of coverage supersede the exclusions and restore coverage: (1) Section 9.9 operates as a grant of coverage for "the activity of administering benefits claims;"and (2) Section 10.2, the "Anti Trust Endorsement,"[8] supersedes any exclusions.

### 1. Activity of Administering Claim Benefits

Section 9.9 of the Policy, the "Benefits and Provider Contracts" Exclusion, provides: "We will not cover Claims for any amounts or limits payable under any insurance policy, benefits contract or provider contract; <u>however, we will pay the Damages and Claim Expenses incurred by a Protected Person in the defense of a Claim for liability that results from the activity of administrating benefit claims</u>." (Policy § 9.9) (emphasis added).

Plaintiff argues that the second clause of this exclusion operates as an express grant of coverage in "the activity of administering benefit claims."  In support of its argument, UHG refers the Court to the related case, <u>UnitedHealth Group v. Columbia Casualty Co.,et al.</u>, 05-CV-1289 (PJS/SRN), in which the Special Master found, construing similar policy language, an independent grant of coverage.  (<u>See</u> Special Master Report 4A, 4/2/2009, Doc. No. 377, at 8.)  Plaintiff contends that the reasoning applied by the Special Master in the related case applies equally to this Policy – this Policy contains exceptions to exclusions like those distinguished by the Special Master.  (Pl.'s Mem. Opp'n at 33.)  And while Minnesota law controls in the related case and New York law applies here, UHG argues that that distinction is without a difference, stating that under both states' laws, "'[t]he specific denomination of a policy provision as an exclusion is not necessarily dispositive of whether that provision is indeed an exclusion.'"  (<u>Id.</u> at

---

[8]When referring to the specific Policy provision, the Court uses the spelling found in the Policy; e.g., the "Anti Trust Endorsement."

31) (citing <u>Miceli v. State Farm Mut. Auto Ins. Co.</u>, 762 N.Y.S.2d 199, 201 (App. Div. 2003), <u>rev'd on other grounds</u>, 3 N.Y.3d 725 (N.Y. 2004)).

Plaintiff argues that both <u>NYAG</u> and <u>Malchow</u> involve administering benefits claims – conduct that falls within the coverage grant in § 9.9. Also, UHG asserts that the grant of coverage in this section prevails over the "Failure to Pay" and "Benefits Owed" Exclusions, or, at the very least, it renders the Policy ambiguous. (<u>Id.</u> at 34.) In light of the possible ambiguity, UHG argues that New York law requires the Court to permit the parties to submit extrinsic evidence as to the parties' intent. (<u>Id.</u> at 34-35) (citing, e.g., <u>Jellinick v. Naples & Assoc., Inc.</u>, 744 N.Y.S.2d 610, 614 (app. Div. 2002); <u>Arrow Communication Labs., Inc. v. Pico Prod., Inc.</u>, 615 N.Y.S.2d 187, 188 (App. Div. 1994)).

In response, Defendants argue that Exclusion 9.9 does not contain an overriding grant of coverage, because the Policy does not cover unpaid benefits. First, Defendants note that, under New York law, courts uniformly hold that "policy exclusions are to be read *seriatim*," i.e., that if any one exclusion applies, there is no coverage since the exclusions may not be regarded as inconsistent with each other. (Defs.' Reply Mem. at 16) (citing <u>Catucci v. Greenwich Ins. Co.</u>, 830 N.Y.S.2d 281, 282 (App. Div. 2007); <u>Sampson v. Johnston</u>, 708 N.Y.S.2d 210 (App. Div. 2000)). Thus, Defendants argue, Exclusions 9.6 and 10.3 squarely preclude coverage and because they must be applied *seriatim,* no other exclusion can override them. Second, Defendants argue that an exception to an exclusion should not be read so broadly that the rule – i.e., the exclusion clause – is swallowed by the exception. (<u>Id.</u>) (citing <u>LaQuila Construction, Inc. v. Travelers Indem. Inc.</u>, 66 F.Supp.2d 543, 545 (1999), <u>aff'd</u>, 216 F.3d 1072 (2d Cir. 2000); <u>Narob Development Corp. v. Insurance Company of North America</u>, 631 N.Y.S.2d 155-56 (App. Div. 1995)).

Third, Defendants contend that it would be illogical to interpret the reference to

"administering benefit claims" in § 9.9's second clause such that the exclusion swallows up the Policy's general provision that unpaid benefits are not covered.  (Defs.' Reply Mem. at 17.) Finally, Defendants note that the second clause of § 9.9 also incorporates the word "Damages," which, they argue, does not include unpaid claim benefits.  Whatever the purpose of the clause, Defendants maintain that it is specifically limited to Damages and claim expenses incurred "in the defense" of a claim.  Therefore, Defendants assert, even assuming that the clause operates as a grant of coverage, it is limited to amounts specifically resulting from a claim's defense.  (Id. at 18-19)

Section 9.9 of the Policy perfectly illustrates why dismissal is inappropriate at this time. It is entirely unclear from the Policy whether this provision functions as a grant of coverage. Because the Court finds it ambiguous, the development of the factual record will be necessary to the resolution of this issue.  It is noteworthy that the Special Master in the 05-1289 case reached his conclusion (finding that the clause operated as a grant of coverage) in the context of a motion for partial summary judgment.  The resolution of this particular issue highlights the need for the development of a full and complete factual record, consequently, the Court cannot find, at this time, as a matter of law, that no coverage exists for these claims.

## 2.      Anti-Trust Endorsement and Retroactivity

Plaintiff contends that a second grant of coverage supersedes any exclusions, pointing to Section 10.2 of the Policy, the "Anti Trust Endorsement," which provides:

> [N]otwithstanding any other provisions of this Policy, including any exclusionary provisions, we will pay amounts any Protected Person is legally required to pay as Damages and Claim Expenses for Claims that directly or indirectly result from or are related to, a Wrongful Act consisting or allegedly consisting in whole or in party of anti-trust [or] restraint of trade activities.

(Policy, § 10.2.)  Plaintiff  maintains that although the Malchow complaint did not include a specific count for violation of the Sherman Act, the AMA matter has virtually the same factual

allegations and has, over time, "morphed" into a Sherman Act claim. (Pl.'s Mem. Opp'n at 38.) In the AMA matter, the plaintiffs initially framed their legal theories of recovery as arising under ERISA and like the initial Malchow Complaint, the early iterations of the AMA Complaints did not assert a Sherman Act theory. After the district court dismissed most of the ERISA claims, the AMA plaintiffs amended their complaint to focus on antitrust theories, based on the same core factual allegations. (Id. at 39.) In connection with their antitrust claims, the plaintiffs continued to allege that UHG used UCR data "to reduce reimbursements paid to beneficiaries well below true UCR rates." (AMA v. United Healthcare Corp., 2006 U.S. Dist. LEXIS 93864, at *7 (S.D.N.Y. Dec. 29, 2006.))

Thus, UHG argues, the use of the Ingenix Database in calculating UCR charges, in both the iterations of the AMA complaint and in Malchow, was alleged to be a "Wrongful Act." While Malchow did not expressly allege an antitrust claim, UHG claims that that "does not exonerate the Insurers." (Pl.'s Mem. Opp'n at 37.) Under New York law, UHG argues, coverage depends not on specific theories of recovery pled by the plaintiff, but on the claims that the facts support. (Id.) (citing Erdman v. Eagle Ins. Co., 658 N.Y.S.3d 463, 466 (App. Div. 1997)). In reply, Defendants reassert that Malchow does not involve Damages and that UHG does not dispute that the Anti Trust Endorsement is limited to Damages and Claim Expenses. (Defs.' Reply Mem. at 19.)

Moreover, Defendants argue, the Endorsement's retroactive limitations clearly eliminate Malchow from possible coverage. (Defs.' Reply Mem. at 19-20.) Malchow challenged the alleged "Wrongful Acts" of UHG's Oxford subsidiary, including its use of the Ingenix UCR data, throughout a class period defined as "six years prior to the filing of this [Malchow] Complaint through the present." (See Malchow Complaint ¶ 1, Lazare Dec., Ex. 3.) Thus, Defendants contend, the class period encompassed alleged acts involving use of the Ingenix

UCR data as early as February 2002.  (Defs.' Reply Mem. at 20.)

As to the Oxford entities, the Policy's retroactive date is July 29, 2004.  (Policy § 10.1
Retroactive Dates Endorsement.)  The Anti Trust Endorsement applies to "Claims that directly
or indirectly result from or are related to, a Wrongful Act consisting or allegedly consisting in
whole or in party of anti-trust, restraint of trade activities occurring on or after the Retroactive
Date stated in Item 6 of the Declaration. . . ."  (Policy § 10.2.)  Because UHG relies on alleged
Wrongful Acts that began in 2002, Defendants argue that the Anti-Trust Endorsement cannot
apply to Malchow. (Defs.' Reply Mem. at 20.)

Moreover, Defendants argue that Plaintiff's reading of Malchow would perversely
convert it from an ERISA suit into an antitrust suit, even though it states no antitrust claim.
Defendants point to language in the Complaint in which UHG expressly states that "the
Malchow Claim is not related to the AMA Claim, *inter alia*, because the Defendants in the
Malchow Claim were not subsidiaries of UHG at the time the AMA Claim was made."  (Id. at
21) (citing Amended Complaint ¶ 3.))

Defendants further dispute Plaintiff's position that, assuming the ERISA claim is treated
as an antitrust claim for purposes of this endorsement, coverage must be provided, even if other
Policy provisions confirm that there should be no coverage.  Describing this as an "absurd
result" and not what the parties intended, Defendants urge the Court against adopting such a
reading of an insurance contract.  (Id.. at 22) (citing Newmont Mines v. Hanover Ins. Co., 784
F.2d 127, 135 (2d Cir. 1986); Diamond Glass Cos. v. Twin City Fire Ins. Co., 2008 WL
4613170, at *4 (S.D.N.Y. Aug. 18, 2008)).

Defendants also note that, to the extent the endorsement's language may be ambiguous,
and would require extrinsic evidence to aid in interpretation, that language is not pertinent to this
motion.  Instead, Defendants assert,  "the only reasonable read [sic] of the Anti Trust

Endorsement's first clause is that any coverage intended by the Endorsement, might apply regardless of exclusions that specifically preclude coverage of antitrust claims or certain, material elements of such claims; upon information and belief, extrinsic evidence would contradict the broad view that UHG urges." (Defs.' Reply Mem. at 22, n. 27)   However, Defendants contend that this issue need not be decided at this point because "this endorsement is unambiguously rendered inapplicable to this case by virtue of its reference to 'Damages' and its retroactive limitation." (Id.) (emphasis in original.)

As to Defendants' argument regarding the retroactive application – which for Oxford is July 29, 2004 – Plaintiff's counsel argues that if part of the wrongful acts occur after 2004, this endorsement applies, preempting everything else.  Plaintiff points to the language of the Anti Trust Endorsement which provides that it applies "notwithstanding any other provisions of this Policy, including any exclusionary provision."  (Pl.'s Mem. Opp'n at 38) (citing Policy § 10.2.)

The parties' arguments with respect to the Anti Trust Endorsement and the issue of retroactivity again amplify the ambiguity of this Policy language.  Based on the Policy language alone, this Court cannot find, as a matter of law that the Anti Trust Endorsement covers the claims and supersedes any exclusions in this Policy. Further evidence is required to determine the intent of the parties and how the Endorsement and the issue of retroactivity may be resolved. The Court cannot conclusively find that coverage is excluded despite this Endorsement.

In sum, the Court finds that Plaintiff has, as a matter of law, stated a claim upon which relief can be granted.  Pursuant to Rule 12(b)(6), this Court must view the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff.  Looking solely at the pleadings and the documents embraced by the pleadings, the Court finds that UHG has adequately pled that the underlying claims fall within the Policy's definition of "Damages."

As to the parties' alternative arguments for or against coverage (the Blanket Billing and

Failure to Pay Exclusions; the Anti-Trust Endorsement and issue of retroactivity), they are simply not capable of resolution without a more complete factual record. The factual record will inform both the Court and the parties on the these issues. Accordingly, the Court recommends that Defendants' Motions to Dismiss be denied.

**THEREFORE, IT IS HEREBY RECOMMENDED THAT:**

1. Defendant Ace American Insurance Company's Motion to Dismiss (Doc. No. 69) be **DENIED;**

2. Defendant Hiscox Dedicated Corporate Member and Lexington Insurance Company's Motion to Dismiss (Doc. No. 72) be **DENIED;**

3. Defendant Homeland Insurance Company's Motion to Dismiss (Doc. No. 75) be **DENIED;**

4. Defendant National Union Fire Insurance Company's Motion to Dismiss (Doc. No. 78) be **DENIED;** and

5. Defendant Darwin National Assurance Company's Motion to Dismiss (Doc. No. 81) be **DENIED.**

Dated: August 27, 2009

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **September 11, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.