THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

UNITEDHEALTH GROUP,
INCORPORATED,

          Plaintiff,

    v.

HISCOX DEDICATED CORPORATE
MEMBER, LTD., individually,
LEXINGTON INSURANCE
COMPANY, NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA, DARWIN
NATIONAL ASSURANCE
COMPANY, HOMELAND
INSURANCE COMPANY OF NEW
YORK, and ACE AMERICAN
INSURANCE COMPANY,

          Defendants.

**Court File No. 09-CV-210 (PJS/SRN)**

---

**PLAINTIFF UNITEDHEALTH GROUP INC.'S SUPPLEMENTAL BRIEF
IN OPPOSITION TO DEFENDANTS' OBJECTIONS TO THE AUGUST 27, 2009
REPORT AND RECOMMENDATION**

David B. Goodwin (*pro hac vice*)
Michael S. Greenberg (*pro hac vice*)
Covington & Burling LLP
One Front Street
San Francisco, California  94111-5356
Telephone:  (415) 591-6000

Jeffrey J. Bouslog (No. 174671)
Christine L. Nessa (No. 277666)
Oppenheimer, Wolff & Donnelly LLP
45 South Seventh Street, Suite 3300
Minneapolis, Minnesota  55402-1609
Telephone:  (612) 607-7000

Attorneys for Plaintiff UNITEDHEALTH GROUP, INC.

By Order dated November 5, 2009, the Court asked the parties to brief (1) the nature of the Assurance of Discontinuance ("AOD"), including whether the AOD is a contract or is instead a type of "injunctive, declaratory, or administrative relief" within the meaning of Lloyd's Policy No. 509/QG007207 ("Lloyd's Policy"); (2) whether the Anti-Trust Endorsement of the Lloyd's Policy provides coverage for the New York Attorney General ("NYAG") Claim; and (3) whether United waived its argument in favor of applying the Anti-Trust Endorsement to the NYAG Claim by purportedly failing to raise it until the hearing on the Insurers' objections to Magistrate Judge Nelson's Report and Recommendations.   UnitedHealth Group submits this response to that Order, to supplement the arguments that United previously presented to this Court and to the Magistrate Judge.

## I.   AN "ASSURANCE OF DISCONTINUANCE" IS A CONTRACT WITH THE NEW YORK ATTORNEY GENERAL

The AOD is a contract between the NYAG and United, both by its own terms and under New York law.   The AOD has all of the elements of a valid contract; the AOD itself states that it is an *agreement* between the parties; and the NYAG and New York courts have historically referred to and treated AODs as contracts.   The AOD is not a form of injunctive, declaratory, or administrative relief, as defined under governing New York law.   Therefore, the AOD does not fall within the exclusion from the definition of "Damages" in the Lloyd's Policy for non-monetary relief, including "the cost of complying with any injunctive, declaratory, or administrative relief."

A.      **The AOD Has Every Element of a Valid Contract**

A valid contract under New York law requires (1) an offer, (2) acceptance of the offer, (3) consideration, (4) mutual assent, and (5) an intent to be bound.  *Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 46 (A.D. 1st Dept. 2009) (citing 22 N.Y. Jur. 2d, Contracts § 9); *Leibowitz v. Cornell University*, 584 F.3d 487, 507 (2d Cir. 2009) (New York law).

The AOD satisfies all five elements.   The NYAG sent United a Notice of Proposed Litigation on February 13, 2008, alleging that United had used an unreliable and defective database constructed by its subsidiary Ingenix to determine usual, customary and reasonable charges for out-of-network healthcare services.   (Notice, Summary at 2.)   The Notice informed United that the NYAG "intends to commence litigation…to enjoin unlawful acts and practices…and to obtain injunctive relief, restitution, damages, civil penalties, and such other relief as the Court shall deem just and proper," but offered United "the opportunity to show…why such proceedings should not be instituted."  (Notice at 1-2.)  In other words, the NYAG offered United the opportunity to negotiate and settle the NYAG Claim informally, to avoid litigation.

United and the NYAG eventually reached a negotiated settlement, which was memorialized in the AOD.   In exchange for the NYAG's discontinuance of its investigation, United promised, among other things, to pay $50 million to a non-profit. (AOD, ¶¶ 19-32, 36.)  These promises constituted consideration.  *Egnotovich v. Katten Muchin Zavis & Roseman, LLP*, 866 N.Y.S.2d 156 (A.D. 1st Dept. 2008) (finding consideration in an "exchange of promises"); *Beitner v. Becker*, 824 N.Y.S.2d 155 (A.D. 2d Dept. 2006) (consideration is "a benefit to the promisor or a detriment to the

promisee"). The parties' mutual assent is indicated by the signatures of authorized representatives of the NYAG and United at the end of the AOD. (AOD, p. 19.) Their intent to be bound is shown by the AOD itself, which states that the NYAG will continue to monitor United to ensure compliance with the AOD, that United has waived its right to challenge the AOD, and that the AOD constitutes the "entire *agreement*" between the parties. (*Id.* at ¶¶ 39-40, 46, 53.) Moreover, United and the NYAG have since abided by the terms of the AOD (Compl. ¶ 50), further demonstrating their intent to be bound by it.

### B.      The AOD Looks Like a Contract, Not an Injunction or Order

The terms and format of the AOD also demonstrate that it is a contract. The AOD lists all the terms of the agreement between the NYAG and United. (AOD, ¶¶ 19-54.) It notes that United "has agreed to comply with the provisions of this Assurance of Discontinuance." (*Id.* at 3.) The AOD also contains an "Entire Agreement" clause, at paragraph 53, and ends with the words "AGREED TO BY THE PARTIES." (*Id.* at 18-19.) It does not use the words "injunction," "injunctive relief," "enjoin," "declaratory relief," or "administrative relief." It is not signed by or imposed on United by a court, as it would be were it an injunction or order.

### C.      The NYAG and New York Courts Treat AODs as Contracts

For many years, the NYAG and New York courts have treated AODs as contracts, not as injunctions or declaratory or administrative relief. For example, in 1985, the New York Attorney General sued Solil Management, seeking specific performance of an AOD that required Solil to refund rent overcharges and to stop engaging in fraudulent and illegal rent practices. *Abrams v. Solil Mgmt. Corp.*, 491 N.Y.S.2d 243 (Sup. 1985). The

NYAG argued that "the Assurance is, in reality, a stipulation of settlement, a contract between the parties" and the NYAG thus could sue for breach of contract when Solil failed to abide by the Assurance.  *Id.* at 246.   The court agreed and described the Assurance as "a stipulation of settlement, which binds the parties."   *Id.* at 247.   Although the court noted that the statute permitting AODs did not "explicitly sanction" suits for breach of contract, it explained that "[t]he right to enter into an Assurance of Discontinuance under Executive Law Section 63(15) would be hollow if it did not include the power to compel performance of *the agreement*."   *Id.* at 249 (italics added). The court then held that the NYAG was entitled to the remedy of "specific performance" against Solil, as "the affirmative or mandatory injunction permitted under Executive Law Section 63(12) may be utilized to accomplish the purpose of specific performance of the Assurance by requiring respondent to perform in accordance with *the agreement*."   *Id* (italics added).   Thus, the court not only recognized the AOD as a contract, but expressly distinguished the AOD from the type of injunctive remedy that a court may order if the other contracting party breaches and the NYAG files suit to compel performance.

The NYAG has since pursued breach of contract claims against parties that fail to comply with AODs, seeking specific performance to enforce the Assurances.  *See, e.g.*, *People v. Condor Pontiac, Cadillac, Buick & GMC Trucks, Inc.*, 2003 WL 21649689 (N.Y. Sup. 2003) (not reported); *Spitzer v. All-Pro Telemarketing Assocs.*, 758 N.Y.S.2d 775 (Sup. 2003).   Moreover, the New York courts have repeatedly referred to an Assurance as an "agreement."   *E.g.*, *Millennium Partners, L.P. v. Select Ins. Co.*, 882 N.Y.S.2d 849 (Sup. 2009) (describing an AOD as a "settlement agreement"); *Koppell v.*

*Long Island Soc'y for the Prevention of Cruelty to Children*, 621 N.Y.S.2d 762, 765 (Sup. 1994) (referring to the "Assurance agreement").

### D.    The AOD Is Not Injunctive Relief

"An injunction is a judicial order requiring a person to do or refrain from doing certain acts or commanding someone to undo some wrong or injury."   43A C.J.S. Injunctions § 1 (2009).   It is "a remedial writ which a court issues for the purpose of enforcing its equity jurisdiction."   *Id.* at § 2.   The AOD is not an injunction.   It was not issued by any court ─ indeed there never was a suit, let alone a suit seeking an injunction or court order.   Further, as noted, the NYAG has sought injunctions from the courts in order to enforce AODs (*see Abrams*, 491 N.Y.S.2d at 749, and *Spitzer*, 758 N.Y.S.2d at 755), which would be unnecessary if the AODs themselves were injunctions.   The remedy in New York for failure to comply with an injunction is not another injunction but a proceeding for civil contempt.   67A N.Y. Jur. 2d, Injunctions § 204.   Moreover, the same statute that gives the NYAG the authority to enter into AODs, Section 63 of the New York Executive Law, also contains a *separate* subsection authorizing the NYAG to apply to the state courts for an injunction.   N.Y. Exec. Law §§ 63(12) & (15) (2009).   The NYAG has no authority to issue an injunction on its own.   *See* N.Y. Exec. Law § 63(12) (requiring the NYAG to petition the courts to obtain injunctive relief).

The cases that the Insurers previously cited in arguing that the AOD constituted a non-monetary injunctive remedy are inapposite.   None of the cases involved AODs; all involved interpretations of *court* orders.   Thus, in *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 319 (S.D.N.Y. 2008), the plaintiffs asked *the court* to enjoin the continued

distribution of a movie that played a portion of a copyrighted song without the plaintiffs'
permission as copyright owners, and the court distinguished between a preliminary
injunction, which prohibits future conduct, and a mandatory injunction, which commands
a specific act.  Similarly, in *Patterson v. Newspaper & Mail Deliverers' Union*, 138 B.R.
149 (S.D.N.Y. 1992), a bankruptcy debtor asked the court, during the pendency of its
bankruptcy proceedings, to relieve it of the obligation to pay a fraction of a court-
appointed administrator's salary it owed under a federal consent decree.  In determining
whether the automatic stay provision of Section 362(a) of the Bankruptcy Code applied
to the salary payments, the court noted that Section 362(b)(5) permits governmental
agencies to enforce judgments against debtors as long as they are not money judgments.
*Id.* at 152.  The court distinguished the fractional salary payments in *Patterson* from an
ordinary money judgment because the payments were part of a broader agreement to
reform the debtor's hiring practices that was "in the nature of injunctive relief" and did
not involve "a definite and certain monetary expense."  *Id.*  Finally, *Bullock v. Maryland
Cas. Co.*, 102 Cal. Rptr. 2d 804 (Ct. App. 2001), addressed a local ordinance that
required anyone who converts a hotel to nonresidential use to pay for housing to replace
the units withdrawn from the market.  In concluding that the sums paid to comply with a
court order enforcing the ordinance were not "damages," the court explained that under
California law, the undefined term "damages" refers to money that "compensated for, or
sought to alleviate, harm caused by *past conduct*," whereas the sums at issue in *Bullock*
were solely directed to avoiding *future* harm.  *Id*. at 811-12 (italics in original).

In the proceedings before the Magistrate Judge, the Insurers also cited to Judge McKenna's passing references to "injunctive relief" in his May 19, 2009 order concerning the approval of the settlement of the *AMA* action (the principal claim at issue in the companion case to this one, *UnitedHealth v. Columbia*). *See Am. Med. Ass'n v. United Healthcare Corp.*, No. 1:00-cv-2800 (LMM), Memorandum and Order (5/19/09) at 3-4, Dkt. # 393. But Judge McKenna was describing the settlement of the ***AMA* case** as having both injunctive and damages components. He explained that even if the *AMA* settlement were not approved, the relief embodied in the AOD would achieve the same result as the injunctive portion of the *AMA* settlement. By that remark, Judge McKenna could *not* have been referring to the portion of the AOD in which United agreed to pay $50 million to a nonprofit, because the *AMA* settlement agreement does not require United to pay money to a nonprofit. The AOD, in contrast, requires *both* payment of $50 million *and* a change in United's claims handling procedures going forward (the latter requirement was also in the *AMA* settlement agreement).

### E.     The AOD Is Not Declaratory Relief

"A 'declaratory judgment' declares the rights of the parties or expresses the opinion of the court on a question of law without seeking execution or performance from the opposing party . . . for the purpose of guiding future conduct." 26 C.J.S. Declaratory Judgments § 1. Under the New York statutes, a "court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be

claimed."  N.Y. C.P.L.R. § 3001 (2009); *see also* 43 N.Y. Jur. 2d Declaratory Judgments § 1.

The AOD is not declaratory relief.  It neither expresses the opinion of a court on any question of law, nor offers any final judgment about the rights and legal relations of the NYAG and United.  Instead, it is a contract requiring performance from both the NYAG and United.

### F.    The AOD Is Not Administrative Relief

The AOD is not administrative relief.  No state administrative agency initiated any administrative proceeding against United; there were no administrative hearings or decisions concerning the NYAG's allegations; and there was no administrative order requiring United to pay money.  Rather, the NYAG threatened a lawsuit against United, after which the parties entered into a settlement agreement that required United to pay $50 million.

For all of these reasons, and the reasons set forth in United's prior briefing and oral arguments, the Court should reject the Insurers' contention that the $50 million payment pursuant to the AOD is "injunctive, declaratory, or administrative relief."

## II.   THE ANTI-TRUST ENDORSEMENT PROVIDES COVERAGE FOR THE NYAG CLAIM

The relevant portion of the Anti-Trust Endorsement in the Lloyd's Policy provides:

> [N]otwithstanding any other provisions of this Policy, including any exclusionary provision, we will pay amounts any Protected Person is legally required to pay as Damages and Claim Expenses for Claims that directly or indirectly result from or are related to, a Wrongful Act

consisting or allegedly consisting in whole or in part of anti-trust, restraint of trade activities occurring on or after the Retroactive Date stated in Item 6 of the Declaration and before the cancellation date or Expiration Date of this Policy. Damages arising out of the same or interrelated Wrongful Acts shall be deemed to arise from the first such same or interrelated acts Wrongful Acts.

Lloyd's Policy § 10.2 (bolding deleted).

This endorsement applies to the NYAG Claim. The NYAG alleged that United had conflicts of interest as a result of its ownership of Ingenix, which gave United control over the database that is widely used by the nation's largest health insurers to calculate reimbursement rates for treatment by out-of-network health care providers. AOD at 1-2, 6. The NYAG claimed that "the system that is meant to reimburse consumers fairly as a reflection of the market is instead wholly owned and operated *by the industry*," which "depresses" or "understates" reimbursement rates for out-of-network treatment. AOD at 2-3, 6-7 (emphasis added). In other words, the NYAG alleged that United's ownership of Ingenix, together with the agreement of large health insurers to provide the data used by the Ingenix databases and to use the Ingenix databases to calculate usual, customary and reasonable out-of-network charges, restrained trade. That the AOD does not expressly use the term "anti-trust" or "restraint of trade," or that it also includes allegations of Wrongful Acts that may not consist of antitrust or restraint of trade activities, is beside the point, because the exclusion explicitly applies as long as the Wrongful Acts "in part" involve activities that *either* allegedly or actually consist of antitrust or restraint of trade activities taking place after the applicable retroactive date.

### A.   The Endorsement Covers Claims by United for Acts Between January 1, 1977 and May 1, 2008

At the hearing on the Insurers' objections to the Report and Recommendations, the Court raised several questions concerning the "Retroactive Date" portion of the Anti-Trust Endorsement, as applied to the *Malchow* Claim, which is asserted against Oxford Health, an entity that United acquired in 2004.   United explained that the Endorsement expressly applies to *Malchow* so long as the pertinent Wrongful Acts occurred "in part" after the retroactive date, and that there is no dispute that some of the alleged acts in *Malchow* that may constitute antitrust activities occurred after the applicable date.   But this issue does not even arise for the NYAG Claim, which was asserted against United. The Retroactive Date that applies to United is "1st January 1977" (Lloyd's Policy at § 10.1), long before the activities at issue in the NYAG Claim took place.

### B.   The Endorsement Covers the $50 Million in Damages and/or Claim Expenses Related to the AOD

The Endorsement provides that the Insurers will pay "amounts any Protected Person is legally required to pay as Damages and Claim Expenses for Claims."   *Id.* at § 10.2 (bolding deleted).   United incurred Claims Expenses in connection with the NYAG Claim.   In addition, the AOD legally requires United to pay "Damages," specifically, $50 million to a nonprofit.   AOD at 9, 10, 17.   As noted in United's Opposition to Defendants' Motions to Dismiss the Complaint, June 19, 2009 at 5, 12-13 (Dkt. # 103), the Lloyd's Policy defines "Damages" as "any monetary amount…an Insured is legally obligated to pay as a result of a Claim," and includes "settlements; and Claim Expenses awarded against, or agreed to, as part of a settlement."   Lloyd's Policy § 4.4 (bolding

deleted).  Nothing in the Policy's definition of "Damages" requires that the settlement payment be made directly to the plaintiff to be covered, and New York courts have found coverage for a settlement agreement that requires the settling party to pay money to a third party nonprofit.  *See Vigilant Ins. Co. v. Bear Stearns Cos., Inc.*, 824 N.Y.S.2d 91 (A.D. 1st Dept. 2006), *rev'd on other grounds*, 10 N.Y.3d 170 (2008) ($30 million payment to non-profit for independent research and investor education is covered under the policies' definition of loss, which included "settlements"); *see also PMI Mortgage Ins. Co. v. Am. Int'l Lines Specialty Ins. Co.*, No. C02-1774-PJH, 2007 WL 1864780 at * 3 (N.D. Cal. June 28, 2007) (not reported) (settlement that included payments to a nonprofit was a covered loss).  Nor does the definition of "Damages" in the Lloyd's Policy, which refers simply to "any monetary amount" in payment of a "settlement," preclude coverage simply because the settlement agreement stipulates, as settlement agreements often do, how and to whom the money is to be paid.  The agreement to pay $50 million to a non-profit in settlement of the NYAG Claim squarely fits within the definition of "Damages" in the Lloyd's Policy.

## C.   The Endorsement Covers the Wrongful Acts in Restraint of Trade Alleged in the AOD

The Endorsement also requires that the Damages or Claim Expenses arise from a "Wrongful Act consisting or allegedly consisting in whole or in part of anti-trust, restraint of trade activities."  *Id.* at § 10.2.  The Lloyd's Policy defines "Wrongful Act" as

> any actual or alleged negligent act, error, omission, misstatement, breach of duty, breach of privacy or breach of confidentiality in the performing or failure to perform Professional Services or Medical professional services,

as applicable, by any Insured or person for whom the Insured is legally responsible.

*Id.* at § 4.17 (bolding deleted).

According to the NYAG's allegations in the AOD, United's ownership of Ingenix and the agreement of United and other health insurers to use Ingenix's allegedly flawed databases to calculate out-of-network reimbursement rates, effectively allowed United and other health insurers to manipulate prices in the market for out-of-network health care services.  In particular, the NYAG alleged that United "has a conflict of interest in owning and operating the Ingenix Databases in connection with determining reimbursement rates," that other "health insurers have an incentive to manipulate the data they submit to Ingenix so as to depress reimbursement rates they determine using Ingenix schedules, given their own reimbursement obligations toward consumers," that "the pooled data" provided by the other insurers "skew[s] the reimbursement rates downwards," and that "insurers do not explain how they arrive at these [out-of-network] rates and do not disclose their conflicts of interest."  AOD at 2, 6-7.  The NYAG further charged that the insurers' collective actions also hurt consumers by concealing the reimbursement rate calculations in a "black box," and failing to provide "clear and accurate information" to consumers which would have assisted them in selecting their health insurers and out-of-network providers.  *Id.* at 7.  The NYAG concluded that health insurers cannot "fairly determine market rates" for reimbursing consumers and that an independently operated database is necessary to enhance consumer choice and welfare.  *Id.* at 7-8.

These allegations satisfy the definition of a Wrongful Act in the Policy. They encompass alleged "negligent acts" or "errors," such as any claimed failure by Ingenix to properly audit the rate information provided by other health insurers (*id.* at 6) and the establishment of a data collection mechanism that has the effect of permitting other health insurers to supply data to Ingenix that purportedly depresses reimbursement rates; "omissions," such as United's alleged failure to inform consumers of how United calculates reimbursement rates or of United's potential conflicts of interest as the owner of Ingenix; and "breaches of duty" to consumers, such as supposedly failing to fairly calculate reimbursement rates. Further, the acts occurred in "performing or failing to perform Professional Services," as the Lloyd's Policy defines the term "Professional Services" to include, *inter alia*, (1) "administration of benefit plans," (2) "claim handling, reviewing and adjusting," (3) "the review of health care services including: cost of health care," and (4) "actuarial services provided by Ingenix to a third party for a fee." Lloyd's Policy at § 4.9.

The acts that the NYAG alleged consisted, "in part," of alleged antitrust or "restraint of trade activities." To determine whether a particular action is a restraint of trade, courts deem some types of misconduct (such as an agreement to fix prices) *per se* improper; but for most types of alleged misconduct, courts apply a "rule of reason," which requires a plaintiff to show that "the challenged action has had an actual adverse effect on competition as a whole in the relevant market," which "diminish[ed] overall competition, and hence consumer welfare." *K.M.B. Warehouse Distribs., Inc., v. Walker Mfg. Co.*, 61 F.3d 123, 127-28 (2d Cir. 1995) (italics and citation omitted). Generally, an

unreasonable restraint is one that raises price, reduces output, diminishes quality, limits consumer choice, or creates, maintains, or enhances market power. *See, e.g., FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (agreement among members of dentists' association to use a package of services limits consumer choice by impeding the "'ordinary give and take of the market place'") (citation omitted).

In essence, the NYAG asserted that United and the other insurers, as the largest purchasers of health care services, jointly provided information to and used Ingenix's database and market power in a way that created an oligopsony. By using a reimbursement mechanism that allegedly depressed prices, that oligopsony allegedly had the effect of reducing demand for out-of-network health care providers, which in turn reduced consumer choice in using of out-of-network providers. *See Todd v. Exxon Group*, 275 F.3d 191, 198-99 (2d Cir. 2001) (explaining that when an oligopsony is alleged, an "[i]nformation exchange is…a facilitating practice that can help support an inference of a price-fixing agreement," and the exchange may itself be a violation of the Sherman Act); *Knevelbaard Dairies v. Kraft Foods Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) ("When buyers agree illegally to pay suppliers less than the prices that would otherwise prevail, suppliers are obviously injured…[, and t]he suppliers' loss also constitutes antitrust injury") (citation omitted).

Specifically, as noted, the NYAG described the Ingenix databases as the "industry leader" in the area, "widely used by health insurers as a benchmark in determining reimbursement rates." AOD at ¶¶ 9, 13. The NYAG alleged that those insurers "have a conflict of interest in" both providing data to and "using the Ingenix Databases" because

they "have a financial incentive to manipulate the data they provide to the Ingenix Databases so that the pooled data will skew reimbursement rates downward." *Id.* at ¶ 12; *see Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 347 (1982) ("'[m]aximum price fixing may channel distribution through a few large or specifically advantaged dealers who otherwise would be subject to significant nonprice competition'") (citation omitted); *National Macaroni Mfrs. Ass'n v. FTC*, 345 F.2d 421, 426-27 (7th Cir. 1965) (trade association's resolution calling for production of macaroni with a reduced durum wheat content violated Sherman Act by systematically decreasing demand for durum wheat). Indeed, as United explained in its opposition to the motions to dismiss in this case, the district court in the AMA case found that substantively similar allegations against United by the AMA plaintiffs were sufficient to state a claim for a restraint of trade violation of the Sherman Act. *See Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 446-47 (S.D.N.Y. 2008).

Finally, the Anti-Trust Endorsement is very broad in scope, applying to acts that "directly *or indirectly result from or are related to*, a Wrongful Act consisting or allegedly consisting in whole *or in part* of anti-trust, restraint of trade activities." Lloyd's Policy at § 10.2 (emphasis added). Even if this Court were to find that the NYAG Claim is only the *indirect result of* or *related to* those acts that could constitute antitrust or restraint of trade activities, and only does so *in part*, the Endorsement would still apply to the entire NYAG Claim. Moreover, the Endorsement states that it applies "notwithstanding any other provisions of this Policy, including any exclusionary

provision," and thus the "benefits owed" exclusion and the "failure to pay" exclusions that were the focus of the Insurers' motion to dismiss would not bar coverage.

## III. UNITED DID NOT WAIVE ANY ARGUMENT IN FAVOR OF APPLYING THE ANTI-TRUST ENDORSEMENT TO THE NYAG CLAIM

The Court has also asked for briefing on whether United waived any argument in favor of applying the Anti-Trust Endorsement to the NYAG Claim "by failing to raise it until oral argument on defendants' objections." The premise for the Court's request – based on a statement by counsel for Hiscox, who suggested that United had raised the issue for the first time in argument before this Court – is incorrect. In fact, United presented this argument both in its complaint, and also to the Magistrate Judge.

United alleged in its first amended complaint that it is seeking coverage for both the *Malchow* Claim and the NYAG Claim (at ¶¶ 1-8), and that the Insurers cover these claims (*id.*). United further alleged (at ¶ 28) that the Anti-Trust Endorsement is one of the policy provisions that confers coverage, and never alleged that the endorsement applies only to one claim rather than the other.

During the hearing on the Insurers' motion to dismiss before Magistrate Judge Nelson, Hiscox's lawyer nonetheless asserted (as he did in the argument before this Court) that United was not taking the position that the endorsement applied to the NYAG Claim. July 28, 2009 Hearing Tr. at 17 (Dkt #116).

In response, counsel for United specifically argued that the Anti-Trust Endorsement provides coverage for *both* the NYAG Claim and the *Malchow* Claim. After invoking the Anti-Trust Endorsement and noting that it applies to "restraint of trade

activities," (*id.* at 41:25-43:24), United's counsel argued with respect to the NYAG Claim:

> [A]s to <u>New York Attorney General [Claim]</u>, I can only read . . . the assurance of discontinuance as saying, consumer choice was harmed by the fact that United owned and used the Ingenix database and this effectively -- effectively what the AOD does is requires United to divest Ingenix to set up a competitor and to enhance consumer choice. That's what it's about. And if that isn't a restraint on trade allegation, I don't know what is.

*Id.* at 44:1-8 (emphasis in original). United then separately discussed the application of the Anti-Trust Endorsement to the *Malchow* claim. *See id.* at 44:9-18. The Magistrate Judge concluded, as one of many reasons for recommending denial of the Insurers' motion to dismiss, that coverage under the Anti-Trust Endorsement is possible for the *Malchow* Claim. Report & Recommendation at 27 (Dkt #117). She did not address whether the Endorsement also could provide coverage for the NYAG Claim.

This Court is required to "make a *de novo* determination upon the record . . . of any portion of the Magistrate Judge's disposition to which specific written objection has been made." L.R. 72.2. "[T]he record" includes both the pleadings that the parties filed as well as the transcript of the hearing before the Magistrate Judge. *See United States v. Oliver*, No. 06-124 MJD/RLE, 2007 WL 551613, at *1 (D. Minn. Feb. 21, 2007) (not reported) (conducting "*de novo* review of the record, including the transcripts of both hearings before the Chief Magistrate Judge and the exhibits submitted in conjunction with those hearings"); *see also Maxwell v. Mabry*, 672 F.2d 683, 685 (8th Cir. 1982) (noting that the district court reviewed the "entire record including the transcript of the hearing before the magistrate"). Because United presented the Anti-Trust Endorsement

- 17 -

argument to the Magistrate Judge, United preserved the argument for purposes of opposing the Insurers' objections. *Id*.

Even if this Court were to disagree with the Magistrate Judge's analysis regarding coverage for NYAG Claim, it may adopt the Magistrate Judge's recommendation to deny the Insurers' motion to dismiss on the alternative ground that the Anti-Trust Endorsement applies to the NYAG Claim, as United alleged in the complaint and argued at the hearing. *Cf. Richmond v. Higgins*, 435 F.3d 825, 828 (8th Cir. 2006) (court may affirm on "any basis supported by the record"). This is true even if United – the prevailing party – only raised this alternative ground for affirmance in its oral presentation and not in its written response to the Insurers' objections. *Cf. Transcontinental Ins. Co. v. W.G. Samuels Co.*, 370 F.3d 755, 758 (8th Cir. 2004) ("We may affirm a judgment on any ground raised in the district court, and the party that prevailed in the district court need not file a cross-appeal to raise alternative grounds for affirmance.").

Finally, even if United had not presented this argument to the Magistrate Judge at all, this Court would still have discretion to consider it. *See, e.g.*, *Stephens v. Tolbert*, 471 F.3d 1173, 1177 (11th Cir. 2006); *cf. Brown v. St. Louis Police Dep't*, 691 F.2d 393, 396 (8th Cir. 1982) (a court may "affirm on any ground supported by the record even if the issue was not pleaded, tried, or otherwise referred to in the proceedings below"). This Court retains, as a statutory and as a constitutional matter, broad discretion when considering a magistrate judge's report and recommendation. *Stephens*, 471 F.2d at 1176. A magistrate judge "has no authority to make a final and binding disposition," *see United States v. Raddatz*, 447 U.S. 667, 673 (1980), and the district court may even

receive further evidence when it reviews the report and recommendation, *see* 28 U.S.C. § 636(b)(1).  Because of these unique aspects of a district court's supervision of a report and recommendations, a district court may accept arguments that were not presented to the magistrate judge.  *Stephens*, 471 F.3d at 1177; *see also Thomas v. Arn*, 474 U.S. 140, 154 (1985) (noting that even if no objections to magistrate judge's findings and recommendations are filed, district court may undertake "further review . . . *sua sponte* or at the request of a party, under a *de novo* or any other standard").  Indeed, some appellate courts have even held that as part of its obligation to review *de novo* any issue considered by the magistrate judge to which a proper objection is made, a district court *must* consider all arguments, regardless of whether they were raised before the magistrate judge.  *See, e.g., United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992).

Here, not only did United argue the Antitrust Endorsement before the Magistrate Judge, and then again at the hearing on the Insurers' objections, but this Court has now allowed the parties, through this supplemental briefing, to fully air their substantive arguments on the endorsement, so there can be no prejudice to the Insurers by considering the merits of the issue now.

In sum, there has been no waiver of the NYAG Anti-Trust Endorsement argument; this Court has discretion to accept the Magistrate Judge's recommendation on any ground supported by the record; and it should do so here.

## IV.   CONCLUSION

For the foregoing reasons, this Court should find that (1) the AOD is not "injunctive, declaratory, or other administrative relief" within the meaning of the Lloyd's

policy but instead is a contract; (2) the Anti-Trust Endorsement covers the NYAG Claim, and (3) United did not waive the argument that the Anti-Trust Endorsement covers the NYAG Claim.

Dated:  November 25, 2009

Respectfully submitted,

/s/ David B. Goodwin
David B. Goodwin (pro hac vice)
Michael S. Greenberg (pro hac vice)
Covington & Burling LLP
One Front Street
San Francisco, California  94111-5356
Telephone:  (415) 591-6000
Email: Dgoodwin@cov.com

Jeffrey J. Bouslog (No. 174671)
Christine L. Nessa (No. 277666)
Oppenheimer, Wolff & Donnelly LLP
45 South Seventh Street, Suite 3300
Minneapolis, Minnesota  55402-1609
Telephone:  (612) 607-7000
Email: Jbouslog@Oppenheimer.com

*Attorneys for Plaintiff UnitedHealth Group Incorporated*