UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITEDHEALTH GROUP
INCORPORATED,

Case No. 09-CV-0210 (PJS/SRN)

Plaintiff,

v.

MEMORANDUM OPINION AND ORDER

HISCOX DEDICATED CORPORATE
MEMBER LTD., individually;
LEXINGTON INSURANCE COMPANY;
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA;
DARWIN NATIONAL ASSURANCE
COMPANY; HOMELAND INSURANCE
COMPANY OF NEW YORK; and ACE
AMERICAN INSURANCE COMPANY,

Defendants.

David B. Goodwin and Michael S. Greenberg, COVINGTON & BURLING, LLP; Jeffrey J. Bouslog, Christine L. Nessa, and Katherine M. Wilhoit, OPPENHEIMER, WOLFF & DONNELLY LLP, for plaintiff.

Stephen M. Lazare and David E. Potter, LAZARE POTTER & GIACOVAS LLP; Eric C. Tostrud and David D. Leishman, LOCKRIDGE GRINDAL NAUEN P.L.L.P., for defendants Hiscox Dedicated Corporate Member Ltd. and Lexington Insurance Company.

David P. Pearson, Thomas H. Boyd, and Erin A. Oglesbay, WINTHROP & WEINSTINE, for defendant National Union Fire Insurance Company of Pittsburgh, PA.

Andrew M. Luger and Monte A. Mills, GREENE ESPEL P.L.L.P.; Lewis K. Loss and Matthew J. Dendinger, THOMPSON, LOSS & JUDGE, LLP, for defendant Darwin National Assurance Company.

Patricia J. St. Peter and Matthew J. Gollinger, ZELLE HOFFMAN VOELBEL & MASON LLP, for defendant Homeland Insurance Company of New York.

Steven J. Sheridan, FOLEY & MANSFIELD; Thomas M. Jones and Kevin M. Haas, COZEN & O'CONNOR, for defendant Ace American Insurance Company.

Plaintiff UnitedHealth Group Incorporated ("United") recently agreed to settle two lawsuits — one a class action filed in federal court in New Jersey, and the other an action threatened by the New York Attorney General's Office.  In this lawsuit, United seeks to compel its managed-care liability insurers to indemnify it for the amounts that it agreed to pay to settle the two actions and for the attorney's fees and costs that it incurred in defending those actions.

The insurers filed five motions to dismiss United's amended complaint.  The Court referred those motions to Magistrate Judge Susan R. Nelson, who recommended denying the insurers' motions in their entirety.  This matter is before the Court on the insurers' objection to Judge Nelson's recommendation.

The Court has conducted a de novo review.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Based on that review, the Court finds that the insurers are not obligated to indemnify United for any of the amounts that United incurred in defending or settling the New Jersey action or the action threatened by the New York Attorney General's Office, with the following narrow exceptions:  First, the insurers may be obligated to indemnify United for some of the amount (if any) that it paid to defend and settle the claim made against it by the New Jersey plaintiffs for the attorney's fees incurred by those plaintiffs.  Second, the insurers may be obligated to indemnify United for the attorney's fees and costs that United incurred in defending the action threatened by the New York Attorney General's Office.  With these exceptions, the motions of the insurers are granted, and United's complaint is dismissed.

# I.  BACKGROUND

United seeks coverage for two claims: (1) the "*Malchow* claim," which arises from a lawsuit captioned *Malchow v. Oxford Health Plans, Inc.*, No. 08-935 (D.N.J. filed Feb. 19, 2008); and (2) the "NYAG claim," which arises from a Notice of Proposed Litigation ("NYAG Notice" or "Notice")[1] sent to United by the New York Attorney General's Office.

## A.  The Malchow Claim

The *Malchow* action was filed in the United States District Court for the District of New Jersey on February 19, 2008.  Am. Compl. ¶ 1(a).  The *Malchow* plaintiffs had obtained health insurance through various Oxford Health Plan entities, which are subsidiaries of United.  Am. Compl. ¶¶ 33-34; Lazare Decl. Ex. 3 ¶ 1 [Docket No. 92-2] (hereinafter "*Malchow* Compl.").  According to the *Malchow* complaint, members of Oxford's health plans who received services from out-of-network providers were required to pay a fixed percentage of the "usual, customary, and reasonable amount" ("UCR") charged by healthcare providers for those services, with Oxford paying the balance.  *Malchow* Compl. ¶ 9.  If the out-of-network provider from whom the subscriber received services charged an amount in excess of the UCR, then the subscriber was required to pay all of the excess, as well as a fixed percentage of the UCR.  *Malchow* Compl. ¶ 11.

The Oxford health plans calculated the UCR using databases created by Ingenix, Inc., another subsidiary of United.  *Malchow* Compl. ¶¶ 14, 95.  The Ingenix databases were supposed

---

[1]The Notice is formally captioned "Notice of Proposed Litigation Pursuant to Section 63(12) of the Executive Law, Sections 349 and 350 of Article 22-A of the [] General Business Law, and Section 2601(a) of the Insurance Law."  Lazare Decl. Ex. 2 [Docket No. 92-1 at 70-77] (hereinafter "Notice at ___").

to reflect the amounts charged by various healthcare providers for various services in various geographic regions. *Malchow* Compl. ¶ 14. Using data from the Ingenix databases, Oxford created multiple UCR schedules. *Malchow* Compl. ¶ 47. Under the "standard" schedule, for example, the UCR was purportedly set at the amount that 70% of all healthcare providers in the relevant geographic location would accept as full payment for the service. *Malchow* Compl. ¶ 47. The *Malchow* plaintiffs alleged, among other things, that Ingenix skewed the UCR downward by using flawed, incomplete, and outdated data. *Malchow* Compl. ¶¶ 18-19, 54-55, 105-108. Based on these and other allegations, the *Malchow* plaintiffs brought claims under ERISA and New Jersey law for: (1) unpaid benefits; (2) failure to provide a full and fair review of claims for benefits; (3) failure to comply with ERISA's disclosure obligations; (4) violations of fiduciary duty; and (5) violations of claims-handling procedures.

On January 14, 2009, United executed a global settlement with the *Malchow* plaintiffs and with the plaintiffs in two similar class-action lawsuits: *American Medical Association v. United Healthcare Corp.*, No. 00-2800 (S.D.N.Y. filed Mar. 15, 2000), and *Oborski v. United Healthcare Corp.*, No. 00-7246 (S.D.N.Y. filed Sept. 25, 2000). Am. Compl. ¶ 3. The *American Medical Association* and *Oborski* actions were consolidated in 2001. Am. Compl. ¶ 3. United refers to these two actions collectively as the "*AMA* claim" and is seeking coverage for that claim in another lawsuit pending before this Court. *See UnitedHealth Group Inc. v. Columbia Casualty Co.*, No. 05-1289 (PJS/SRN) (D. Minn. filed June 29, 2005).[2] If the joint settlement of the *Malchow* and *AMA* actions is approved, United will be obligated to establish a cash

---

[2]The insurance policy at issue in *UnitedHealth Group Inc. v. Columbia Casualty Co.* is similar to the insurance policy at issue in this case. The Court will refer to *UnitedHealth Group Inc. v. Columbia Casualty Co.* as "the '05 case."

settlement fund of $350 million from which members of the settlement class will be eligible to receive compensation. Am. Compl. ¶ 3; Lazare Decl. Ex. 5 § 3 [Docket No. 92-3] (hereinafter "Settlement"). In this action, United alleges that its insurers are obligated to pay portions of the *Malchow/AMA* settlement that are attributable to resolving the *Malchow* action, as well as attorney's fees and costs that United incurred in defending *Malchow*. Am. Compl. ¶¶ 3, 43.

### B. The NYAG Claim

On February 13, 2008, the New York Attorney General's Office notified United that it intended to sue United and its subsidiaries to enjoin United's allegedly fraudulent use of the Ingenix databases. On January 13, 2009, United and the New York Attorney General's Office entered into an Assurance of Discontinuance ("AOD") — essentially a settlement agreement[3] — under which United agreed, among other things, to contribute $50 million to a nonprofit organization for the purpose of creating and operating a new, independent database. Lazare Decl. Ex. 4 ¶¶ 20-21, 26 [Docket No. 92-2 at 53-71] (hereinafter "AOD ¶ ___"). Part of that $50 million will also be used by the nonprofit organization to fund various consumer-education efforts, including the creation and maintenance of a website that discloses out-of-network reimbursement rates. AOD ¶ 24, 26, 32-33. In this action, United alleges that its insurers are obligated to indemnify United for this $50 million contribution, as well as for the attorney's fees and costs that United incurred in defending and settling the threatened action. Am. Compl. ¶ 57.

---

[3]Under New York Executive Law § 63(15), the attorney general may, in lieu of instituting a civil action, "accept an assurance of discontinuance of any act or practice in violation of such law from any person engaged or who has engaged in such act or practice." In any subsequent civil action brought by the attorney general, an AOD violation is prima facie evidence of a violation of the applicable law.

### C.  The Insurance Policies

United seeks coverage under several insurance policies that were in effect from May 1, 2007 through May 1, 2008.  Am. Compl. ¶ 1.  The primary policy at issue is Lloyd's Policy No. 509/QG007207 ("the Policy").  Defendants Hiscox Dedicated Corporate Member Limited and Lexington Insurance Company subscribed to that Policy, with Hiscox acting as the lead underwriter.  Am. Compl. ¶¶ 10, 11.  The other defendants issued excess policies that generally followed form to the underlying Policy.  Am. Compl. ¶¶ 19-24.  The details of the Policy will be discussed below.

## II.  ANALYSIS

### A.  Standard of Review

In deciding a Rule 12(b)(6) motion, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008); *Maki v. Allete, Inc.*, 383 F.3d 740, 742 (8th Cir. 2004); *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 (8th Cir. 2003).  Although the factual allegations in the complaint need not be pleaded in great detail, they must be sufficient to "raise a right to relief above the speculative level . . . ."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment.  Fed. R. Civ. P. 12(d).  But the court may consider materials that are necessarily embraced by the complaint, as well as exhibits attached to the complaint, without converting the motion to dismiss into a motion for summary judgment.  *Mattes*, 323 F.3d at 697 n.4.  Here, the parties agree that the

Court may properly consider the Policy, the *Malchow* complaint, the *Malchow/AMA* settlement, the NYAG Notice, and the AOD.  Hr'g Tr. 15-17, Nov. 4, 2009 [Docket No. 142].

United argues, however, that although the Court may consider the *Malchow/AMA* settlement and the AOD, the Court may not treat the factual recitations in those documents as true.  The Court agrees, but the Court also wishes to make clear that interpreting the terms of a contract is not the same thing as treating factual recitations within a contract as true.

A contract sometimes recites certain facts before it sets forth the terms of the agreement between the parties.  For example, in a prefatory paragraph, a settlement agreement might identify the plaintiff as a Minnesota corporation and the defendant as a Wisconsin corporation and recite that the Minnesota corporation has sued the Wisconsin corporation in federal court.  Those would be factual representations.

But every contract also includes provisions that define the obligations of the parties.  For example, one provision of a settlement agreement may obligate the defendant to pay a sum of money to the plaintiff, and another provision may obligate the plaintiff to dismiss its lawsuit against the defendant.  Such terms are not representations about facts; instead, they make up the agreement itself.  When a court interprets such terms in a contract, the court is not treating factual representations as true; it is simply defining the legal obligations created by the contract.

With respect to the *Malchow/AMA* settlement and the AOD, the Court will not treat any facts recited in those agreements as true.  But the Court will interpret the terms of the agreements, just as the Court will interpret the terms of the insurance policies that United attached to its complaint.  Specifically, in determining the purpose of the $50 million contribution required by the AOD, the Court will look to the terms of the AOD.  After all, the

AOD is the document that creates United's obligation to make the $50 million contribution and

defines the nature and purpose of that contribution.  When the Court ascertains the purpose of the

$50 million contribution by referring to the AOD, the Court is not treating factual representations

in the AOD as true, but simply doing what courts usually do when they rule on Rule 12(b)(6)

motions in contract cases: construing the terms of the contract.

### B.  Governing Law

### 1.  Application of New York Law

The Policy provides that it is to be construed under New York law.  Am. Compl. Ex. A

§ 2.11 [Docket No. 44-1] (hereinafter "Policy § ___").  Under New York law, a court must

enforce the clear language of an insurance contract.  *Morgan Stanley Group Inc. v. New England

Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000).  Clear and unambiguous provisions must be given

their plain and ordinary meaning.  *U.S. Fidelity & Guar. Co. v. Annunziata*, 492 N.E.2d 1206,

1207 (N.Y. 1986).  The insured bears the initial burden of establishing coverage.  *Consol. Edison

Co. of N.Y., Inc. v. Allstate Ins. Co.*, 774 N.E.2d 687, 690 (N.Y. 2002).  Once the insured has

established coverage, the burden shifts to the insurer to establish that an exclusion applies and

defeats that coverage.  *Id.*

To defeat coverage, an exclusion must be clear and subject to no other reasonable

interpretation.  *Seaboard Sur. Co. v. Gillette Co.*, 476 N.E.2d 272, 275 (N.Y. 1984).  Policy

exclusions are construed narrowly, and any ambiguity must be construed against the insurer as

the drafter of the policy.  *Id.*; *Westview Assocs. v. Guar. Nat'l Ins. Co.*, 740 N.E.2d 220, 222

(N.Y. 2000).  In this case, though, the parties seem to agree that the insurers did *not* draft the

Policy — or at least all of the Policy.  Instead, the Policy was apparently negotiated by United

and its insurers, and some of the Policy's provisions were apparently drafted by United.  It is thus

not clear whether and to what extent this canon of construction should apply.  It makes little

difference at this stage, however.  Because any ambiguity in the Policy will either have to be

construed against the insurers or resolved after discovery on the basis of extrinsic evidence, the

Court will have to deny the insurers' motions to dismiss insofar as those motions rely on the

meaning of ambiguous provisions.

### 2.  Finding a Duty to Indemnify on a Rule 12(b)(6) Motion

United argues, as an initial matter, that the insurers' motions must be denied because the

Court cannot determine on a Rule 12(b)(6) motion whether an insurer has a duty to indemnify.

Instead, United argues, the Court must await further discovery and development of the record.

The Court disagrees.

It is a basic precept of insurance law — in New York and everywhere else — that the

duty to defend is broader than the duty to indemnify.  *Auto. Ins. Co. of Hartford v. Cook*, 850

N.E.2d 1152, 1155 (N.Y. 2006) ("It is well settled that an insurance company's duty to defend is

broader than its duty to indemnify.").  The existence of a duty to defend can readily be

determined on a Rule 12(b)(6) motion because "[a] duty to defend is triggered by the allegations

contained in the underlying complaint."  *BP Air Cond. Corp. v. One Beacon Ins. Group*, 871

N.E.2d 1128, 1131 (N.Y. 2007).[4]  In other words, a court can determine whether an insurer had

---

[4] A duty to defend also arises when the insurer has actual knowledge of facts that could establish coverage.  *Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 690 N.E.2d 866, 868 (N.Y. 1997).  United has not alleged any such actual knowledge on the part of the insurers.

an obligation to defend merely by examining the face of the complaint filed in the underlying

action — a task that is well within the authority of a court ruling on a Rule 12(b)(6) motion.

It is true, as United argues, that where the underlying complaint *establishes* a duty to

defend, the determination of whether the insurer *also* owes a duty to indemnify must ordinarily

await the resolution of the underlying action — or at least the development of a factual record in

the coverage action. *Lionel Freedman, Inc. v. Glens Falls Ins. Co.*, 267 N.E.2d 93, 95 (N.Y.

1971); *Prashker v. U.S. Guarantee Co.*, 136 N.E.2d 871, 874-75 (N.Y. 1956); *see also Servidone*

*Constr. Corp. v. Security Ins. Co.*, 477 N.E.2d 441, 423 (N.Y. 1985) (although insurer's breach

of duty to defend was undisputed, plaintiff still had to show that the loss was covered in order to

trigger the duty to indemnify).  But when the underlying complaint does *not* establish a duty to

defend, there can be no duty to indemnify.  Again, the duty to indemnify is narrower than the

duty to defend; "if the allegations, on their face, do not bring the case within the coverage of the

policy, there is no duty to defend *or indemnify* . . . ."  *Burkhart, Wexler & Hirschberg, LLP v.*

*Liberty Ins. Underwriters, Inc.*, 875 N.Y.S.2d 590, 591-92 (N.Y. App. Div. 2009) (emphasis

added); *see also Lionel Freedman, Inc.*, 267 N.E.2d at 95 ("Inasmuch as our decision that the

insurer is not obligated to defend could be reached only after a determination of no coverage, we

conclude that summary judgment dismissing the complaint in its entirety should have been

awarded to defendant.").

In this case, the Policy technically obligates the insurers to reimburse United for its

defense costs rather than to defend United themselves.  But the point remains:  If neither the

*Malchow* complaint nor the NYAG Notice would have triggered a duty to defend — that is, if

neither the *Malchow* complaint nor the NYAG Notice "contains any facts or allegations which

bring the claim even potentially within the protection purchased," *BP Air Conditioning Corp.*, 871 N.E.2d at 1131 (citation and quotations omitted) — then, as discussed above, the insurers do not have a duty either to pay United's defense costs or to indemnify United.  The Court will therefore proceed to examine the *Malchow* complaint and the NYAG Notice to determine whether either "contains any facts or allegations which bring the claim even potentially within the protection purchased" by United from its insurers.  *Id.*

### C.  *Malchow*

#### 1.  Damages

United cites three provisions of the Policy that potentially establish coverage for the *Malchow* claim: (1) the main insuring clause, (2) the Antitrust Endorsement, and (3) a clause that appears within an exclusion found at § 9.9 of the Policy — a clause that, according to United, should be construed as an affirmative grant of coverage.  Although these provisions differ in a number of respects, all provide that the insurers will pay "Damages" and "Claim Expenses" that result from a "Claim."[5]  *See* Policy §§ 3.1, 9.9, 10.2.  A "Claim" is simply a "written demand which seeks Damages . . . ."  Policy § 4.2.[6]  Accordingly, the first step in deciding whether the

---

[5]The Antitrust Endorsement provides that it applies "notwithstanding any other provisions of this Policy, including any exclusionary provision . . . ."  Policy § 10.2.  United conceded at oral argument, however, that despite this extremely broad language, the Antitrust Endorsement covers only "Damages," as that term is defined in the Policy (including the portion of the definition that might be considered limiting or exclusionary).  Hr'g Tr. 147-49, Nov. 4, 2009.

[6]"Damages" include "Claim Expenses" (which in turn include "Defense Costs"), but only to the extent that the "Claim Expenses" are "awarded against, or agreed to as part of a settlement."  Policy §§ 4.3, 4.4.  Thus, although United's own defense costs are "Claim Expenses," they are not "Damages" within the meaning of the Policy, as they would not be "awarded against" United or "agreed to as part of a settlement" by United.

insurers are required to indemnify United in connection with the *Malchow* action is determining

whether the complaint filed against United sought "Damages."

The Policy defines "Damages" as follows:

> **Damages** mean any monetary amount in excess of the applicable
> Retention and not exceeding **Underwriters'** Limit of Liability
> which an **Insured** is legally obligated to pay as a result of a **Claim**.
> **Damages** include compensatory, exemplary, statutorily mandated,
> and punitive damages; settlements; and **Claim Expenses** awarded
> against, or agreed to as part of a settlement.  Damages do not
> include fines, penalties, or taxes; amounts, benefits, or coverages
> owed to any enrollee, member, subscriber, or client under any
> contract, healthcare plan, insurance policy, reinsurance policy, or
> plan or program of self-insurance; amounts owed to any provider
> of **Medical Professional Services** under any contract; non-
> monetary relief or redress in any form, including without limitation
> the cost of complying with any injunctive, declaratory, or
> administrative relief, and matters which are uninsurable under
> applicable law.

Policy § 4.4.

The Policy thus defines "Damages" to include certain things (for example,

"compensatory, exemplary, statutorily mandated, and punitive damages") and not to include

other things (for example, "fines, penalties, or taxes").  The parties dispute whether these latter

provisions should be treated as exclusions.  As noted, New York courts generally hold that the

insurer bears the burden of proving that an exclusion defeats coverage.  Apparently, though, New

York at one time followed the rule that an insured's initial burden to establish coverage includes

the burden to establish that any exclusionary provisions *in the main coverage clause* do not

apply.  *See, e.g.*, *Ruffalo's Truck. Serv. v. Nat'l Ben-Franklin Ins. Co.*, 243 F.2d 949, 952-53 (2d

Cir. 1957).  Some recent cases seem to follow that rule.  *See, e.g.*, *Am. Cont'l Props., Inc. v.

Nat'l Union Fire Ins. Co.*, 608 N.Y.S.2d 807, 809 (N.Y. App. Div. 1994).  But most recent cases

appear to focus on the nature of the provision, rather than its location in the policy, to determine whether the provision is an exclusion. *See Planet Ins. Co. v. Bright Bay Classic Vehicles, Inc.*, 553 N.E.2d 562, 564 (N.Y. 1990) (finding that limiting language in the definition of coverage was an exclusion); *Sokolowski ex rel. M.M. & P. Pension Plan v. Aetna Life & Cas. Co.*, 670 F. Supp. 1199, 1205-06 (S.D.N.Y. 1987) (treating similar exceptions from a "damages" definition as exclusions); *see also McMahon v. Boston Old Colony Ins. Co.*, 412 N.Y.S.2d 465, 467 (N.Y. App. Div. 1979) (an exclusion takes out persons or events that are otherwise included within the defined scope of coverage). Some of these recent cases concern the insurers' compliance with statutory written-disclaimer requirements rather than the parties' respective burdens of proof, but the reasoning of the cases seems to apply in this context.

The Court agrees with United that, to the extent that language in the second half of the "Damages" definition excludes coverage that is provided in the first half, that language should be treated as an exclusion, and the insurers should bear the burden of establishing that coverage is precluded by that exclusion. At this stage of the proceedings, though, it makes little difference who bears the burden of proof. If a provision is clear, then its clear meaning will be applied, regardless of who bears the burden of proof. If a provision is not clear, then the Court will deny the motions to dismiss insofar as they rely on that provision — again, no matter who bears the burden of proof.

As described above, the *Malchow* plaintiffs brought five claims: (1) a claim for unpaid benefits under ERISA and New Jersey law; (2) a claim for failure to provide a full and fair review of claims for benefits under ERISA; (3) a claim for failure to comply with ERISA's disclosure obligations; (4) a claim for violation of the fiduciary duties imposed by ERISA; and

-13-

(5) a claim for violations of ERISA's claims-procedure provisions.  The complaint mainly sought injunctive and declaratory relief, not monetary damages.  In their prayer for relief, the plaintiffs sought declarations that United breached its contractual and fiduciary obligations and violated various provisions of law.  The plaintiffs further sought injunctive relief that would compel United to comply with its legal, contractual, and fiduciary obligations.  With one exception (discussed below), the only monetary amounts sought in the complaint were for unpaid benefits, interest on those unpaid benefits, and attorney's fees and costs.

The cost of complying with injunctive and declaratory relief is not included in the Policy's definition of "Damages," and United concedes that the claims of the *Malchow* plaintiffs for injunctive and declaratory relief are not covered by the Policy.  Similarly, "Damages" is defined to exclude "amounts, benefits, or coverages owed to any enrollee, member, subscriber, or client under any contract, healthcare plan, insurance policy, reinsurance policy, or plan or program of self-insurance . . . ."  As United conceded at oral argument, the plaintiffs' demand for unpaid benefits in Count I of the complaint also does not trigger any duty to defend or indemnify. Hr'g Tr. 49-50, Nov. 4, 2009.  Thus, United concedes that the bulk of the *Malchow* claims are *not* covered under the Policy.

United nevertheless argues that coverage is at least potentially triggered by two forms of monetary relief sought in the complaint: (1) the plaintiffs' attempt to recover a statutory penalty of up to $110 per day for United's failure to comply with various disclosure obligations, and (2) the plaintiffs' demand for attorney's fees.  The Court considers each claim in turn.

-14-

*a.  Section 1132(c)*

In Count III of their complaint, the *Malchow* plaintiffs allege that United's "failure to supply accurate . . . information is actionable under 29 U.S.C. § 1132(c)."  *Malchow* Compl. ¶ 164.  Although the *Malchow* complaint did not cite a particular subsection of § 1132(c), the plaintiffs were apparently making a claim under § 1132(c)(1).  Section 1132(c)(1) states, in relevant part:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

The Department of Labor has promulgated a rule increasing the maximum recovery under § 1132(c)(1) to $110 per day for violations occurring after July 29, 1997.  *See* 29 C.F.R. § 2575.502c-1.  The question is whether Count III of the *Malchow* complaint, in seeking recovery of $110 per day under § 1132(c)(1), sought "Damages" as defined in the Policy.

The Policy's definition of "Damages" expressly excludes "penalties."  The Court finds, and United does not argue otherwise, that the term "penalties" is unambiguous.  A "penalty" is a "[p]unishment imposed on a wrongdoer" — in particular, "a sum of money exacted as punishment for either a wrong to the state or a civil wrong (as distinguished from compensation for the injured party's loss)."  *Black's Law Dictionary* 1168 (8th ed. 2004).  Federal courts uniformly agree that monetary awards under § 1132(c)(1) are penalties because they punish rather than compensate.  *Christensen v. Qwest Pension Plan*, 462 F.3d 913, 919 (8th Cir. 2006) (§ 1132(c)(1) "is a statutory penalty that may not be imposed 'unless the words of the statute

-15-

plainly impose it'" (quoting *Comm'r v. Acker*, 361 U.S. 87, 91 (1959))); *Chestnut v.*

*Montgomery*, 307 F.3d 698, 704 (8th Cir. 2002) ("The purpose of ERISA's statutory penalty

[under § 1132(c)(1)] is to punish noncompliance."); *Mondry v. Am. Family Mut. Ins. Co.*, 557

F.3d 781, 806 (7th Cir.) (holding that, in addition to the statutory penalty, the plaintiff could seek

restitution for the administrator's failure to comply with its disclosure duties because "the

purpose of those penalties [under § 1132(c)(1)] is to induce the plan administrator to comply

with the statutory mandate rather than to compensate the plan participant for any injury she

suffered as a result of non-compliance"), *cert. denied*, 130 S. Ct. 200 (2009); *Scott v. Suncoast*

*Beverage Sales, Ltd.*, 295 F.3d 1223, 1232 (11th Cir. 2002) (§ 1132(c)(1) is "designed more for

the purpose of punishing the violator than compensating the participant or beneficiary");

*Lampkins v. Golden*, 104 F.3d 361, 1996 WL 729136, at *3 (6th Cir. Dec. 17, 1996)

(unpublished table disposition) ("The purpose of the statutory penalty is not to compensate

participants, but to induce administrators to expeditiously provide requested plan documents by

punishing those who fail to comply.").

The Eighth Circuit's decision in *Christensen* illustrates the point. In *Christensen*, the

plaintiff requested and received several estimates of his expected pension benefits through an

automated telephone system. *Christensen*, 462 F.3d at 915-16. After the plaintiff retired, he

learned that the estimates were based on an erroneous assumption about his pay grade. *Id.* at

916. The plaintiff then sued under ERISA, contending, among other things, that the plan

administrator was liable under § 1132(c)(1) because it had failed to comply with 29 U.S.C.

§ 1025(a)(1) (2000), which required plan administrators to provide a statement of total accrued

-16-

benefits on written request.[7]  *Id.* at 918.  The plaintiff argued that the written-request requirement

should be broadly construed to include his electronically recorded requests.  *Id.* at 919.  The

Eighth Circuit rejected this argument, explaining that, *as a penalty provision*, § 1132(c)(1) must

be narrowly construed.  *Id.*  For support, the Eighth Circuit cited the Supreme Court's decision in

*Commissioner v. Acker*, 361 U.S. 87 (1959), which explained that "penal statutes are to be

construed strictly" and "one is not to be subject to a penalty unless the words of the statute

plainly impose it."  *Christensen*, 462 F.3d at 919; *Acker*, 361 U.S. at 91 (citations and quotations

omitted).

It is true, as United argues, that § 1132(c) itself labels as "penalt[ies]" only some of the

monetary remedies available under that subsection.  Specifically, when § 1132(c) authorizes the

Secretary of Labor to assess a monetary amount, it describes that amount as a "civil penalty."  By

contrast, § 1132(c)(1) simply says that an administrator may be "personally liable" to participants

and beneficiaries for up to $110 per day; it does not refer to the $110 recovery as a "penalty."

United argues that this difference in language demonstrates that Congress intended to draw a

distinction between penalties that the Secretary may assess and non-punitive monetary relief that

a court may award to participants and beneficiaries.  United's argument has surface appeal, but it

is inconsistent with the great weight of authority.  It is also inconsistent with the fact that, no

matter how it is labeled, the $110 sanction operates as a penalty.  The sanction is assessed against

an administrator who unlawfully refuses to comply with a request for any information, and it can

be assessed regardless of whether the refusal caused no harm, a little harm, or lots of harm to the

---

[7]The language of § 1025(a)(1) has since been amended, but it retains the requirement that
requests for information be in writing.

requester.

United also cites a couple of cases in which courts, in dicta, have referred to the penalties in § 1132(c) as "damages." *See Varity Corp. v. Howe*, 516 U.S. 489, 507 (1996) (referring to the remedies available under § 1132(c) as "liquidated damages"); *Swede v. Rochester Carpenters Pension Fund*, 467 F.3d 216, 218 (2d Cir. 2006) (referring to "statutory damages" under § 1132(c)(1)). Neither of these cases is persuasive on this issue. *Varity* did not involve a claim under § 1132(c); instead, the issue in *Varity* was whether § 1132(a)(3) authorizes courts to award relief to individual plan beneficiaries for breach of fiduciary duty. *Varity Corp.*, 516 U.S. at 507. Before addressing that question, the Supreme Court gave a brief summary of ERISA's enforcement provisions. *Id.* In its brief summary, and in obvious dicta, the Court referred to the penalties in § 1132(c) as "liquidated damages." *Id.* Given that *Varity* had nothing to do with § 1132(c), the Supreme Court was clearly not focusing on or making a decision about the precise nature of the monetary remedy available under that subsection. Indeed, the Supreme Court referred to *all* of the monetary remedies in § 1132(c) as "liquidated damages" even though, as noted, the statute explicitly labels as "penalt[ies]" the amounts assessed by the Secretary of Labor under § 1132(c).

*Swede* is a bit closer to the mark, in that, unlike *Varity*, it at least involved a claim under § 1132(c). *Swede*, 467 F.3d at 218. But that claim was not at issue on appeal, and thus, as in *Varity*, the court's description of a claim under § 1132(c) as one for "statutory damages" was casual dicta, not a studied holding.

For these reasons, the Court holds that the $110 per day monetary remedy in § 1132(c)(1) is a penalty — and, as a penalty, is excluded from the Policy's definition of "Damages." Hence,

the portion of the joint settlement of the *Malchow* and *AMA* actions that is attributable to the claim under § 1132(c)(1) is not the responsibility of United's insurers.

### b. Attorney's Fees

United next argues that the *Malchow* plaintiffs' claim for attorney's fees is a claim for "Damages." *See Malchow* Compl. at 49. This is, at first blush, a strange argument. After all, United has conceded that all of the substantive claims brought against it in the *Malchow* action were not covered by the Policy, save the claim under § 1132(c)(1). The Court has held that the claim under § 1132(c)(1) was also not covered. Thus, the *Malchow* lawsuit was made up entirely of uncovered claims. Yet United argues the *Malchow* plaintiffs' demand that United pay the attorney's fees that they incurred in pursuing *uncovered* claims against United was itself a covered claim.

The insurers do not dispute that, in the abstract, a claim against United for attorney's fees might trigger coverage. The Policy defines "Damages" broadly to mean "any monetary amount . . . which an Insured is legally obligated to pay as a result of a Claim." Policy § 4.4. "Claim" is defined simply as a "written demand which seeks Damages . . . ." Policy § 4.2. When a plaintiff files a lawsuit against United and demands, inter alia, that United pay the plaintiff's attorney's fees, the plaintiff is making a "Claim" — that is, "a written demand" that seeks a "monetary amount." If a court then orders United to pay the fees of the plaintiff's attorney, that award represents "Damages" — that is, "a[] monetary amount . . . which an Insured is legally obligated to pay as a result of a Claim." The same is true if United's obligation to pay the fees arises out of a settlement rather than a court order.

The insurers argue that, while all of this is true in the abstract, United is nevertheless not

"legally obligated to pay" the attorney's fees of the *Malchow* plaintiffs.  According to the insurers, under the terms of the *Malchow/AMA* settlement, United is legally obligated to make one lump-sum settlement payment to the plaintiffs, and the plaintiffs are then obligated to pay their own attorney's fees out of that recovery.  Because United has no legal obligation to pay attorney's fees — but instead has only a legal obligation to pay a sum in settlement of the substantive claims, from which sum the plaintiffs will pay their attorneys — United is not paying "Damages" with respect to the "Claim" for attorney's fees.

United disagrees.  United argues that some portion of the settlement fund is attributable to the *Malchow* plaintiffs' "Claim" for attorney's fees and thus qualifies as "Damages." Specifically, United contends that (1) the *Malchow* plaintiffs made a claim against United for attorney's fees; (2) United settled that claim; and (3) part of the total amount being paid to the plaintiffs under the *Malchow/AMA* settlement represents the amount that United agreed to pay to the *Malchow* plaintiffs to settle their claim for attorney's fees.  If this is true — and there is a good chance that it is true, given that the settlement agreement itself provides that the plaintiffs' attorney's fees will be paid out of the settlement fund, *see* Settlement § 17 — then it is irrelevant that United will not be required to cut a separate check to the *Malchow* plaintiffs' attorneys.

United is correct.  Nothing in the definition of "Damages" excludes a claim for attorney's fees from being part of a judgment or settlement.  And there is no dispute that, if the *Malchow/AMA* settlement is approved, United will be "legally obligated to pay" the amounts required by the settlement.  Thus, to the extent that any portion of the *Malchow/AMA* settlement is attributable to a settlement of the *Malchow* plaintiffs' claim for attorney's fees — and that is a

matter that the Court cannot decide on a motion to dismiss — that portion of the settlement falls squarely within the Policy's definition of "Damages."

The insurers cite *CNL Hotels & Resorts, Inc. v. Houston Casualty Co.*, 505 F. Supp. 2d 1317 (M.D. Fla. 2007), for the proposition that payment to counsel from an uncovered settlement fund does not give rise to coverage. In *CNL Hotels*, the insured was found to have improperly acquired funds and ordered to make restitution to its victims; the insured then sought indemnification from its insurers for the restitutionary payment. *Id.* at 1322-25. Applying New York law, the court found that such restitutionary payments were uninsurable. *Id.* In a cryptic footnote, the court rejected the insured's argument that an award of attorney's fees from the settlement fund was not the same as an uninsurable restitutionary payment: "The fact that the plaintiffs had to use some of that money to pay their attorneys does not alter the character of CNL's payment, which was clearly restitutionary." *Id.* at 1326 n.12.

Unlike *CNL Hotels*, though, here there is a dispute concerning the character of the settlement. Again, the insurers claim that, under the settlement, United is paying to settle uncovered substantive claims, and the plaintiffs are then using part of their recovery to pay their own attorneys. This is the situation described in the *CNL Hotels* footnote. But United contends that, under the settlement, it is paying not only to settle uncovered substantive claims, but also to settle a covered claim for attorney's fees. The fact that most of a settlement is attributable to uncovered claims does not mean that the insured cannot seek indemnification for a portion of the settlement that is attributable to covered claims. *Cf. Nat'l Union Fire Ins. Co. v. Ambassador Group, Inc.*, 556 N.Y.S.2d 549, 553 (N.Y. App. Div. 1990) (discussing apportionment of a settlement between covered and uncovered claims).

The insurers also cite *Millennium Partners, L.P. v. Select Insurance Co.*, 882 N.Y.S.2d

849 (N.Y. Sup. Ct.), *aff'd*, 889 N.Y.S.2d 575 (N.Y. App. Div. 2009), for the proposition that

defense costs may not be recovered except in connection with covered claims.  But *Millennium*

*Partners* concerned an insured's attempt to be indemnified for attorney's fees that it incurred in

defending uncovered claims, *id.* at 851, not an insured's attempt to be indemnified for a claim for

attorney's fees made against the insured by a third party.

The Court again acknowledges that the result sought by United seems counterintuitive:

The insurers would have to pay the attorney's fees incurred by the *Malchow* plaintiffs in pursuing

uncovered claims against United, even though the insurers would not have to pay the attorney's

fees incurred by United in defending those uncovered claims.[8]  But the Policy says what the

Policy says.  Under the extremely broad language used by the policy, the claim for attorney's fees

made against United by the *Malchow* plaintiffs was a "Claim" for "Damages."[9]

---

[8]The Court does not understand United to be arguing that, if the claim of the *Malchow* plaintiffs for their attorney's fees was a covered claim, United is entitled to recover from the insurers not only the fees and costs that it incurred in defending against that covered claim, but also all of the fees and costs that it incurred in defending against all of the uncovered claims. Such a contention would appear to be inconsistent with § 4.3(a) of the Policy, which defines "Claim Expenses" to include amounts "incurred in the investigation and defense of any Claim *covered* hereunder . . . ."  (Emphasis added.)

[9]*See Sokolowski v. Aetna Life & Cas. Co.*, 670 F. Supp. 1199, 1208-10 (S.D.N.Y. 1987) (holding that a claim for attorney's fees under ERISA triggered the insurer's duty to defend and indemnify); *see also Pac. Ins. Co. v. Burnet Title, Inc.*, 380 F.3d 1061, 1065-66 (8th Cir. 2004) (holding that a claim for attorney's fees, which was the sole claim for monetary relief not excluded from the definition of damages, was a claim for damages); *Nat'l Cas. Co. v. Coastal Dev. Servs. Found.*, 171 Fed. Appx. 680, 685 (9th Cir. 2006) (holding that a suit for equitable relief that included a claim for attorney's fees was a claim for damages).

Some courts have held that claims for attorney's fees under 42 U.S.C. § 1988 are not damages because § 1988 expressly defines attorney's fees as costs.  *See, e.g.*, *City of Sandusky v.*

(continued...)

In sum, if the insurers are to avoid responsibility for reimbursing United for the amount (if any) that it paid to settle the claim of the *Malchow* plaintiffs for attorney's fees, the insurers will not be able to rely on the Policy's definition of "Damages."  Instead, the insurers will have to rely on an exclusion in the Policy.  United argues, however, that all of the exclusions in the Policy are irrelevant because the *Malchow* claim is covered not only by the general insuring clause, but also by two specific insuring clauses that override all exclusions.  Before examining the Policy's exclusions, then, the Court must first determine whether United is correct in arguing that none of those exclusions is even relevant.

### 2.  The Antitrust Endorsement

The first of the two specific insuring clauses that United contends cover the *Malchow* claim for attorney's fees is the Antitrust Endorsement.[10]  That endorsement states, in relevant part:

> In consideration of the premium charged and notwithstanding any other provisions of this Policy, including any exclusionary provision, we will pay amounts any **Protected Person** is legally required to pay as **Damages** and **Claim Expenses** for **Claims** that directly or indirectly result from or are related to a **Wrongful Act**

---

[9](...continued)
*Coregis Ins. Co.*, 192 Fed. Appx. 355, 359-60 (6th Cir. 2006).  This reasoning is inapplicable here for two reasons.  First, the *Malchow* plaintiffs sought fees under ERISA, which does not define fees as part of the costs.  *See* 29 U.S.C. § 1132(g)(1).  Second, and more importantly, the Policy's definition of "Damages" includes "Claim Expenses awarded against, or agreed to as part of a settlement," and "Claim Expenses" includes "all costs taxed against the Insured in any Suit."  Policy §§ 4.3, 4.4.  Thus, even if the attorney's fees sought by the *Malchow* plaintiffs were considered "costs," they would still be included within the definition of "Damages."

[10]As noted above, United concedes that the Antitrust Endorsement covers only "Damages," as that term is defined in the Policy.  Hr'g Tr. 147-49, Nov. 4, 2009.  The Court has already held that the only claim brought by the *Malchow* plaintiffs that sought "Damages" was their claim for attorney's fees.

> consisting or allegedly consisting in whole or in part of anti-trust, restraint of trade activities occurring on or after the Retroactive Date stated in Item 6 of the Declaration and before the cancellation date or Expiration Date of this Policy. **Damages** arising out of the same or interrelated **Wrongful Acts** shall be deemed to arise from the first such same or interrelated acts [*sic*] **Wrongful Acts**.

Policy § 10.2.

United contends that the claim of the *Malchow* plaintiffs for attorney's fees is covered by this endorsement — an endorsement that, by its terms, trumps "any exclusionary provision" in the Policy. The Court disagrees. Even assuming that the claim of the *Malchow* plaintiffs related to "anti-trust, restraint of trade activities" — something that is far from clear — the Antitrust Endorsement does not provide coverage for that claim.

The parties agree that the terms used in the Antitrust Endorsement are defined in the same way as they are defined in the rest of the Policy. The Policy defines "Wrongful Act" to "mean[] any actual or alleged negligent act, error, omission, misstatement, [or] breach of duty . . . ." Policy § 4.17. As described above, the *Malchow* litigation focused on United's allegedly unlawful use of the Ingenix databases to deny or underpay claims. Without question, every time that a United employee unlawfully used an Ingenix database to deny a claim or part of a claim for benefits, that United employee committed a "breach of duty" — that is, a separate Wrongful Act. Moreover, the parties do not dispute that every unlawful use of the Ingenix databases was "interrelated" with every other unlawful use of the Ingenix databases. Thus, for purposes of the Policy, the *Malchow* plaintiffs sought damages arising out of interrelated Wrongful Acts.

The second sentence of the Antitrust Endorsement provides that "[d]amages arising out of . . . interrelated Wrongful Acts shall be deemed to arise from the first such . . . interrelated . . .

Wrongful Acts."  Under the Policy, then, all of the damages sought by the *Malchow* plaintiffs are deemed to arise from United's first use of the Ingenix databases — a use that occurred no later than 1994.[11]

The problem for United is that the Antitrust Endorsement does not provide coverage for United's first use of the Ingenix databases in or before 1994.  The Antitrust Endorsement covers only claims that "directly or indirectly result from or are related to a Wrongful Act consisting or allegedly consisting in whole or in part of anti-trust, restraint of trade activities occurring on or after the Retroactive Date stated in Item 6 of the Declaration . . . ."  The "Retroactive Date stated in Item 6 of the Declaration" is July 29, 2004.  *See* Policy at 3, § 10.1.[12]  Because the last sentence of the Antitrust Endorsement dictates that all of the damages suffered by the *Malchow* plaintiffs are deemed to arise from a Wrongful Act that occurred *before* July 29, 2004, and because the Antitrust Endorsement covers only damages that arise from Wrongful Acts that occurred on or *after* July 29, 2004, the Antitrust Endorsement does not cover any of the damages sought by the *Malchow* plaintiffs.

United's argument to the contrary is sometimes difficult to follow, but it seems to be premised on the contention that United's use of the Ingenix databases over a period of many years — a period of time that began before the Retroactive Date and ended after the Retroactive

---

[11]The *Malchow* plaintiffs complained of United's use of the Ingenix databases beginning sometime around 2002.  *See Malchow* Compl. ¶¶ 44-50, 59-63, 73-80, 137-138.  But the *Malchow/AMA* settlement class includes persons whose out-of-network healthcare benefits were calculated using the Ingenix databases as early as 1994.  Settlement at 11.

[12]There are different Retroactive Dates applicable to United and its various subsidiaries. Because the *Malchow* action was brought against Oxford Health Plans, the applicable Retroactive Date is July 29, 2004.

Date — constituted only a single Wrongful Act.  In United's view, the first sentence of the Antitrust Endorsement covers that single Wrongful Act because that act "consist[ed] or allegedly consist[ed] in whole or *in part* of anti-trust, restraint of trade activities occurring on or after the Retroactive Date . . . ."  Based on this assumption, United presumably believes that the last sentence of the Antitrust Endorsement is irrelevant.  As United reads it, that sentence applies only to "[d]amages arising out of the same or interrelated Wrongful *Acts*" — plural.  But, in United's view, United committed only one Wrongful *Act* — singular.  Thus, according to United, the claim of the *Malchow* plaintiffs for attorney's fees is covered by the first sentence of the Antitrust Endorsement, and that coverage is not disturbed by the second sentence of the Antitrust Endorsement.

It is tempting to dismiss United's argument out of hand.  As explained above, there is no question that, every time a United employee unlawfully used an Ingenix database to deny a claim for benefits, that United employee committed a separate Wrongful Act.  Again, the Policy defines "Wrongful Act" to include a "breach of duty," and each unlawful use of the Ingenix databases breached a duty to a claimant.  Each such denial could have been the focus of a separate lawsuit, and each such denial could have led to a separate recovery.  Clearly, then, the *Malchow* plaintiffs were complaining of thousands of individual Wrongful Acts, not a single Wrongful Act.

United's argument cannot be dismissed so quickly, however.  Although United neglects to mention it, one part of the definition of "Wrongful Act" — a part that the Court has not yet quoted — can be read to support United's argument.  Specifically, after defining "Wrongful Act" in § 4.17, the Policy goes on to say the following:

> All **Wrongful Acts** arising out of the same or related actual or
> alleged negligent act, error, omission, misstatement, breach of
> duty, breach of privacy or breach of confidentiality shall be deemed
> to be the same **Wrongful Act**.

Policy § 4.17.  The parties agree that every unlawful use of the Ingenix databases was "related"

to every other unlawful use of the Ingenix databases.  And thus, although every unlawful use of

the Ingenix databases was a separate Wrongful Act, all of these Wrongful Acts "[arose] out of

the same or related . . . breach of duty," and thus, under § 4.17, all of these Wrongful Acts are

"deemed to be the same Wrongful Act."

The issue, though, is how this provision affects the analysis under the Antitrust

Endorsement.  In particular, how does it change the analysis under the second sentence of that

endorsement, which, again, provides that "[d]amages arising out of the same or interrelated

Wrongful Acts shall be deemed to arise from the first such same or interrelated . . . Wrongful

Acts"?

Presumably, United would argue that, because § 4.17 dictates that all of its thousands of

illegal uses of the Ingenix databases be "deemed to be the same Wrongful Act," United should be

deemed for purposes of the Policy to have committed only a single Wrongful Act.  Hence, the

second sentence of the Antitrust Endorsement would not apply, as it applies only when there are

"the same or interrelated Wrongful Acts" — plural.  United might further argue that it would

make no sense to provide that damages that arise out of only a single Wrongful Act must "be

deemed to arise from the *first such*" Wrongful Act.  If there is only a single Wrongful Act, then

there would not be a "first such" Wrongful Act, because there would not be a "second such" or a

"third such" Wrongful Act.  Or so the argument would go.

-27-

The problem with United's argument — or, more accurately, the argument that the Court is putting in United's mouth — is that it would render the second sentence of the Antitrust Endorsement meaningless.  All Wrongful Acts that are "the same or interrelated" for purposes of the Antitrust Endorsement are *also* going to "aris[e] out of the same or related . . . negligent act, error, omission, [etc.]" for purposes of § 4.17.  Thus, the Wrongful Acts that would trigger application of the second sentence of the Antitrust Endorsement would *always*, by virtue of § 4.17, be deemed to be "the same Wrongful Act."  If United's argument is correct, then the second sentence of the Antitrust Endorsement would apply only to situations involving multiple related Wrongful Acts.  But such situations would never arise, as multiple related Wrongful Acts would always be deemed to be a single Wrongful Act under § 4.17.  The last sentence of the Antitrust Endorsement would be meaningless, and, under New York law, "[a]n insurance contract should not be read so that some provisions are rendered meaningless."  *County of Columbia v. Cont'l Ins. Co.*, 634 N.E.2d 946, 950 (N.Y. 1994).

Clearly, then, when the second sentence of the Antitrust Endorsement speaks of attributing damages that "aris[e] out of the same or interrelated Wrongful Acts" to "the first such same or interrelated . . . Wrongful Acts," it is referring not to the one big Wrongful Act that is artificially created by § 4.17, but to the many little Wrongful Acts that make up that one big Wrongful Act.  In other words, what the second sentence of the Antitrust Endorsement describes as "the same or interrelated Wrongful Acts" is exactly the same thing as what § 4.17 describes as "Wrongful Acts arising out of the same or related actual or alleged . . .  breach of duty . . . ."  In both provisions, "Wrongful Acts" is referring to the *component* Wrongful Acts, not to the *consolidated* Wrongful Act.

This is the only reading of the second sentence of the Antitrust Endorsement that gives it meaning and that permits it to fulfill its apparent purpose.  The second sentence seems designed to protect the insurer from liability for any Wrongful Acts that occurred after the Retroactive Date and that related to Wrongful Acts that occurred before the Retroactive Date.  Put differently, the second sentence protects the insurer from having to pay for antitrust violations that are ongoing at the time that the insured becomes covered under the Antitrust Endorsement. (In this respect, the second sentence acts like a preexisting-conditions exclusion in a health-insurance policy.)  On United's reading of the second sentence, it would not do anything, and thus it would obviously not fulfill this purpose.  On the Court's reading, it would.  *Cf. Evanston Ins. Co. v. GAB Bus. Servs., Inc.*, 521 N.Y.S.2d 692, 695 (N.Y. App. Div. 1987) ("'[R]esort to a literal construction may not be had where the result would be to thwart the obvious and clearly expressed purpose which the parties intended to accomplish or where such a construction would lead to an obvious absurdity . . . .'" (quoting *McGrail v. Equitable Life Assurance Soc.*, 55 N.E.2d 483, 486 (N.Y. 1944))).

The second sentence of the Antitrust Endorsement is not a thing of beauty, but its meaning is clear enough:  When an insured (such as United) is sued by a plaintiff (such as Malchow) who has been injured by a Wrongful Act (such as the unlawful denial of a benefit claim), and that Wrongful Act was related to other Wrongful Acts (such as other unlawful denials of benefit claims), then the damages sought by the plaintiff are deemed to arise from the first of that group of Wrongful Acts.  If the first of that group of Wrongful Acts occurred before the Retroactive Date, then the Antitrust Endorsement provides no coverage for any of the

damages caused by any of the Wrongful Acts in the group.[13]   For these reasons, the Court holds

that the Antitrust Endorsement does not cover the *Malchow* plaintiffs' claim for attorney's fees.

---

[13]The Court's reading of the Antitrust Endorsement does not render meaningless the endorsement's use of the phrase "consisting in whole *or in part* of anti-trust, restraint of trade activities occurring on or after the Retroactive Date . . . ."  Consider two scenarios:

Suppose that the first in a series of related Wrongful Acts occurs before the Retroactive Date, and the last in that series of Wrongful Acts occurs after the Retroactive Date.  Those Wrongful Acts would be deemed to be a single Wrongful Act by virtue of § 4.17, and that single Wrongful Act would "consist[] in whole or in part of anti-trust, restraint of trade activities occurring on or after the Retroactive Date . . . ."  Hence, the first sentence of the Antitrust Endorsement would initially extend coverage to all of the Wrongful Acts.  But the second sentence of the Antitrust Endorsement dictates that all of the *damages* caused by that series of Wrongful Acts would be deemed to have been caused by the first Wrongful Act in the series — a Wrongful Act that is not within the coverage period.  Thus, as a practical matter, the second sentence limits the coverage that is initially extended by the first sentence, just as exclusions often limit coverage that is initially extended by insuring clauses.

But consider a second scenario:  Suppose that the first in a series of related Wrongful Acts occurs after the Retroactive Date but before the Expiration Date, and the last in that series of Wrongful Acts occurs after the Expiration Date.  Those Wrongful Acts would be deemed to be a single Wrongful Act by virtue of § 4.17, and that single Wrongful Act would "consist[] in whole or *in part* of anti-trust, restraint of trade activities occurring on or after the Retroactive Date . . . and before the . . . Expiration Date . . . ."  Hence, the first sentence of the Antitrust Endorsement would extend coverage to all of the Wrongful Acts (something that would not be true without the words "in part").  Morever, the second sentence of the Antitrust Endorsement dictates that all of the *damages* caused by that series of Wrongful Acts would be deemed to have been caused by the first Wrongful Act in the series — a Wrongful Act that was within the coverage period.  The second sentence makes clear that damages caused after the Expiration Date are covered, as long as the later Wrongful Act that causes those damages relates to an earlier Wrongful Act that occurred before the Expiration Date.

Roughly speaking then, the Antitrust Endorsement does not cover any damages caused by a series of related Wrongful Acts that begin before the Retroactive Date.  In other words, the Antitrust Endorsement does not cover antitrust violations that are already ongoing at the time that the insured becomes covered under the endorsement.  (In this case, Oxford was acquired by United — and thus became covered under the endorsement — on the Retroactive Date.)  But the Antitrust Endorsement covers all damages caused by a series of Wrongful Acts that begin after the Retroactive Date — that is, after the insured becomes covered under the endorsement — and then extend past the Expiration Date.  If an antitrust violation starts on the insurer's watch, the insurer will cover all damages caused by that violation, including damages that arise after Expiration Date.

3.  Section 9.9

The second of the two specific insuring clauses that United contends cover the *Malchow*

claim for attorney's fees is a clause found in § 9.9 of the Policy.  Section 9.9, which is a Policy

*exclusion*, provides as follows:

> **9.9.  Benefits and Provider Contracts.**  We will not cover **Claims**
> for any amounts or limits payable under any insurance policy,
> benefits contract or provider contract; however, we will pay the
> **Damages** and **Claim Expenses** incurred by a **Protected Person** in
> the defense of a **Claim** for liability that results from the activity of
> administrating benefit claims.

United contends that the carveback in the second sentence of this exclusion is actually an

affirmative grant of coverage that supersedes every exclusion in the Policy.  Of course, the phrase

"the activity of administrating benefit claims" describes most of what United does.  Thus, United

is contending that at the bottom of the 22nd page of the Policy, in a section entitled "What This

Policy Will Not Cover — Exclusions," at the end of the 9th of the 21 exclusions listed in that

section, following a semicolon, the parties tucked 31 words that effectively wipe out much of the

rest of the Policy and obligate the insurers to cover just about any claim that might be brought

against United.

United's contention is highly implausible, and, not surprisingly, United has not found any

New York cases that are particularly supportive of its position.  United does rely on *Miceli v.*

*State Farm Mutual Automobile Insurance Company* for the general proposition that "[t]he

specific denomination of a policy provision as an exclusion is not necessarily dispositive of

whether that provision is indeed an exclusion."  762 N.Y.S.2d 199, 201 (N.Y. App. Div. 2003);

*rev'd on other grounds*, 819 N.E.2d 995 (N.Y. 2004).  But, in *Miceli*, everyone agreed that the

provision in question limited (rather than granted) coverage.  The dispute was merely about whether the limiting provision should be classified as an exclusion from coverage or instead as a part of the description of the scope of coverage.  *Id.* at 200-01.  *Miceli* thus had nothing to do with whether a carveback from an exclusion is an affirmative grant of coverage.

More to the point, United's argument that the carveback in § 9.9 supersedes every exclusion in the Policy has been rejected by numerous New York cases.  Under New York law, "[e]xclusions in policies of insurance must be read seriatim, not cumulatively, and if any one exclusion applies there can be no coverage since no one exclusion can be regarded as inconsistent with another."  *Zandri Constr. Co. v. Firemen's Ins. Co.*, 440 N.Y.S.2d 353, 356 (N.Y. App. Div.), *aff'd sub nom. Zandri Constr. Co. v. Stanley H. Calkins, Inc.*, 430 N.E.2d 922 (N.Y. 1981).  In adopting this rule, *Zandri* explicitly rejected the argument that an ambiguity created by a carveback to an exclusion should be resolved by holding that the carveback controls over all other exclusions.  *Id.* at 355.  New York courts (and courts applying New York law) have consistently followed this rule since it was adopted in *Zandri*.  *See, e.g.*, *Maroney v. N.Y. Cent. Mut. Fire Ins. Co.*, 839 N.E.2d 886, 888 (N.Y. 2005); *Tradin Organics USA, Inc. v. Md. Cas. Co.*, 325 Fed. Appx. 10, 11 (2d Cir. 2009); *Catucci v. Greenwich Ins. Co.*, 830 N.Y.S.2d 281, 282 (N.Y. App. Div. 2007); *Ruge v. Utica First Ins. Co.*, 819 N.Y.S.2d 564, 566 (N.Y. App. Div. 2006); *Sampson v. Johnston*, 708 N.Y.S.2d 210, 211 (N.Y. App. Div. 2000); *Monteleone v. Crow Constr. Co.*, 673 N.Y.S.2d 408, 411 (N.Y. App. Div. 1998); *Charter Oaks Fire Ins. Co. v. Clayton*, 62 F.3d 1414, 1995 WL 469423, at *4-6 (4th Cir. Aug. 9, 1995) (per curiam) (unpublished table disposition); *Rhinebeck Bicycle Shop, Inc. v. Sterling Ins. Co.*, 546 N.Y.S.2d 499, 501-02 (N.Y. App. Div. 1989).

United contends that the seriatum rule has not been adopted by New York's highest court and is inconsistent with the principle that insurance policies must be construed as a whole. Both of these assertions are incorrect. The "seriatum" rule originated in *Zandri*, which the New York Court of Appeals affirmed in a brief, three-sentence opinion. *Zandri*, 430 N.E.2d at 922. About the only substantive comment that the Court of Appeals made in its short opinion was that "[t]he exception to the exclusion for contractual liability when read in conjunction with the other policy exclusions does not lead to a contrary result." *Id.* The Court of Appeals therefore appeared to rely on the seriatum rule in affirming the lower court. The Court of Appeals has also explicitly relied on *Zandri* and its progeny for the principle that "'if any one exclusion applies there can be no coverage.'" *Maroney*, 839 N.E.2d at 888 (quoting *Monteleone*, 673 N.Y.S.2d at 411, which in turn was quoting *Zandri*). Finally, even if the Court of Appeals had not signaled its approval of *Zandri* by affirming it in the first instance and later citing it in *Maroney*, this Court would not be free to disregard a long line of authority from New York's intermediate appellate courts. *Cf. Hope v. Klabal*, 457 F.3d 784, 790 (8th Cir. 2006) ("We are bound by decisions of the Minnesota Supreme Court, and if that court has not considered an issue, we must follow decisions of the Minnesota Court of Appeals if they are the best evidence of Minnesota law.").

*Zandri* also makes clear that the "seriatum" rule, far from being inconsistent with the rule that insurance policies must be construed as a whole, is in fact a particularized application of that rule:

> The so-called "doctrine of ambiguity" is a rule of construction and is intended as an aid in the interpretation of policy terms when the intent of the contracting parties is unclear. It is not a rule of law to be rigidly applied when there is a *de minim[i]s* conflict that readily

> gives way when a full reading of the policy makes the intent of the
> parties clearly discernible.

*Zandri*, 440 N.Y.S.2d at 355.  United's suggestion that *Zandri* conflicts with other rules of

construction is thus erroneous.

The Court notes that, although this excerpt from *Zandri* suggests that a carveback could

control over other policy exclusions if there were more than a *de minimis* conflict, there does not

appear to be any New York case that has actually so held.  Instead, subsequent cases applying

*Zandri* make clear that even directly conflicting language does not preclude the application of the

general principle that an exclusion that clearly eliminates coverage must be applied, even if it

conflicts with a carveback in another exclusion.  *See Sampson*, 708 N.Y.S.2d at 211 ("Contrary

to Johnston's contention, the fact that another exclusion may have been inconsistent with

exclusion 2(*l* ) is irrelevant."); *Hartford Accident & Indem. Co. v. A.P. Reale & Sons, Inc.*, 644

N.Y.S.2d 442, 443 (N.Y. App. Div. 1996) ("While we recognize that exclusion (a) seems to be

contradicted by exclusions (n) and (2)(d)(iii), this apparent contradiction is negated by the

application of the principle that policy exclusions are to be read seriatim and, if any one

exclusion applies, there is no coverage since no one exclusion can be regarded as inconsistent

with another").

In any event, the carveback and the two exclusions at issue in this case — the Failure to

Pay Exclusion and the Blanket Billing Endorsement — are not in direct conflict because neither

of the two exclusions wipes out all of the coverage preserved by the carveback.  The carveback

saves coverage for claims resulting from the "activity of administrating benefit claims," which

describes a broad range of activity.  By contrast, the Failure to Pay Exclusion and the Blanket

Billing Endorsement are more narrowly targeted at, respectively, certain failures to pay and certain claims alleging discounting. Thus, for example, a claim that a benefits administrator unlawfully disclosed private health information while acting within the scope of her employment with United would be a claim resulting from "the activity of administering benefit claims" and hence would be within the carveback. But such a claim would not be excluded by either the Failure to Pay Exclusion or the Blanket Billing Endorsement. The Court therefore concludes that § 9.9 does not supersede either of the two exclusions that are relied upon by the insurers in this case.

### 4. Exclusions

#### a. Failure to Pay Exclusion

Turning now to those exclusions, the insurers first argue that the Failure to Pay Exclusion bars coverage for the *Malchow* plaintiff's claim for attorney's fees. That exclusion reads as follows:

> **9.6 Failure to Pay.** We will not cover **Claims** arising out of or resulting from the commingling of or inability or failure to pay or collect premium, claim benefit or tax money; or your failure to properly send such moneys regardless of the cause.

Policy § 9.6. The insurers argue that this exclusion unambiguously precludes payment for claims "arising out of" United's "failure to pay . . . claim benefit . . . money . . . ." The *Malchow* plaintiffs' claim for attorney's fees is excluded, according to the insurers, because that claim arose out of United's failure to pay the full benefits allegedly due to the plaintiffs under their healthcare contracts with United.

The flaw in the insurers' argument is that it ignores the fact that the *Malchow* action was not made up entirely of claims about United's underpayment of benefits.  In addition to those claims, the *Malchow* plaintiffs also asserted claims for failure to provide a full and fair review, failure to provide information required under ERISA, breach of fiduciary duty, and violation of claims-procedure provisions.  Certainly, some of those claims arose out of United's failure to pay benefits.  But not all of them did.

For example, as discussed above, the *Malchow* plaintiffs brought a claim under 29 U.S.C. § 1132(c) for failure to provide information in violation of ERISA.[14]  *Malchow* Compl. ¶¶ 162-66.  This cause of action does not depend on any allegation or finding that United failed to pay "claim benefit . . . money."  *Cf. Worth Constr. Co. v. Admiral Ins. Co.*, 888 N.E.2d 1043, 1045 (N.Y. 2008) ("arising out of" requires "some causal relationship" (citations and quotations omitted)).  Similarly, the *Malchow* plaintiffs claimed that United breached its fiduciary duties by failing to disclose, and by making false representations about, various aspects of United's use of the Ingenix databases.  *Malchow* Compl. ¶ 171.  Like the claim under § 1132(c), this claim does not appear to depend on any allegation or finding that United failed to pay "claim benefit . . . money."

To be clear:  Some of the claims of the *Malchow* plaintiffs that did not arise out of United's failure to pay "claim benefit . . . money" — such as the claim under § 1132(c) — are not

---

[14]The insurers argue that the *Malchow* plaintiffs failed to plead their § 1132(c) claim adequately.  But the question in this coverage action is not whether the *Malchow* plaintiffs' § 1132(c) claim would have survived a motion to dismiss, but instead whether the *Malchow* complaint "contain[ed] any facts or allegations which [brought] the claim *even potentially* within the protection purchased . . . ."  *BP Air Cond. Corp.*, 871 N.E.2d at 1131 (emphasis added; citation and quotations omitted).  The *Malchow* plaintiffs clearly alleged that United was liable to them under § 1132(c).

covered by the Policy because, as discussed above, they did not seek "Damages."  But the Court

has held that the *Malchow* plaintiffs' claim for attorney's fees *did* seek "Damages."  Thus, to

avoid having to indemnify United for the amount (if any) that it paid to settle the *Malchow*

plaintiff's claim for attorney's fees, the insurers will have to show that all of those fees were

incurred in connection with claims that fell within an exclusion.

Take, for example, the *Malchow* plaintiffs' claim under § 1132(c).  As the Court has held,

that claim did not seek "Damages," so the insurers do not have to indemnify United for the

amount it paid to settle the claim or for the amount that United paid its attorneys to defend the

claim.  But the claim of the *Malchow* plaintiffs for the *attorney's fees* that they incurred in

pursuing their claim under § 1132(c) *did* seek "Damages."  Thus, the insurers will have to

indemnify United for the amount (if any) that it paid to settle the claim for attorney's fees

incurred in pursuing the § 1132(c) claim (as well as the portion (if any) of United's own defense

costs attributable to defending that claim for attorney's fees), unless the § 1132(c) claim is found

to be within a Policy exclusion.

At this point, the Court cannot hold that each and every claim that the *Malchow* plaintiffs

hired attorneys to pursue arose out of United's failure to pay "claim benefit . . . money" and

therefore fell within the Failure to Pay Exclusion.  And even if the Court could find that each and

every claim in the *Malchow* complaint arose out of United's failure to pay "claim benefit . . .

money," the Court would hesitate to grant the insurers' motion to dismiss for two reasons:

First, as United points out, the Failure to Pay Exclusion differs in one important respect

from other provisions in the Policy.  Many provisions apply to claims that arise out of either

wrongful conduct or *alleged* wrongful conduct; in other words, even if United did not *commit* the

conduct, the provision applies as long as United was *alleged* to have committed the conduct.  *See* Policy § 4.17 ("Wrongful Act means any actual *or alleged* negligent act"), § 9.8 ("We will not cover Claims arising out of . . . theft *or alleged* theft of your funds"), § 10.2 ("we will pay . . . for Claims that . . . result from or are related to a Wrongful Act consisting *or allegedly consisting* in whole or in part of anti-trust, restraint of trade activities") (emphases added).

By contrast, the Failure to Pay Exclusion bars coverage for claims arising out of United's "failure to pay."  It says nothing about United's *alleged* failure to pay.  United argues — not implausibly, in the Court's view — that to benefit from the Failure to Pay Exclusion, the insurers must establish not merely that the *Malchow* plaintiffs *alleged* that United failed to pay "claim benefit . . . money," but that United *in fact* failed to pay "claim benefit . . . money."  At this early stage of the proceedings, the Court cannot determine whether this is indeed what the Failure to Pay Exclusion requires — or, if it is, whether United indeed failed to pay "claim benefit . . . money."

Second, United has argued that the Failure to Pay Exclusion is intended to apply only when United is acting as a third-party administrator.  Hr'g Tr. 96-97, Nov. 4, 2009.  This appears to be a dubious argument.  If the parties intended the Failure to Pay Exclusion to apply *only* to activities undertaken by United as a third-party administrator, one would think that the phrase "third-party administrator" would appear somewhere in the exclusion.  It does not.  But given the multiple other reasons why the Court cannot hold, at this stage of the proceedings, that the Failure to Pay Exclusion bars coverage of the *Malchow* attorney's-fees claim, the Court will permit United to take discovery on, and present evidence supporting, its interpretation.

-38-

*b. Blanket Billing Endorsement*

The insurers next argue that the *Malchow* claim is excluded under the Blanket Billing

Endorsement.  In relevant part, that endorsement provides as follows:

> In consideration of the premium charged, it is hereby understood
> and agreed that this Policy shall not apply to **Claims** based upon,
> arising out of or attributable to disputes involving negotiated
> discounts, co-payment percentages paid, or any **Claims** alleging
> discounting or failure to disclose how discounts are calculated.

Policy § 10.3.  The insurers argue that the Blanket Billing Endorsement precludes coverage for

the *Malchow* claim because that claim alleged "discounting [and] failure to disclose how

discounts are calculated."  "Discount," say the insurers, means "to subtract from a cost or price."

Docket No. 111 at 13.  From that premise, the insurers reason that the *Malchow* complaint

alleged "discounting" because it alleged that United did not pay the full amount that was due to

the *Malchow* plaintiffs under their health-insurance policies.

The Court rejects the insurers's contention that *any* failure to pay the full amount owing

under a contract is "discounting."  When a homeowner fails to make a mortgage payment, or a

customer fails to pay a phone bill, or an employer fails to pay wages owed to an employee, the

debtor is not applying a 100% "discount."  Likewise, when United denied or underpaid a claim

for benefits, it was not necessarily applying a "discount."  As this Court held in the '05 case, "It

is surely true, as United argues, that the exclusion is not necessarily triggered just because United

is accused of failing to pay someone the full amount that is due under a contract."  *UnitedHealth

Group Inc. v. Columbia Cas. Co.*, No. 05-CV-1289 (PJS/SRN), 2010 WL 317521, at *8

(D. Minn. Jan. 19, 2010).

"Discounting" describes some failures to pay, but not others.  At a minimum, "[b]ecause a 'discount' presupposes an initial cost or price from which some amount is deducted, a 'claim alleging discounting' would not . . . encompass a straightforward dispute over the proper amount of the initial cost or price."  *Id.*  As the Court reads the *Malchow* complaint, the plaintiffs did not allege that United first properly calculated the initial cost or price, and then subtracted some fixed percentage from that initial cost or price.  (Such an allegation *was* made in one of the underlying actions involved in the '05 case.)  Rather, the *Malchow* plaintiffs alleged that, through its use of flawed databases, United improperly calculated the cost or price in the first place, and then fully paid that miscalculated cost or price.  Because a dispute over the proper amount of an initial cost or price does not involve "discounts" or "discounting," and because it appears that just such a dispute was at the heart of the *Malchow* complaint, the Court denies the insurers' motion to dismiss insofar as it is based on the Blanket Billing Endorsement.

### 5.  Conclusion

In sum, then, the Court finds as follows with respect to the *Malchow* claim:

(1) the only claim brought by the *Malchow* plaintiffs that sought "Damages" was their claim for attorney's fees;

(2) the *Malchow* plaintiffs' claim for attorney's fees is not covered by the Antitrust Endorsement;

(3) the second clause in § 9.9 is not an affirmative grant of coverage that trumps all exclusions in the Policy, but rather a carveback that modifies only the exclusion[15] found in the first clause of § 9.9;

(4) the Failure to Pay Exclusion may preclude coverage of the claim brought by the *Malchow* plaintiffs, but ambiguities in the exclusion and factual disputes preclude the Court from deciding the issue at this time; and

(5) the Blanket Billing Endorsement does not appear to bar coverage of the claim brought by the *Malchow* plaintiffs.

As the main insuring clause appears to provide coverage for the claim of the *Malchow* plaintiffs for attorney's fees, and as the Court cannot now find that that coverage was eliminated by a Policy exclusion, the Court denies the insurers' motions to dismiss with respect to the *Malchow* claim for attorney's fees.

## D. NYAG

In the NYAG claim, United seeks coverage for the $50 million that it agreed to pay pursuant to the AOD. The insurers argue that they are not required to indemnify United for the $50 million payment because that payment does not represent "Damages" under the Policy.[16]

---

[15]The insurers initially argued that the *Malchow* claim is barred by this exclusion. Docket No. 102 at 19 n.9. They did not renew this argument in objecting to Judge Nelson's R&R, however. In any event, the exclusion makes little difference, as it essentially mirrors the definition of "Damages" in excluding "[c]laims for any amounts or limits payable under any insurance policy, benefits contract or provider contract . . . ."

[16]United argues that coverage for the NYAG claim is available under the main insuring clause, the Antitrust Endorsement, and § 9.9 of the Policy. As discussed above, all three of these provisions require "Damages" as a prerequisite to coverage.

The Court agrees, and therefore grants the insurers' motions to dismiss United's complaint

insofar as it seeks indemnification for the $50 million payment.

Under New York law, the Attorney General is authorized to settle actions as follows:

> In any case where the attorney general has authority to institute a
> civil action or proceeding in connection with the enforcement of a
> law of this state, in lieu thereof he may accept an assurance of
> discontinuance of any act or practice in violation of such law from
> any person engaged or who has engaged in such act or practice.
> Such assurance may include a stipulation for the voluntary
> payment by the alleged violator of the reasonable costs and
> disbursements incurred by the attorney general during the course of
> his investigation.  Evidence of a violation of such assurance shall
> constitute prima facie proof of violation of the applicable law in
> any civil action or proceeding thereafter commenced by the
> attorney general.

N.Y. Exec. Law § 63(15).  The Attorney General entered into the AOD with United pursuant to

this statute.

At the core of the AOD is a commitment by United to stop using the Ingenix databases

and to start using what the AOD refers to as "the [n]ew [d]atabase."  AOD ¶¶ 20, 28.  The AOD

spells out the details of how this commitment will be fulfilled.  A university-level school of

public health or other appropriate school will be chosen to establish the new database, and the

new database will then be owned and operated by a nonprofit company.  AOD ¶¶ 20-22.  The

nonprofit company will also create a website to disclose out-of-network reimbursement rates to

the public and provide consumer-education services in the area of health care.  AOD ¶¶ 24, 32-

33.  Within sixty days after the Attorney General notifies United that the new database is

available for use, United must cease operating and using the Ingenix databases.  AOD ¶ 28.

United must then use the new database to determine reimbursement rates for a period of five

years and is prohibited from owning, operating, or funding any similar database.  AOD ¶ 28.  To

fund the establishment and operation of the new database and the nonprofit company's

consumer-education efforts (including the website), United must make a $50 million contribution

to the nonprofit company.  AOD ¶ 26.[17]  As noted, the critical question for the Court is whether

this $50 million contribution represents "Damages" under the Policy.

   The Policy defines "Damages" generally as "any monetary amount in excess of the

applicable Retention . . . ."  Policy § 4.4.  The Policy then excludes from the definition of

"Damages" any "non-monetary relief or redress in any form, including without limitation the cost

---

[17]United argues that, at this stage of the proceedings, the true nature of the $50 million
payment cannot be determined, and the insurers cannot establish that "every single penny of the
$50 million that United paid — let alone any penny of it at all — was for the purpose of obeying
an injunction to change United's databases."  Docket No. 103 at 14.  But United's claim for
coverage is based on the AOD, and the AOD is an integrated contract.  AOD ¶ 53.  The AOD is
crystal clear on the matter:  "The Company shall contribute the sum of $50 million (the "Sum")
for the benefit of the Not-for-Profit Company or other entities as determined by the OAG *to fund
the establishment and operation of the New Database and the website described in this
Assurance, related services, and consumer education efforts*."  AOD ¶ 26.  If, for example,
United sent a check for $3 million to the nonprofit company and instructed the nonprofit
company to use the $3 million to produce brochures for United, then United would still owe the
nonprofit company $50 million under the AOD.  Without doubt, then, under the AOD, "every
single penny of the $50 million that United paid" was indeed for "the purpose of . . . chang[ing]
United's databases," as well as funding consumer-education efforts.

   United cannot rely on the plain meaning of the AOD when it benefits United (such as in
claiming that it has incurred a covered loss under the Policy), and then turn around and disclaim
the plain meaning of the AOD when it harms United (such as in claiming that a payment made
"to fund the establishment and operation of the New Database" was not made to fund the
establishment and operation of the New Database).  *Cf. Millennium Partners, L.P. v. Select Ins.
Co.,* 889 N.Y.S.2d 575, 576 (N.Y. App. Div. 2009) (rejecting insured's argument that there was
an issue of fact concerning the nature of the payment under an AOD because the AOD
conclusively linked the disgorgement to improperly acquired funds).  A court may, in ruling on a
Rule 12(b)(6) motion, interpret a contract that is necessarily embraced by a complaint.  *Mattes*,
323 F.3d at 697 n.4.  That is exactly what the Court has done in this case — interpreted the terms
of the AOD, which is a contract, and which was necessarily embraced by United's complaint.

of complying with any injunctive, declaratory, or administrative relief . . . ."  Policy § 4.4.  Thus, the Policy establishes that "any monetary amount" (with certain exceptions) is "Damages," while any "non-monetary relief or redress in any form" is not "Damages."  The question, then, is whether the $50 million contribution is "monetary" or "non-monetary."

Obviously, it is not enough to say that, because the $50 million contribution involves the payment of money, it must be "monetary."  As noted, the Policy explicitly defines "*non*-monetary relief" to include "the cost of complying with any injunctive, declaratory, or administrative relief."  Therefore, under the Policy, some payments of money are "monetary," and some payments of money are "non-monetary."

It is also not enough to say that, because no injunction or other court order was entered against United, the $50 million contribution cannot represent "the cost of complying with any injunctive, declaratory, or administrative relief."  To begin with, the cost of complying with an AOD may indeed represent "the cost of complying with any . . . administrative relief."  More importantly, though, the Policy defines "non-monetary relief" to "includ[e] *without limitation* the cost of complying with any injunctive, declaratory, or administrative relief."  When a contract provides that *x* includes *y*, that means that *x* is not *limited* to *y* — particularly when, as here, the contract explicitly says that *x* includes *without limitation y*.  In short, "the cost of complying with any injunctive, declaratory, or administrative relief" is one thing that is defined as "non-monetary relief" under the Policy, but it is not the only thing.  The question before the Court is whether the $50 million contribution that United must make pursuant to the AOD is *also* a form of "non-monetary relief" and therefore outside of the definition of "Damages."

The Court believes that it is.  There can be no doubt that, if a court had simply ordered United to stop using the Ingenix databases, and United then had to pay money to establish a new database, United's payments would be defined as "non-monetary relief" under the Policy. Likewise, if a court had ordered United not only to stop using the Ingenix databases, but also to establish a new database, the money that United paid to establish the new database would unquestionably be defined as "non-monetary relief" under the Policy.

Suppose that the court, in addition to ordering United to establish a new database, went further and told United *how* to establish a new database.  Suppose, for example, that the court ordered United to establish a new database by hiring an independent third party.  Without question, the money that United paid to that independent third party would be defined as "non-monetary relief" under the Policy.  And that would remain true even if the court ordered United not just to *pay* an independent third party to establish a new database, but *how much* to pay the independent third party, so as to ensure that United could not defeat the order to establish a new database by under-funding the work of the third party.

In sum, for purposes of determining whether amounts paid by United to comply with a court order were "Damages" under the Policy, it would not matter whether the court said:

United is hereby ORDERED to stop using the Ingenix databases;

United is hereby ORDERED to stop using the Ingenix databases and to establish a new database;

United is hereby ORDERED to stop using the Ingenix databases and to pay an independent third party to establish a new database; or

> United is hereby ORDERED to stop using the Ingenix databases
> and to pay an independent third party no less than $50 million to
> establish a new database.

In the fourth order, just as in the first, second, and third orders, the money that United paid to the

independent third party to establish a new database would represent "the cost of complying

with . . . injunctive . . . relief," which is expressly defined as "non-monetary" and thus expressly

excluded from the definition of "Damages."

The only difference between the fourth order described above and the situation now

before this Court is that, instead of being ordered by a court to pay $50 million to an independent

third party to establish a new database, United has agreed to make such a payment as part of a

settlement of threatened litigation.  It would make no sense to hold that when United is obligated

by *a court order* to pay $50 million to an independent third party to establish a new database, the

payment *is* "non-monetary relief," but when United is obligated by *a settlement agreement* to pay

$50 million to an independent third party to establish a new database, that payment is *not* "non-

monetary relief."  Nothing in the definition of "Damages" even hints that whether a payment is

"monetary" or "non-monetary" turns on the source of the legal obligation to make the payment.

To the contrary, the Policy broadly excludes from the definition of "Damages" "non-monetary

relief or redress *in any form*" and makes clear that, while "non-monetary relief" "includ[es]" the

cost of complying with court orders, it is not "limit[ed]" to such costs.

Given this broad language, United cannot, through a settlement, create insurance

coverage that would not exist if the same relief were ordered by a court.  *Cf. Servidone Constr.*

*Corp. v. Security Ins. Co.*, 477 N.E.2d 441, 444 (N.Y. 1985) ("We agree . . . that an insurer's

breach of duty to defend does not create coverage and that, even in cases of negotiated

-46-

settlements, there can be no duty to indemnify unless there is first a covered loss."). Not only does nothing in the Policy suggest such a result, but such a result would readily lend itself to manipulation. Suppose, for example, that the New York Attorney General's Office had filed suit, the case had been vigorously litigated, and United had lost. Suppose further that the court, in addition to ordering United to pay compensation to the victims of its illegal actions, had also ordered United to cease using the Ingenix databases, to use a new database, and to pay $50 million to an independent third party to create the new database. Suppose further that United appealed the judgment and lost. Under United's theory, the New York Attorney General's Office and United could then "settle" the litigation (before United filed a petition for a writ of certiorari in the United States Supreme Court), United could agree in that settlement to do everything that the trial court had ordered it to do, the parties could agree to ask the trial court to vacate its order, and the $50 million contribution would transform from a "non-monetary" payment for which United was responsible into a "monetary" payment for which the insurers were responsible. Such an outcome would be absurd — and, as noted, completely without support in the text of the Policy.

In sum, the Court concludes that, had a court ordered United to do what it agreed to do in the AOD[18] — stop using the Ingenix databases and fund the establishment and operation of the new database (as well as consumer-education efforts) through a $50 million contribution to an independent third party[19] — the $50 million contribution would represent "the cost of complying

---

[18]This may very well happen. The insurers point out that, if the *Malchow/AMA* settlement is approved, the terms of the AOD will become a part of a court judgment. *See* Settlement § 4.

[19]United cites several cases for the proposition that insurance policies can cover payments
(continued...)

with . . . injunctive . . . relief" and therefore be defined as "non-monetary" under the Policy.  The

Court further concludes that such a $50 million contribution remains "non-monetary relief" when

United's obligation to make the contribution arises from an AOD rather than a court order.  The

Court therefore holds that the insurers have no obligation to indemnify United for the $50 million

contribution that it must make pursuant to the AOD.[20]

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, the Court

ADOPTS IN PART the Recommendation of the Magistrate Judge [Docket No. 117].  IT IS

HEREBY ORDERED THAT:

1.      Defendants' objection [Docket No. 124] is SUSTAINED IN PART AND

        OVERRULED IN PART.

---

[19](...continued)
to third-party nonprofits.  But in none of those cases was the court asked to apply policy language
similar to the language that is at issue here.  *See PMI Mortgage Ins. Co. v. Am. Int'l Specialty
Lines Ins. Co.*, No. 02-1774, 2006 WL 3290428, at *5 (N.D. Cal. Nov. 13, 2006) (although the
policy had a similar exclusion, the insurer did not rely on it); *Vigilant Ins. Co. v. Bear Stearns
Cos.*, 824 N.Y.S.2d 91, 94 (N.Y. App. Div. 2006) (discussing payment to nonprofit without
mentioning any applicable exclusions), *rev'd on other grounds*, 884 N.E.2d 1044 (N.Y. 2008).
Those cases are therefore of little relevance.

[20]United is also seeking indemnification for the attorney's fees and costs that it incurred in
connection with the New York Attorney General's investigation.  It is possible that these
amounts are recoverable under the Policy as "Claim Expenses . . . incurred in the investigation
and defense of [a] Claim covered hereunder . . . ."  Policy § 4.3.  As United points out, the
NYAG Notice was a "Claim" in that it expressly sought damages, see NYAG Notice at 1, and
thus United may be entitled to recover its "Claim Expenses" even if it did not ultimately pay any
"Damages."  The insurers contend, though, that the NYAG Notice was not a "Claim *covered
[]under*" the Policy because it was excluded by the Failure to Pay Exclusion and the Blanket
Billing Endorsement.  United counters that these exclusions are irrelevant because the NYAG
claim is covered by the Antitrust Endorsement.  Having reviewed the parties' briefing, the Court
concludes that it is not possible to determine, at this stage of the proceedings, whether any of
these provisions are applicable.

2.     The motion of defendant Ace American Insurance Company to dismiss [Docket No. 69] is GRANTED IN PART AND DENIED IN PART.

3.     The motion of defendants Hiscox Dedicated Corporate Member Ltd. and Lexington Insurance Company to dismiss [Docket No. 72] is GRANTED IN PART AND DENIED IN PART.

4.     The motion of defendant Homeland Insurance Company of New York to dismiss [Docket No. 75] is GRANTED IN PART AND DENIED IN PART.

5.     The motion of defendant National Union Fire Insurance Company of Pittsburgh, PA to dismiss [Docket No. 78] is GRANTED IN PART AND DENIED IN PART.

6.     The motion of defendant Darwin National Assurance Company to dismiss [Docket No. 81] is GRANTED IN PART AND DENIED IN PART.

7.     Defendants' motions are GRANTED:

   a.     with respect to plaintiff's claim for coverage of the amounts that it spent to defend and settle the *Malchow* action, except insofar as plaintiff is seeking indemnification for the amount (if any) that it paid to settle the claim made against it by the *Malchow* plaintiffs for their attorney's fees, as well as the amount (if any) that it incurred in defending against that claim for attorney's fees; and

   b.     with respect to plaintiff's claim for coverage of the amounts that it spent to defend and settle the NYAG action, except insofar as plaintiff is seeking

-49-

indemnification for the amount that it incurred in defending against that

threatened action.

8.      Defendants' motions are DENIED in all other respects.


Dated: February _9_, 2010                    <u>s/Patrick J. Schiltz          </u>
                                                  Patrick J. Schiltz
                                                  United States District Judge